**Exhibit**
2

# DEPARTMENT OF THE TREASURY

## Internal Revenue Service

### 26 CFR Part 1

[REG–104390–18]

RIN 1545–BO54

**Guidance Related to Section 951A (Global Intangible Low-Taxed Income)**

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** This document contains proposed regulations implementing section 951A of the Internal Revenue Code. Section 951A was added to the Internal Revenue Code by the Tax Cuts and Jobs Act, which was enacted on December 22, 2017. This document also contains proposed regulations under sections 951, 1502, and 6038. These proposed regulations would affect United States shareholders of controlled foreign corporations.

**DATES:** Written or electronic comments and requests for a public hearing must be received by November 26, 2018.

**ADDRESSES:** Send submissions to: Internal Revenue Service, CC:PA:LPD:PR (REG–104390–18), Room 5203, Post Office Box 7604, Ben Franklin Station, Washington, DC 20044. Submissions may be hand-delivered Monday through Friday between the hours of 8 a.m. and 4 p.m. to CC:PA:LPD:PR (indicate REG–104390–18), Courier's Desk, Internal Revenue Service, 1111 Constitution Avenue NW, Washington, DC 20224, or sent electronically, via the Federal eRulemaking Portal at *www.regulations.gov* (IRS REG–104390–18).

**FOR FURTHER INFORMATION CONTACT:** Concerning proposed regulations §§ 1.951–1, 1.951A–0 through 1.951A–7, 1.6038–2, and 1.6038–5, Melinda E. Harvey or Michael Kaercher at (202) 317–6934; concerning proposed regulations §§ 1.1502–12, 1.1502–13, 1.1502–32, and 1.1502–51, Austin Diamond-Jones at (202) 317–6847 or Kevin M. Jacobs at (202) 317–5332; concerning submissions of comments or requests for a public hearing, Regina L. Johnson at (202) 317–6901 (not toll free numbers).

**SUPPLEMENTARY INFORMATION:**

## Background

This document contains proposed amendments to 26 CFR part 1 under sections 951, 951A, 1502, and 6038 (the "proposed regulations"). Added to the Internal Revenue Code ("Code") by section 14201(a) of the Tax Cuts and Jobs Act, Public Law 115–97 (2017) ("the Act"), section 951A requires a United States shareholder ("U.S. shareholder") of any controlled foreign corporation ("CFC") for any taxable year to include in gross income the shareholder's global intangible low-taxed income ("GILTI") for such taxable year. Section 14201(d) of the Act provides that section 951A applies to taxable years of foreign corporations beginning after December 31, 2017, and to taxable years of U.S. shareholders in which or with which such taxable years of foreign corporations end. The proposed regulations under section 951A provide guidance for U.S. shareholders to determine the amount of GILTI to include in gross income ("GILTI inclusion amount").

Section 14201(b) of the Act added two new foreign tax credit provisions relating to GILTI—section 960(d) provides a foreign tax credit for taxes properly attributable to tested income taken into account by a domestic corporation under section 951A, and section 904(d)(1)(A) provides that any amount included in gross income under section 951A (other than passive category income) is treated as a separate category of income for purposes of section 904. In addition, section 14202(a) of the Act added section 250 to the Code providing domestic corporations a deduction equal to a percentage of their GILTI inclusion amount and foreign-derived intangible income, subject to a taxable income limitation. The proposed regulations do not include any rules relating to foreign tax credits or the deduction under section 250. Rules relating to foreign tax credits and the deduction under section 250 will be included in separate notices of proposed rulemaking. It is anticipated that the proposed regulations relating to foreign tax credits will provide rules for assigning the section 78 gross-up attributable to foreign taxes deemed paid under section 960(d) to the separate category described in section 904(d)(1)(A).

Before the Act, section 951(b) defined a U.S. shareholder of a foreign corporation as a United States person ("U.S. person") that holds at least 10 percent of the total combined voting power of all classes of stock entitled to vote in a foreign corporation. Section 14214(a) of the Act amended this definition to include a U.S. person that holds at least 10 percent of the total value of shares of all classes of stock of the foreign corporation. Section 14215(a) of the Act amended section 951(a)(1) to eliminate the requirement that a foreign corporation must be a CFC for an uninterrupted period of 30 days or more in order to require an inclusion under section 951(a)(1) (the "30-day requirement"). These amendments apply to taxable years of foreign corporations beginning after December 31, 2017, and to taxable years of U.S. shareholders with or within which such taxable years of foreign corporations end. See sections 14214(b) and 14215(b) of the Act. The proposed regulations under section 951 incorporate these amendments into the regulations and provide other guidance necessary for U.S. shareholders to coordinate subpart F and GILTI.

## Explanation of Provisions

### I. Section 951A

#### A. Overview

The Act established a participation exemption system under which certain earnings of a foreign corporation can be repatriated to a corporate U.S. shareholder without U.S. tax. See section 14101(a) of the Act and section 245A. However, Congress recognized that, without any base protection measures, the participation exemption system could incentivize taxpayers to allocate income—in particular, mobile income from intangible property—that would otherwise be subject to the full U.S. corporate tax rate to CFCs operating in low- or zero-tax jurisdictions. See Senate Committee on the Budget, 115th Cong., Reconciliation Recommendations Pursuant to H. Con. Res. 71, at 365 (Comm. Print 2017) ("Senate Explanation"). Therefore, Congress enacted section 951A in order to subject intangible income earned by a CFC to U.S. tax on a current basis, similar to the treatment of a CFC's subpart F income under section 951(a)(1)(A). However, in order to not harm the competitive position of U.S. corporations relative to their foreign peers, GILTI of a corporate U.S. shareholder is taxed at a reduced rate by reason of the deduction under section 250 (with the resulting U.S. tax further reduced by a portion of foreign tax credits under section 960(d)). Id. Also, due to the administrative difficulty in identifying income attributable to intangible assets, in contrast to income from tangible assets, intangible income (and thus GILTI) is determined for purposes of section 951A based on a formulaic approach, under which a 10-percent return is attributed to certain tangible assets ("qualified business asset investment" or "QBAI") and then each dollar of certain income above such "normal return" is effectively treated as intangible income. Id. at 366.

Section 951A(a) provides that a U.S. shareholder of any CFC for a taxable year must include in gross income its GILTI for that year. A GILTI inclusion is treated in a manner similar to a section 951(a)(1)(A) inclusion of a CFC's subpart F income for many purposes of the Code. See section 951A(f)(1). However, a GILTI inclusion is determined in a manner that is fundamentally different from that of an inclusion under section 951(a)(1)(A). Subpart F income is determined at the level of a CFC, and then a U.S. shareholder that owns stock directly or indirectly in the CFC generally includes in gross income its pro rata share of the CFC's subpart F income. The amount of the shareholder's section 951(a)(1)(A) inclusion with respect to one CFC is not taken into account in determining the shareholder's section 951(a)(1)(A) inclusion with respect to another CFC. A U.S. shareholder's pro rata share of a CFC's subpart F income is generally the final step in determining its section 951(a)(1)(A) inclusion.

Similar to an inclusion under section 951(a)(1)(A), the determination of a U.S. shareholder's GILTI inclusion amount begins with the calculation of certain items of each CFC owned by the shareholder, such as tested income, tested loss, or QBAI. A U.S. shareholder then determines its pro rata share of each of these CFC-level items in a manner similar to a shareholder's pro rata share of subpart F income under section 951(a)(2). See section 951A(e)(1). However, in contrast to an inclusion under section 951(a)(1)(A), the U.S. shareholder's pro rata shares of these items are not amounts included in gross income, but rather amounts taken into account by the shareholder in determining the GILTI included in the shareholder's gross income. The U.S. shareholder aggregates (and then nets or multiplies) its pro rata share of each of these items into a single shareholder-level amount—for example, aggregate tested income reduced by aggregate tested loss becomes net CFC tested income and aggregate QBAI multiplied by 10 percent becomes deemed tangible income return. A shareholder's GILTI inclusion amount for a taxable year is then calculated by subtracting one aggregate shareholder-level amount from another—the shareholder's net deemed tangible income return ("net DTIR") is the excess of deemed tangible income return over certain interest expense, and, finally, its GILTI inclusion amount is the excess of its net CFC tested income over its net DTIR.

As explained above, a U.S. shareholder does not compute a separate GILTI inclusion amount with respect to each CFC for a taxable year, but rather computes a single GILTI inclusion amount by reference to all its CFCs. Cf. section 951A(f)(2) (allocating the U.S. shareholder's GILTI inclusion amount to each tested income CFC for purposes of various sections of the Code). Because a U.S. shareholder's GILTI inclusion amount is determined based on the relevant items of all the CFCs of which it is a U.S. shareholder, the effect of the provision is generally to ensure that a U.S. shareholder is taxed on its GILTI wherever (and through whichever CFC) derived. See, for example, Senate Explanation at 366 ("The Committee believes that calculating GILTI on an aggregate basis, instead of on a CFC-by-CFC basis, reflects the interconnected nature of a U.S. corporation's global operations and is a more accurate way of determining a U.S. corporation's global intangible income.").

The proposed regulations under section 951A follow an outline similar to the description in this overview. Proposed §§ 1.951A–2 through 1.951A–4 provide detailed guidance on items determined at the CFC level—that is, tested income and tested loss, QBAI, and the items necessary to determine the amount of certain interest expense that reduces net DTIR. Proposed § 1.951A–1(d) provides rules for determining the U.S. shareholder's pro rata share of these CFC-level items. Finally, proposed § 1.951A–1(c) provides rules describing the aggregation of the U.S. shareholder's pro rata share amounts to determine the shareholder's GILTI inclusion amount.

*B. General Rules and Definitions*

1. Inclusion of GILTI in Gross Income

Proposed § 1.951A–1 provides general rules to determine a U.S. shareholder's GILTI inclusion amount and associated definitions. Some of the definitions distinguish between a CFC's taxable year and a U.S. shareholder's taxable year. For example, a "U.S. shareholder inclusion year" refers to the relevant taxable year of the U.S. shareholder and is defined as a taxable year of the U.S. shareholder that includes a CFC inclusion date (as that term is defined in the proposed regulations) of the CFC. See proposed § 1.951A–1(e)(4). A "CFC inclusion year" refers to the relevant taxable year of the CFC beginning after December 31, 2017 (the effective date of section 951A for a foreign corporation that is a CFC). See proposed § 1.951A–1(e)(2).

2. Determination of Net DTIR

Proposed § 1.951A–1(c)(3) defines net DTIR, which is computed at the U.S. shareholder level based on QBAI (as defined in proposed § 1.951A–3(b)) held by the shareholder's CFCs and offsets the shareholder's net CFC tested income for purposes of determining the shareholder's GILTI inclusion amount. A CFC's QBAI is equal to its aggregate average adjusted bases in specified tangible property, which is defined as tangible property used in the production of tested income. See section 951A(d)(2)(A) and proposed § 1.951A–3(c)(1). Consistent with the statute and the conference report accompanying the Act ("Conference Report"), the proposed regulations clarify that a tested loss CFC does not have specified tangible property. See H.R. Rep. No. 115–466, at 642, fn. 1536 (2017) (Conf. Rep.) and proposed § 1.951A–3(b), (c)(1), and (g)(1). Accordingly, for purposes of calculating a GILTI inclusion amount, a U.S. shareholder does not take into account the tangible property of a tested loss CFC in calculating its aggregate pro rata share of QBAI, its deemed tangible income return, or its net DTIR.

3. Determination of Pro Rata Share

Section 951A(e)(1) provides that, for purposes of determining a U.S. shareholder's GILTI inclusion amount, the shareholder's pro rata share of a CFC's tested income, tested loss, and QBAI "shall be determined under the rules of section 951(a)(2) in the same manner as such section applies to subpart F income." Accordingly, the proposed regulations incorporate the pro rata share rules of section 951(a)(2) and § 1.951–1(b) and (e), with appropriate modifications to account for the differences between subpart F income, on the one hand, and tested income, tested loss, and QBAI, on the other. Similar to the determination of a U.S. shareholder's pro rata share of subpart F income, proposed § 1.951A–1(d)(1) provides that a U.S. shareholder's pro rata share of any CFC item necessary for calculating its GILTI inclusion amount is determined by reference to the stock such shareholder owns (within the meaning of section 958(a)) in the CFC ("section 958(a) stock") as of the close of the CFC's taxable year, including section 958(a) stock treated as owned by the U.S. shareholder through a domestic partnership under proposed § 1.951A–5(c). See section I.F of this Explanation of Provisions for an explanation of proposed rules for domestic partnerships and their partners.

In several places, the provisions of proposed § 1.951A–1(d) reference section 951(a)(2) and proposed § 1.951–1(e), which amends existing § 1.951–1(e). See section II.A of this Explanation of Provisions for an explanation of the proposed modifications to § 1.951–1(e). Comments requested guidance on how to determine a preferred shareholder's pro rata share of CFC items for purposes of GILTI. Rules relating to the allocation of tested income to preferred stock are included in proposed § 1.951A–1(d)(2) by cross-reference to proposed § 1.951–1(e). In addition, the proposed regulations provide rules relating to a preferred shareholder's pro rata share of tested loss and QBAI.

A U.S. shareholder's pro rata share of tested income generally is determined in the same manner as its pro rata share of subpart F income under section 951(a)(2) and § 1.951–1(b) and (e) (that is, based on the relative amount that would be received by the shareholder in a year-end hypothetical distribution of all the CFC's current year earnings). See proposed § 1.951A–1(d)(2)(i). For purposes of determining a U.S. shareholder's pro rata share of a CFC's QBAI, the amount of QBAI distributed in the hypothetical distribution of section 951(a)(2)(A) and § 1.951–1(e) is generally proportionate to the amount of the CFC's tested income distributed in the hypothetical distribution. See proposed § 1.951A–1(d)(3)(i). However, a special rule in the proposed regulations provides that if a CFC's QBAI exceeds 10 times its tested income, so that the amount of QBAI allocated to preferred stock would exceed 10 times the tested income allocated to the preferred stock under the general proportionate allocation rule, the excess amount of QBAI is allocated solely to the CFC's common stock. See proposed § 1.951A–1(d)(3)(ii). The proposed cap on QBAI allocated to a preferred shareholder (10 times tested income) is derived from the statutory cap on the amount of QBAI that may be used to compute GILTI (10 percent of aggregate QBAI). These rules in the proposed regulations ensure that the notional "normal return" associated with the CFC's QBAI generally flows to the shareholders in a manner consistent with their economic rights in the earnings of the CFC. For illustration, see proposed § 1.951A–1(d)(3)(iii), *Examples 1* and *2*.

For purposes of determining a U.S. shareholder's pro rata share of a CFC's tested loss, the amount distributed in the hypothetical distribution is the amount of the tested loss, rather than the CFC's current earnings and profits, and the tested loss is distributed solely with respect to the CFC's common stock, except in certain cases involving dividend arrearages with respect to preferred stock and common stock with no liquidation value. See proposed § 1.951A–1(d)(4)(i) through (iii). In the latter case, the proposed regulations provide that any amount of tested loss that would otherwise be distributed in the hypothetical distribution to a class of common stock that has no liquidation value is instead distributed to the most junior class of equity with a positive liquidation value to the extent of the liquidation value. See proposed § 1.951A–1(d)(4)(iii). In subsequent years, tested income is allocated to any class of stock to the extent that tested loss was allocated to such class in prior years under this special rule. See proposed § 1.951A–1(d)(2)(ii). In addition, the proposed regulations provide that section 951(a)(2)(B) is applied to reduce tested losses, but modified to treat the amount of a dividend received by another person as equal to the amount of the tested loss, without regard to whether an actual dividend is made by the tested loss CFC. See proposed § 1.951A–1(d)(4)(i)(D). The effect of this rule is to reduce a shareholder's pro rata share of tested loss in proportion to the number of days the shareholder did not own the stock of the tested loss CFC within the meaning of section 958(a). Each of these modifications is intended to ensure that the tested loss of a CFC is allocated to each U.S. shareholder in an amount commensurate with the economic loss borne by the shareholder by reason of the tested loss.

Proposed § 1.951A–1(d)(5) and (6) provide rules for determining a shareholder's pro rata share of "tested interest expense" and "tested interest income." Tested interest expense and tested interest income are defined in proposed § 1.951A–4, which is discussed in section I.E of this Explanation of Provisions. A U.S. shareholder's pro rata share of a CFC's tested interest expense for a taxable year equals the amount by which the CFC's tested interest expense reduces the shareholder's pro rata share of tested income, increases the shareholder's pro rata share of tested loss, or both. Conversely, a U.S. shareholder's pro rata share of tested interest income for a taxable year equals the amount by which the CFC's tested interest income increases the shareholder's pro rata share of tested income, reduces the shareholder's pro rata share of tested loss, or both. For example, tested interest income could both increase a U.S. shareholder's pro rata share of tested income and decrease its pro rata share of tested loss if a CFC with tested income for a taxable year would have, without regard to the tested interest income, a tested loss for the taxable year.

The Department of the Treasury ("Treasury Department") and the IRS request comments on the proposed approaches for determining a U.S. shareholder's pro rata share of a CFC's QBAI and tested loss, including how (or whether) to allocate tested loss of a CFC when no class of CFC stock has positive liquidation value.

### 4. Foreign Currency Translation

Because GILTI is computed at the U.S. shareholder level, the tested income, tested loss, tested interest expense, tested interest income, and QBAI of a CFC that uses a functional currency other than the U.S. dollar must be translated into U.S. dollars. The appropriate exchange rate under section 989(b)(3) for income inclusions under section 951(a)(1)(A) is the average exchange rate for the taxable year of the foreign corporation. GILTI inclusion amounts are similar to section 951(a)(1)(A) inclusions in that both inclusions are determined based on certain income (and, in the case of GILTI, certain losses) of the CFC for the taxable year of the CFC that ends with or within the taxable year of the U.S. shareholder. Therefore, the proposed regulations prescribe the same translation rule that is used for subpart F income for translating a pro rata share of tested income, tested loss, tested interest expense, tested interest income, and QBAI. See proposed § 1.951A–1(d)(1). Similarly, a U.S. shareholder's GILTI inclusion amount that is allocated to a tested income CFC under section 951A(f)(2) is translated from U.S. dollars into the CFC's functional currency using the average exchange rate for the taxable year of the tested income CFC. See proposed § 1.951A–6(b)(2)(iii).

### C. Tested Income and Tested Loss

### 1. Determination of Gross Income and Allowable Deductions

Under section 951A(c)(2), tested income and tested loss are determined by beginning with a CFC's gross income, excluding certain items (gross income after exclusions, "gross tested income"), and then subtracting properly allocable deductions determined using rules similar to the rules of section 954(b)(5). While section 951A does not specifically address which expenses of a CFC are allowable as a deduction, existing rules under § 1.952–2 apply to determine the gross income and

deductions of a CFC taken into account in determining its subpart F income. The Treasury Department and the IRS have determined that due to the similarities between gross tested income and subpart F income (for example, gross tested income and subpart F income are both determined at the CFC level and taxed to a U.S. shareholder on a current basis), and the overlap between CFCs impacted by GILTI and subpart F (since a CFC can have both tested income and subpart F income), the determinations of gross income and allowable deductions for GILTI should be made in a manner similar to the determination of subpart F income. Accordingly, the proposed regulations require that the gross income and allowable deduction determinations are made under the rules of § 1.952–2. See proposed § 1.951A–2(c)(2). Under § 1.952–2(a)(1) and proposed § 1.951A–2(c)(2), subject to the special rules in § 1.952–2(c), tested income or tested loss of a CFC is determined by treating the CFC as a domestic corporation taxable under section 11 and by applying the principles of section 61 and the regulations thereunder. Therefore, only items of deduction that would be allowable in determining the taxable income of a domestic corporation may be taken into account for purposes of determining a CFC's tested income or tested loss. If an item of a CFC would be disallowed as a deduction in determining the CFC's taxable income if the CFC were a domestic corporation, the item cannot be taken into account for purposes of determining the tested income or tested loss of the CFC even if the item reduces the CFC's earnings and profits.

The Treasury Department and the IRS request comments on the application of the rules under § 1.952–2 for purposes of determining subpart F income, tested income, and tested loss. In particular, comments are requested as to whether these rules should allow a CFC a deduction, or require a CFC to take into account income, that is expressly limited to domestic corporations under the Code. For example, questions have arisen as to whether a CFC could be entitled to a dividends received deduction under section 245A, even though section 245A by its terms applies only to dividends received by a domestic corporation. See Conf. Rep. at 599, fn. 1486. The Treasury Department and the IRS also welcome comments on other approaches to determining tested income or tested loss, including whether additional modifications should be made to § 1.952–2 for purposes of calculating GILTI.

Comments have also requested guidance on the interactions of section 163(j) and section 267A with section 951A. Issues related to sections 163(j), 245A, and 267A will be addressed in future guidance.

2. Income Excluded From Foreign Base Company Income and Insurance Income by Reason of Section 954(b)(4)

As noted in section I.C.1 of this Explanation of Provisions, section 951A(c)(2) requires that the gross income of the CFC for the taxable year be determined without regard to certain items. One of these items is gross income excluded from foreign base company income (as defined in section 954) or insurance income (as defined in section 953) of the CFC by reason of electing the exception under section 954(b)(4) ("high-tax exception"). In response to comments, the proposed regulations clarify that this exclusion applies only to income that is excluded from foreign base company income and insurance income *solely* by reason of an election made to exclude the income under the high-tax exception of section 954(b)(4). Accordingly, the exclusion does not apply to income that would not otherwise be subpart F income or to categories of income that do not constitute subpart F income due to exceptions other than the high-tax exception (for example, as a result of an exception to foreign personal holding company income under section 954(c)(6) or section 954(h)).

3. Gross Income Taken Into Account in Determining Subpart F Income

Another item excluded from gross tested income is gross income taken into account in determining a corporation's subpart F income. Comments have requested guidance on the interaction between the earnings and profits limitation to subpart F income under section 952(c), including the recapture rule in section 952(c)(2), and the determination of gross income for purposes of section 951A. The Treasury Department and the IRS have determined that any income described in section 952(a) is "taken into account in determining subpart F income" regardless of whether the section 952(c) limitation applies, and therefore should not be included in gross tested income. Conversely, the recapture of subpart F income under section 952(c)(2), even if by reason of earnings and profits attributable to gross tested income, does not result in excluding any amount from gross tested income. Therefore, the proposed regulations provide that tested income and tested loss are determined without regard to the application of

section 952(c). See proposed § 1.951A–2(c)(4).

4. Determination of Allowable Deductions Properly Allocable to Gross Tested Income

Section 951A(c)(2)(A)(ii) provides that tested income and tested loss are determined by subtracting from a CFC's gross tested income "the deductions (including taxes) properly allocable to such gross income under rules similar to the rules of section 954(b)(5) (or to which such deductions would be allocable if there were such gross income)." Regulations under section 954(b)(5) require taxpayers to determine net subpart F income by properly allocating and apportioning deductions to the various categories of subpart F income. For this purpose, § 1.954–1(c) provides that taxpayers must first determine the gross amount of each item of income in a category of income (as described in § 1.954–1(c)(1)(iii)) and then allocate and apportion expenses to these categories under the principles of sections 861, 864, and 904(d). Accordingly, in order to apply the principles of section 954(b)(5) to section 951A (as required under section 951A(c)(2)(A)(ii)), the proposed regulations provide that allowable deductions determined under the principles of § 1.952–2 are allocated and apportioned to gross tested income under the principles of section 954(b)(5) and § 1.954–1(c), treating gross tested income that falls within a single separate category (as defined in § 1.904–5(a)(1)) as an additional category of income for this purpose. See proposed § 1.951A–2(c)(3).

Section I.D.5 of this Explanation of Provisions describes a rule that disregards basis in specified tangible property created in certain taxable transfers occurring before the effective date of section 951A for purposes of calculating QBAI. See § 1.951A–3(h)(2). These rules are cross-referenced in proposed § 1.951A–2(c)(5) to disallow any loss or deduction related to such stepped up-basis in any depreciable or amortizable property (including, for example, intangible property) for purposes of calculating tested income or tested loss.

D. QBAI

1. QBAI and Specified Tangible Property

Proposed § 1.951A–3(b) provides that a tested income CFC's QBAI for any taxable year is the average of the CFC's aggregate adjusted bases as of the close of each quarter in specified tangible property that is used in a trade or

business of the corporation and of a type with respect to which a deduction is allowable under section 167. In general, specified tangible property is tangible property used in the production of tested income. See proposed § 1.951A–3(c)(1). Tangible property is defined as property for which the depreciation deduction provided by section 167(a) is eligible to be determined under section 168 (even if the CFC has elected not to apply section 168). See proposed § 1.951A–3(c)(2). The proposed regulations define tangible property by reference to whether the property can be depreciated under section 168 because, unlike section 167, section 168 applies only to tangible property, and there is a substantial amount of guidance delineating property subject to section 168.

Property that is used in the production of both gross tested income and gross income that is not gross tested income ("dual use property") is proportionately treated as specified tangible property. See proposed § 1.951A–3(d)(1). Generally, the proportion is determined based on the relative amount of gross tested income to income other than gross tested income that the property generates for the taxable year. See proposed § 1.951A–3(d)(2)(i). A special rule is provided for determining the proportion of the property treated as specified tangible property if the property generates no directly identifiable income (for example, because the property is used in general and administrative functions that contribute to the generation of all the income of the CFC). See proposed § 1.951A–3(d)(2)(ii).

Under § 1.167(a)–2, the depreciation allowance for tangible property applies only to that part of the property which is subject to wear and tear, to decay or decline from natural causes, to exhaustion, and to obsolescence. Accordingly, for purposes of section 951A, property that may be in part depreciable qualifies as specified tangible property to the extent it is depreciable. For example, precious metal used in a manufacturing process may be considered specified tangible property in part because it is depreciable in part. See Rev. Rul. 2015–11, 2015–21 I.R.B. 975.

### 2. Determination of Adjusted Basis of Specified Tangible Property

Proposed § 1.951A–3(e) provides rules to determine the adjusted basis of specified tangible property for purposes of determining QBAI. The general rule in proposed § 1.951A–3(e)(1), like section 951A(d)(3), provides that the adjusted basis in any property is determined by using the alternative depreciation system under section 168(g) ("ADS") and allocating the depreciation deduction with respect to the property ratably to each day during the period in the taxable year to which the depreciation relates. ADS applies for purposes of determining QBAI irrespective of whether the basis of the property is determined using another depreciation method for other purposes of the Code.

The Treasury Department and the IRS recognize that taxpayers may hold specified tangible property that was acquired before December 22, 2017, that was not depreciated using ADS. Section 951A(d) does not distinguish between property acquired before December 22, 2017, and property acquired on or after December 22, 2017. The Treasury Department and the IRS have concluded that, regardless of the date acquired, the adjusted basis in specified tangible property should be determined under ADS in order for the U.S. shareholder's pro rata share of QBAI to be properly determined and not distorted. Therefore, the proposed regulations provide that when determining QBAI, the adjusted basis in property placed in service before December 22, 2017, is determined using ADS as if this system had applied from the date that the property was placed in service. See proposed § 1.951A–3(e)(3).

### 3. Short Taxable Year

Net DTIR is intended to reduce a U.S. shareholder's GILTI inclusion amount by an annual return on specified tangible property. To ensure that the net DTIR of a CFC with a taxable year of less than 12 months (a "short taxable year") reflects an annual return, the proposed regulations provide a methodology to reduce the QBAI of a CFC with a short taxable year to an amount that, if annualized, would produce an amount equal to the QBAI for a 12-month taxable year. See proposed § 1.951A–3(f).

### 4. Specified Tangible Property Held Through a Partnership

Section 951A(d)(3)[1] (the "partnership QBAI paragraph") states that if a CFC holds an interest in a partnership at the close of the CFC's taxable year, the CFC takes into account under section 951A(d)(1) its "distributive share of the aggregate of the partnership's adjusted bases (determined as of such date in the hands of the partnership)" in specified tangible property in computing its QBAI. The partnership QBAI paragraph

---

[1] As enacted, section 951A(d) contains two paragraphs designated as paragraph (3).

---

further provides that a CFC's "distributive share of the adjusted basis of any property shall be the controlled foreign corporation's distributive share of income with respect to such property."

The statutory language "distributive share of the aggregate of the partnership's adjusted basis" is ambiguous because the term "distributive share" is used in subchapter K of the Code with respect to income, gain, loss, and credits of a partnership, but not the bases of assets. A partner of a partnership has a basis in its partnership interest ("outside basis"), while the partnership has a separate basis in the assets of the partnership ("inside basis"). The proposed regulations therefore use the term "share" (rather than "distributive share") when referring to the amount of the inside basis of a partnership asset that a partner that is a CFC may include in its QBAI.

The partnership QBAI paragraph provides that a CFC "shall take into account" under section 951A(d)(1) the CFC's distributive share of the basis in partnership specified tangible property. Because section 951A(d)(1) requires an averaging of basis over the close of each quarter of the taxable year of the CFC, and the term "distributive share" as it pertains to basis is ambiguous, it is unclear based on the statute how a CFC determines its distributive share of the basis of partnership specified tangible property for purposes of determining its QBAI. One interpretation of the partnership QBAI paragraph is that a CFC partner's QBAI is increased by an amount equal to the CFC partner's share of the basis that the partnership has in its specified tangible property as of the close of the CFC partner's taxable year. However, that interpretation would be contrary to the requirement in section 951A(d)(1) that the CFC's bases in specified tangible property be averaged over four quarters. Furthermore, giving the term "distributive share" effect, the amount determined at the end of the CFC partner's taxable year should be reduced for any period during the taxable year when the partnership did not own the property, whereas a CFC partner of a partnership that disposed of property before the close of the CFC's taxable year would receive no QBAI benefit if there were a single measurement date. In addition, a requirement that a partnership's basis in specified tangible property be measured on the last day of a CFC partner's taxable year could be burdensome for partnerships that have one or more CFC partners with taxable years that do not coincide with the partnership's taxable

year and, in those cases, would have the effect of decoupling the CFC partner's share of the basis of partnership property used to compute the CFC partner's QBAI from the CFC partner's distributive share of the partnership's income from the property that is taken into account in computing the CFC partner's tested income. Moreover, because depreciation is treated as reducing the adjusted basis of property on each day during the taxable year, calculating a partnership's basis on the final day of the CFC partner's taxable year will generally result in an artificially low basis relative to calculating average adjusted basis over the course of the partnership's taxable year. For the foregoing reasons, the proposed regulations determine a CFC partner's share of the partnership's adjusted basis in specified tangible property by reference to the partnership's average adjusted basis in the property as of the close of each quarter of the partnership's taxable year that ends with or within the CFC's taxable year. See proposed § 1.951A–3(g)(3).

A partner that is a CFC takes into account its share of the adjusted basis of specified tangible property held by a partnership in computing QBAI if, among other things, the property "is used in the production of tested income (determined with respect to such controlled foreign corporation's distributive share of income with respect to such property)." Section 951A(d)(3)(C). Consistent with the general rule for QBAI, only a tested income CFC can increase its QBAI by reason of specified tangible property owned by a partnership. See proposed § 1.951A–3(g)(1). Further, consistent with the parenthetical in the partnership QBAI paragraph, the proposed regulations provide that a CFC partner determines its share of the partnership's average adjusted basis in specified tangible property based on the amount of its distributive share of the gross income produced by the property that is included in the CFC partner's gross tested income relative to the total amount of gross income produced by the property. See proposed § 1.951A–3(g)(2). The proposed regulations incorporate the dual use property rule of section 951A(d)(2)(B) in the context of specified tangible property owned indirectly through a partnership and include similar rules for addressing specified tangible property that does not produce any directly identifiable income. The calculation is performed separately for each item of specified tangible property held by the partnership, taking into account the CFC partner's distributive share of income with respect to such property.

The Treasury Department and the IRS request comments on the proposed approach to specified tangible property held through a partnership, including the rules addressing specified tangible property that does not produce directly identifiable income.

### 5. Anti-Abuse Provisions

Section 951A(d)(4) provides that "[t]he Secretary shall issue such regulations or other guidance as the Secretary determines appropriate to prevent the avoidance of the purposes of this subsection, including regulations or other guidance which provide for the treatment of property if—(A) such property is transferred, or held, temporarily, or (B) the avoidance of the purposes of this paragraph is a factor in the transfer or holding of such property." The Conference Report describes the scope of section 951A(d)(4), stating that "[t]he conferees intend that non-economic transactions intended to affect tax attributes of CFCs and their U.S. shareholders (including amounts of tested income and tested loss, tested foreign income taxes, net deemed tangible income return, and QBAI) to minimize tax under this provision be disregarded." Conf. Rep. at 645. One specific example illustrated in the Conference Report is a transaction that occurs after the measurement date of post-1986 earnings and profits under section 965 but before the first taxable year for which section 951A is effective in order to increase a CFC's QBAI. Id.

Consistent with section 951A(d)(4) and the Conference Report, as well as the Secretary's broad authority under section 7805(a) to "prescribe all needful rules and regulations for the enforcement of" the Code, the proposed regulations provide that specified tangible property of a tested income CFC is disregarded for purposes of determining the tested income CFC's average aggregate basis in specified tangible property if the tested income CFC acquires the property with a principal purpose of reducing the GILTI inclusion amount of a U.S. shareholder and holds the property temporarily but over at least one quarter end. See proposed § 1.951A–3(h)(1). For this purpose, property held for less than a twelve month period that includes at least one quarter end during the taxable year of a tested income CFC is treated as temporarily held and acquired with a principal purpose of reducing the GILTI inclusion amount of a U.S. shareholder. Id.

The Treasury Department and the IRS are aware that taxpayers are engaging in transactions like the ones described in the Conference Report involving taxable transfers of property from one CFC to another CFC before the first taxable year of the transferor CFC to which section 951A applies in order to provide the transferee CFC with a stepped-up basis in the transferred property that, for example, may increase a U.S. shareholder's amount of QBAI with respect to the CFC for periods when it is subject to section 951A. See Conf. Rep. at 645. The stepped-up basis may also reduce the transferee CFC's tested income or increase its tested loss (for example, due to increased depreciation or amortization deductions) during periods when it is subject to section 951A. The Treasury Department and the IRS have determined that it would be inappropriate for a taxpayer to reduce its GILTI inclusion amount for any taxable year by reason of a stepped-up basis in CFC assets attributable to transactions between related CFCs during the period after December 31, 2017, but before the effective date of section 951A. Accordingly, the proposed regulations disallow the benefit of a stepped-up basis in specified tangible property transferred between related CFCs during the period before the transferor CFC's first inclusion year for purposes of calculating the transferee CFC's QBAI. See proposed § 1.951A–3(h)(2). As discussed in section I.C.4 of this Explanation of Provisions, these rules are also cross-referenced in proposed § 1.951A–2(c)(5) to disregard a stepped-up basis in any property that is depreciable or amortizable for purposes of calculating tested income and tested loss.

The U.S. tax results claimed with respect to transactions that fall outside the scope of the anti-abuse rules in the proposed regulations may, nonetheless, be challenged under other statutory provisions or judicial doctrines.

### E. Specified Interest Expense

To calculate a U.S. shareholder's net DTIR, section 951A(b)(2)(B) provides that 10 percent of the aggregate of the shareholder's pro rata share of the QBAI of each CFC (defined as "deemed tangible income return" in proposed § 1.951A–1(c)(3)(ii)) is reduced by "the amount of interest expense taken into account under subsection (c)(2)(A)(ii) in determining such shareholder's net CFC tested income for the taxable year to the extent the interest income attributable to such expense is not taken into account in determining such shareholder's net CFC tested income." Deductions taken

into account under section 951A(c)(2)(A)(ii) are deductions (including taxes) that are properly allocable to gross tested income for purposes of calculating tested income and tested loss. Thus, only a U.S. shareholder's pro rata share of interest expense that is currently deductible and properly allocable to gross tested income is taken into account for purposes of determining the interest expense described in section 951A(b)(2)(B). For purposes of the proposed regulations, interest expense described in section 951A(b)(2)(B) is referred to as "specified interest expense." See proposed § 1.951A–1(c)(3)(iii).

Specified interest expense is a U.S. shareholder-level determination which is net of "attributable" interest income taken into account by the U.S. shareholder. Specifically, specified interest expense of a U.S. shareholder is its pro rata share of interest expense properly allocable to gross tested income reduced by its pro rata share of interest income included in gross tested income to the extent attributable to such interest expense. The effect of this formulation is to count against net DTIR only a U.S. shareholder's pro rata share of interest expense allocable to gross tested income to the extent that the related interest income is not also reflected in the U.S. shareholder's pro rata share of the tested income of another CFC, such as in the case of third-party interest expense or interest expense paid to related U.S. persons.

The amount of interest income "attributable" to interest expense is not defined in section 951A(b)(2)(B). Accordingly, it is necessary to define this concept in the proposed regulations. A definition that incorporates a strict tracing approach would require a U.S. shareholder to determine each item of interest expense with respect to each debt instrument of each of its CFCs to determine whether, and to what extent, the interest income with respect to that debt instrument is taken into account by the U.S. shareholder in determining the shareholder's net CFC tested income. However, the Treasury Department and the IRS have determined that a tracing approach for specified interest expense would be administratively burdensome and difficult to reconcile with the framework of section 951A, which generally requires a determination of CFC-level items followed by a second determination of U.S. shareholder-level aggregate pro rata shares of such items. A tracing approach for specified interest expense would necessitate a hybrid determination, in which the relevant

item—"attributable" interest income—could not be determined at the level of the CFC, but rather would require a matching at the U.S. shareholder level of the shareholder's pro rata share of each item of interest expense with its pro rata share of each item of interest income attributable to such interest expense. A tracing approach would create particular complexity with respect to interest paid between CFCs that are owned by different U.S. shareholders in different proportions or with respect to interest for which the accrual of the expense and inclusion of the income occur in separate taxable years.

The Treasury Department and the IRS have instead determined that a netting approach to specified interest expense accomplishes the purpose of the specified interest expense rule in a more administrable manner and is consistent with the requirement that "attributable" interest income be netted against interest expense. Therefore, the proposed regulations provide that a U.S. shareholder's specified interest expense is the excess of its aggregate pro rata share of the tested interest expense of each CFC over its aggregate pro rata share of the tested interest income of each CFC. See proposed § 1.951A–1(c)(3)(iii). Tested interest expense and tested interest income are generally defined by reference to all interest expense and interest income that is taken into account in determining a CFC's tested income or tested loss. See proposed § 1.951A–4(b)(1) and (2).

Comments have questioned whether interest expense of a captive finance CFC must be taken into account for purposes of determining a U.S. shareholder's specified interest expense, or whether the related interest income from unrelated customers may be available to offset such interest expense. Under a netting approach to the computation of specified interest expense, without modifications, whether a CFC's active banking business increases or reduces the specified interest expense of a U.S. shareholder relative to other taxpayers depends on whether the third-party expense related to such business is greater than or less than interest income related to such business. The Treasury Department and the IRS have determined that a U.S. shareholder's specified interest expense, and therefore its net DTIR and its GILTI inclusion amount, should not depend on whether the U.S. shareholder has one or more CFCs engaged in the active conduct of a financing or insurance business, as long as the interest expense of the CFC is incurred exclusively to fund such business with unrelated

persons and thus not incurred, for instance, to fund the acquisition of specified tangible property. Therefore, the proposed regulations exclude from the definition of tested interest expense any interest expense of a CFC that is an eligible controlled foreign corporation (within the meaning of section 954(h)(2)) or a qualifying insurance company (within the meaning of section 953(e)(3)) ("qualified CFC"), except to the extent of the qualified CFC's assets unrelated to its financing or insurance business and any interest income received by the qualified CFC from loans to certain related persons (interest expense described in this sentence, "qualified interest expense"). See proposed § 1.951A–4(b)(1)(iii). Further, the proposed regulations exclude from the definition of tested interest income any interest income of a qualified CFC included in the gross tested income of the qualified CFC for the CFC inclusion year that is excluded from subpart F income due to the active financing exception of section 954(h) or the active insurance exception of section 954(i) ("qualified interest income"). See proposed § 1.951A–4(b)(2)(iii).

For purposes of determining specified interest expense, interest income and interest expense are defined broadly to encompass any amount treated as interest under the Code or regulations, and any other amount incurred or recognized in a transaction or series of integrated or related transactions in which the use or forbearance of funds is secured for a period of time if the expense or loss is predominately incurred in consideration of the time value of money. See proposed § 1.951A–4(b)(1)(ii) and (2)(ii).

Comments requested clarification of whether the interest expense of a tested loss CFC is used in the determination of specified interest expense. Regardless of whether interest expense increases tested loss or reduces tested income, the expense is "taken into account. . .in determining the shareholder's net CFC tested income" within the meaning of section 951A(b)(2)(B). In addition, if a tested loss CFC's interest expense were not taken into account for purposes of determining specified interest expense, a taxpayer could easily avoid specified interest expense by incurring offshore debt through a tested loss CFC. Therefore, the proposed regulations confirm that any interest expense taken into account for purposes of determining the tested income or tested loss of a CFC is also taken into account in determining a U.S. shareholder's specified interest expense.

*F. Domestic Partnerships and Their Partners*

Comments requested guidance on the treatment of domestic partnerships that own stock of CFCs. Section 951A itself does not contain any specific rules on domestic partnerships and their partners that directly or indirectly own stock of CFCs. Accordingly, proposed § 1.951A–5 provides this guidance to domestic partnerships and their partners on how to compute their GILTI inclusion amounts. This guidance also applies to S corporations and their shareholders, which are treated as partnerships and partners for purposes of sections 951 through 965. See section 1373.

A domestic partnership is a U.S. person by definition under section 7701(a)(4) and (30) and can therefore be a U.S. shareholder of a CFC under section 951(b). Under current law, a domestic partnership that is a U.S. shareholder includes in gross income its section 951(a)(1)(A) inclusion with respect to a CFC, and its partners include in gross income their distributive share of such inclusion. However, as noted in section I.A of this Explanation of Provisions, there is no analog in section 951(a)(1)(A) to the U.S. shareholder-level determinations required by section 951A, and thus the level at which the section 951(a)(1)(A) determination is made—whether at the level of the partnership or its partners—does not generally affect the amount of the inclusion, if the partnership and its partners are all U.S. shareholders. On the other hand, the GILTI inclusion amount is an aggregation of the U.S. shareholder's pro rata shares of tested income, tested loss, QBAI, tested interest expense, and tested interest income of each of its CFCs. Thus, the level at which the GILTI calculation is made dictates the CFC items to be taken into account by the shareholder, and each of these items can impact the shareholder's GILTI inclusion amount.

The Treasury Department and the IRS considered a number of approaches to applying section 951A with respect to domestic partnerships and their partners. A pure aggregate approach to the treatment of domestic partnerships and their partners would treat the partnership as an aggregate of its partners, so that each partner would calculate its own GILTI inclusion amount taking into account its pro rata share of CFC items through the partnership. However, a pure aggregate approach might also be interpreted by taxpayers to exempt small partners of a domestic partnership from the GILTI regime entirely, a result that is not

clearly contemplated in section 951A or its legislative history and is inconsistent with section 951.

The Treasury Department and the IRS also considered a pure entity approach. Under a pure entity approach, the domestic partnership would determine its own GILTI inclusion amount, and each partner would take into gross income its distributive share of such amount. In the case of a partner that is a U.S. shareholder of CFCs owned by the partnership and other CFCs outside the partnership, a pure entity approach would effectively fragment the shareholder's GILTI inclusion amount into multiple GILTI inclusion amounts by separating the items of the CFCs owned by the shareholder through the partnership from the items of the CFCs owned by the shareholder outside the partnership, including through other domestic partnerships. An approach that dramatically alters a U.S. shareholder's inclusion under section 951A for a taxable year depending on the legal structure by which the shareholder owns each CFC presents both an inappropriate planning opportunity as well as a trap for the unwary. Such an approach is also inconsistent with the structure of section 951A, which requires an aggregation of all relevant items of a shareholder's CFCs in order to compute a single GILTI inclusion amount for a U.S. shareholder. As discussed in section III.A of this Explanation of Provisions, the Treasury Department and the IRS relied on similar considerations in concluding that the relevant items of each CFC owned directly or indirectly by members of a consolidated group should be taken into account in determining the GILTI inclusion amount of each member of that group.

In addition, the Treasury Department and the IRS have concluded that other provisions that are related to, and interdependent with, section 951A should apply at the level of a domestic corporate partner. Section 960(d) provides a domestic corporation that is a U.S. shareholder a credit for foreign taxes paid by a CFC that are properly attributable to tested income "taken into account" by the domestic corporation, and determines the amount of that credit by reference to the corporation's aggregate pro rata share of tested income. See section 960(d)(2)(B) and (3). A domestic partnership is not eligible to claim deemed paid credits under section 960(d). Furthermore, under a pure entity approach, a domestic corporate partner of a domestic partnership may not be eligible for a deemed paid credit by reason of its

distributive share of the partnership's GILTI inclusion because a partner would not have a pro rata share of the tested income of any CFC owned by the partnership, and thus it would not take into account the tested income of any such CFC. Similarly, only a domestic corporation is eligible for a section 250 deduction. Nonetheless, the Conference Report indicates that the domestic corporate partners of a domestic partnership should get the benefit of a section 250 deduction, which is consistent with an aggregate approach. See Conf. Rep. at 623, fn. 1517.

Based on the foregoing, the Treasury Department and the IRS have determined that the approach that best harmonizes the treatment of domestic partnerships and their partners across all provisions of the GILTI regime (sections 250, 951A, and 960(d)) is neither a pure aggregate nor a pure entity approach. Rather, the most harmonious approach treats a domestic partnership as an entity with respect to partners that are not U.S. shareholders of any CFC owned by the partnership, but treats the partnership as an aggregate for purposes of partners that are themselves U.S. shareholders with respect to one or more CFCs owned by the partnership. This approach ensures that each non-U.S. shareholder partner takes into income its distributive share of the domestic partnership's GILTI inclusion amount (similar to subpart F), while permitting a partner that is itself a U.S. shareholder to determine a single GILTI inclusion amount by reference to all its CFCs, whether owned directly or through a partnership, as well as allowing a corporate U.S. shareholder to calculate a foreign tax credit under section 960(d) with respect to each such CFC and to compute a section 250 deduction with respect to its GILTI inclusion amount determined by reference to each such CFC.

Therefore, the proposed regulations provide that, in general, a domestic partnership that is a U.S. shareholder of one or more CFCs ("U.S. shareholder partnership") computes its own GILTI inclusion amount in the same manner as any other U.S. shareholder, and each partner takes into account its distributive share of the domestic partnership's GILTI inclusion amount under section 702 and § 1.702–1(a)(8)(ii). See proposed § 1.951A–5(b). However, for purposes of section 951A and the proposed regulations, a partner that is itself a U.S. shareholder (within the meaning of section 951(b)) ("U.S. shareholder partner") of one or more CFCs owned directly or indirectly by a domestic partnership ("partnership CFC") is treated as owning

proportionately section 958(a) stock in each such partnership CFC as if the partnership were a foreign partnership. See proposed § 1.951A–5(c). As a result, a partner that is itself a U.S. shareholder of a CFC owned by a domestic partnership computes its GILTI inclusion amount for a taxable year by taking into account its proportionate share of each of the relevant items—tested income, tested loss, QBAI, tested interest income, and tested interest expense—of such CFC. This rule applies regardless of whether the domestic partnership itself has a GILTI inclusion amount for the taxable year. See proposed § 1.951A–5(g), *Example 6*. In the case that a partner is treated as owning the section 958(a) stock of one or more partnership CFCs, the partner's distributive share of the partnership's GILTI inclusion amount is determined solely by reference to partnership CFCs in which the partner is not a U.S. shareholder. See proposed § 1.951A–5(c) and (g), *Example 3*. A U.S. shareholder partnership is therefore required to provide to its partners their distributive share of the partnership's GILTI inclusion amount, as well as provide to each U.S. shareholder partner the partner's proportionate share of the partnership's pro rata share (if any) of each CFC tested item of each partnership CFC of the partnership, and forms and instructions will be updated accordingly. See proposed § 1.951A–5(f).

To illustrate the differences between the approach taken in the proposed regulations and the pure entity approach, consider a domestic partnership (PRS) with two domestic corporate partners, US1 and US2, owning 5 percent and 95 percent of PRS, respectively. PRS owns 100 percent of the single class of stock of FS1, a CFC with tested income of $100x, and 100 percent of the single class of stock of FS2, a CFC with tested loss of $50x. US2 also owns 100 percent of the single class of stock of FS3, a CFC with tested loss of $20x. Under a pure entity approach, US2's distributive share of PRS's GILTI inclusion amount would be $47.50x (95% × ($100x − $50x)), and US2's pro rata share of FS3's tested loss of $20x would be unused. Under the proposed regulations, US2, because it is a U.S. shareholder partner with respect to FS1 and FS2, aggregates its proportionate share of the tested income and tested loss of FS1 and FS2 with its pro rata share of the tested loss of FS3 in determining its GILTI inclusion amount of $27.50x ((95% × ($100x − $50x)) − $20x). Accordingly,

under a pure entity approach, US2 would be incentivized to reorganize its ownership structure (for example, by liquidating PRS or contributing the stock of FS3 to PRS) in order to obtain the full benefit of the tested loss of FS3. Under the proposed regulations, however, US2 has the same GILTI inclusion amount whether it owns its CFCs directly or through one or more partnerships.

The Treasury Department and the IRS request comments as to whether any other approach to the treatment of domestic partnerships and their partners for purposes of section 951A, including a pure entity approach or a pure aggregate approach, would more appropriately harmonize the provisions of the GILTI regime than the approach of the proposed regulations, particularly in light of the administrative and compliance burdens associated with any other approach and the approach of the proposed regulations. In addition, the Treasury Department and the IRS request comments on adjustments required by reason of computing a GILTI inclusion amount, in whole or in part, at the level of the partner of a domestic partnership, including adjustments to the partner's basis in its partnership interest, the partner's section 704(b) capital account, the partnership's basis in CFC stock under section 961, and a CFC's previously taxed earnings and profits with respect to the partner or partnership under section 959.

## G. Treatment of GILTI Inclusion Amount and Adjustments to Earnings and Profits and Basis

### 1. Treatment of GILTI as Subpart F Income for Certain Purposes

A U.S. shareholder's GILTI inclusion amount is not an inclusion under section 951(a)(1)(A). Nevertheless, for purposes of some provisions, GILTI inclusion amounts are treated similarly to section 951(a)(1)(A) inclusions. Section 951A(f)(1)(A) provides that any GILTI included in gross income is treated in the same manner as an amount included under section 951(a)(1)(A) for purposes of applying sections 168(h)(2)(B), 535(b)(10), 851(b), 904(h)(1), 959, 961, 962, 993(a)(1)(E), 996(f)(1), 1248(b)(1), 1248(d)(1), 6501(e)(1)(C), 6654(d)(2)(D), and 6655(e)(4).

Section 951A(f)(1)(B) grants the Secretary authority to provide rules applying section 951A(f)(1)(A) to other provisions of the Code. A comment requested clarification as to whether GILTI inclusion amounts are net investment income under section 1411. Pursuant to the authority in section

951A(f)(1)(B), the proposed regulations provide that a GILTI inclusion amount is treated in the same manner as an amount included under section 951(a)(1)(A) for purposes of applying section 1411. See proposed § 1.951A–6(b)(1). Thus, for example, a U.S. shareholder that has made an election pursuant to § 1.1411–10(g) with respect to a CFC to treat amounts included in gross income under section 951(a)(1)(A) as net investment income and to apply the basis adjustment rules of sections 961(a) and (b) with respect to such amounts for section 1411 purposes should also treat the portion of the U.S. shareholder's GILTI inclusion amount treated as being with respect to the CFC under section 951A(f)(2) and proposed § 1.951A–6(b)(2) as net investment income.

Comments have requested that regulations clarify that an inclusion under section 951A is determined before an inclusion under section 951(a)(1)(B). The Treasury Department and the IRS have determined that clarification is unnecessary. Because a GILTI inclusion amount is treated as a section 951(a)(1)(A) inclusion for purposes of section 959, the determination of the amount included under section 951(a)(1)(B) is made after the determination of the amount of a section 951(a)(1)(A) inclusion and the GILTI inclusion amount. See section 959(a)(2) and (f)(1). The Treasury Department and the IRS intend to issue a separate notice of proposed rulemaking to update the regulations under sections 959 and 961 to account for the Act's modifications to the U.S. international tax system, including the enactment of section 245A.

The characterization of GILTI inclusions for purposes of determining the unrelated business taxable income of tax-exempt entities will be addressed in separate guidance. The Treasury Department and the IRS request comments on other areas in which the characterization of a GILTI inclusion amount is relevant, and whether it is appropriate in those areas to treat a GILTI inclusion amount in the same manner as a section 951(a)(1)(A) inclusion or in some other manner (for example, as a dividend).

### 2. Interaction With Sections 163(e)(3)(B)(i) and 267(a)(3)(B)

Section 267(a)(3)(B) generally provides that a deduction for an item payable to a related CFC is not allowed until paid, except to the extent that an amount attributable to that item is includible (determined without regard to properly allocable deductions and qualified deficits) in the gross income of

a U.S. shareholder. Section 163(e)(3)(B)(i) provides a similar rule for original issue discount on a debt instrument held by a related CFC.

The Treasury Department and the IRS have determined that deductions should not be deferred under sections 163(e)(3)(B)(i) and 267(a)(3)(B) to the extent an item is taken into account in determining a U.S. shareholder's GILTI inclusion amount. Accordingly, the proposed regulations provide that a deduction is allowed under sections 163(e)(3)(B)(i) and 267(a)(3)(B) for an item taken into account in determining the net CFC tested income of a U.S. shareholder, including a U.S. shareholder treated under the proposed regulations as owning section 958(a) stock of a CFC owned by a domestic partnership. See proposed § 1.951A–6(c)(1). In the case of a U.S. shareholder that is a domestic partnership, this rule applies only to the extent that one or more U.S. persons (other than domestic partnerships) that are direct or indirect partners of the domestic partnership include in gross income their distributive share of the partnership's GILTI inclusion amount or the item is taken into account by a U.S. shareholder partner of the domestic partnership by reason of § 1.951A–5(c). See proposed § 1.951A–6(c)(2).

3. Basis Adjustments for the Use of Tested Losses

In determining a U.S. shareholder's net CFC tested income, the U.S. shareholder's pro rata share of a tested loss of one CFC may offset the shareholder's pro rata share of tested income of another CFC. Under the statute, such a use of a tested loss does not reduce the U.S. shareholder's basis in the stock of the tested loss CFC, increase the stock basis of the tested income CFC, or affect the earnings and profits of either the tested loss CFC or the tested income CFC.

The Treasury Department and the IRS have determined that in certain cases the lack of adjustments to stock basis of a tested loss CFC can lead to inappropriate results. For example, if the U.S. shareholder's basis in the stock of the tested loss CFC is not reduced to reflect the use of the tested loss to offset tested income taken into account by the U.S. shareholder, the U.S. shareholder would recognize a second and duplicative benefit of the loss—either through the recognition of a loss or the reduction of gain—if the stock of the tested loss CFC is disposed of. See *Charles Ilfeld Co.* v. *Hernandez*, 292 U.S. 62 (1934) (denying the loss on stock of subsidiaries upon liquidation when operating losses were previously

claimed from the subsidiaries' operations because "[i]f allowed, this would be the practical equivalent of double deduction"); *U.S.* v. *Skelly Oil. Co.*, 394 U.S. 678 (1969) ("the Code should not be interpreted to allow respondent 'the practical equivalent of a double deduction'" (citing *Charles Ilfeld Co.*)); § 1.161–1. On the other hand, in the case of a corporate U.S. shareholder, but not in the case of an individual, gain recognized on the disposition of a CFC attributable to offset tested income would, in most cases, be eliminated as a result of the application of section 964(e) or section 1248(a) and (j), to the extent the gain is recharacterized as a dividend that is eligible for the dividends received deduction under section 245A. Accordingly, proposed § 1.951A–6(e) generally provides that in the case of a corporate U.S. shareholder (excluding regulated investment companies and real estate investment trusts), for purposes of determining the gain, loss, or income on the direct or indirect disposition of stock of a CFC, the basis of the stock is reduced by the amount of tested loss that has been used to offset tested income in calculating net CFC tested income of the U.S. shareholder. The basis reduction is only made at the time of the disposition and therefore does not affect the stock basis prior to a disposition. Requiring the basis reduction only at the time of the disposition prevents the use of tested losses alone from causing the recognition of gain if the reduction exceeds the amount of stock basis.

The basis adjustments apply only to the extent a "net" tested loss of the controlled foreign corporation has been used. This limitation is intended to ensure that the reduction applies only to the extent necessary to eliminate the duplicative loss in the stock. For example, if a $100x tested loss of a CFC (CFC1) offsets $100x of tested income of another CFC (CFC2) in one year in determining a U.S. shareholder's net CFC tested income, and in the next year CFC1 has $20x of tested income that is offset by a $20x tested loss of CFC2, then the $100x used tested loss attributable to the CFC1 stock from the first year is reduced by the $20x of its tested income from the second year that was offset by the tested loss of CFC2, resulting in a "net" used tested loss of $80x. See proposed § 1.951A–6(e)(2).

Similar adjustments apply when the tested loss CFC is treated as owned by the U.S. shareholder through certain intervening foreign entities by reason of section 958(a)(2) to prevent the indirect use of the duplicative loss through the disposition of interests in those intervening entities. The regulations

provide an exception to those rules in certain cases when the tested loss CFC and the CFC that generated the tested income that is offset by the tested loss are in the same section 958(a)(2) ownership chain; adjustments are not appropriate in these cases because there is no duplicative loss to the extent the shares of both CFCs are directly or indirectly disposed of. See proposed § 1.951A–6(e)(1)(ii).

A direct disposition of the stock of a CFC can result in the indirect disposition of the stock of one or more lower-tier CFCs. See proposed § 1.951A–6(e)(6)(ii)(B). In such a case, basis adjustments may be made to both the stock of the upper-tier CFC and the stock of the lower-tier CFCs. Accordingly, the proposed regulations provide ordering rules for making these adjustments that, in general, are intended to prevent gain resulting from a basis adjustment attributable to the use of a single tested loss from being taken into account more than once. See proposed § 1.951A–6(e)(1)(iv).

The proposed regulations also include rules that take into account certain nonrecognition transactions involving CFCs, such as the acquisition of CFC stock by a domestic corporation and transactions described in section 381. See proposed § 1.951A–6(e)(4)(ii) and (e)(5). These rules are intended to prevent the elimination or avoidance of the basis adjustments through these types of transactions.

Finally, the proposed regulations provide a special rule to address dispositions of CFC stock by another CFC that is not wholly owned by a single domestic corporation. See proposed § 1.951A–6(e)(7). This rule, which is consistent with proposed § 1.961–3(b) and Revenue Ruling 82–16, 1982–1 C.B. 106, is intended to ensure that the appropriate amount of subpart F income is taken into account by U.S. shareholders of the CFC as a result of the disposition.

The Treasury Department and the IRS request comments on these rules, including whether additional adjustments to stock basis or earnings and profits should be made to account for a used tested loss or offset tested income (for example, whether adjustments should be provided that are consistent with those set forth in proposed § 1.965–2(d) and (f) (REG–104226–18, 83 FR 39514, August 9, 2018)). Comments are also requested on whether similar rules should apply to non-corporate U.S. shareholders, taking into account the fact that non-corporate U.S. shareholders are not entitled to a dividends received deduction under section 245A. Additionally, comments

are requested as to whether the definition of "disposition" should be modified. For example, the Treasury Department and the IRS are considering broadening the term to include transactions that do not involve an actual transfer of stock but might result in taxable gain but for the presence of tax basis in CFC stock. Examples of such transactions include distributions subject to section 301(c)(2) or 1059.

## II. Section 951

### A. Pro Rata Share Rules

Section 1.951–1(e) was revised in 2005 and 2006 to address certain avoidance structures, such as structures that resulted in non-economic allocations of subpart F income to shareholders of CFCs that are not U.S. shareholders. The Treasury Department and the IRS have become aware of additional avoidance structures. For example, the existing regulations require an allocation of earnings and profits between classes of stock with discretionary distribution rights based on the fair market value of the stock. While this rule appropriately allocates subpart F income in some cases (for example, involving multiple classes of common stock), some taxpayers have attempted to improperly allocate subpart F income by applying these rules to certain structures involving shares with preferred liquidation and distribution rights. Similar avoidance structures involve cumulative preferred stock with dividends that compound less frequently than annually.

This notice of proposed rulemaking proposes to amend § 1.951–1(e) to address these avoidance structures, which implicate section 951A as well as section 951. The proposed regulations clarify that, for purposes of determining a U.S. shareholder's pro rata share of subpart F income, earnings and profits for the taxable year are first hypothetically distributed among the classes of stock and then hypothetically distributed to each share in the class on the hypothetical distribution date, which is the last day of the CFC's taxable year on which it is a CFC. In lieu of prescribing a determination based on fair market value, the proposed regulations provide that the amount of earnings and profits that would be distributed with respect to classes of stock is based on all relevant facts and circumstances. See proposed § 1.951–1(e)(3). In addition, the proposed regulations disregard any transaction or arrangement that is part of a plan a principal purpose of which is to reduce a U.S. shareholder's pro rata share of the subpart F income of a CFC. See

proposed § 1.951–1(e)(6). This rule also applies for purposes of determining a U.S. shareholder's pro rata share of amounts for purposes of calculating the shareholder's GILTI inclusion amount. Id. As a result of adding this broader rule, the proposed regulations do not include the specific anti-avoidance rule involving section 304 transactions in existing § 1.951–1(e)(3)(v).

The proposed regulations also modify § 1.951–1(e) in specific ways to take into account section 951A. For example, the proposed regulations provide that a U.S. shareholder's pro rata share of a CFC's subpart F income is determined by reference to the shareholder's proportionate share of the total current earnings and profits that would be distributed in the hypothetical distribution. In addition to determining a U.S. shareholder's pro rata share of a CFC's subpart F income, § 1.951–1(e) also applies for purposes of determining the shareholder's pro rata share of the CFC's tested income. See also proposed § 1.951A–1(d)(2). However, because tested income is not limited to the earnings and profits of a CFC, and because a CFC's tested loss increases its earnings and profits for purposes of determining the subpart F income limitation in section 952(c)(1), the earnings and profits allocated in the hypothetical distribution may exceed the earnings and profits of the CFC computed under section 964. Accordingly, the hypothetical distribution in the proposed regulations is based on the greater of the section 964 earnings and profits or the sum of the subpart F income (increased by reason of any tested loss add-back under section 951A(c)(2)(B)(ii) and proposed § 1.951A–6(d)) and tested income of the CFC.

### B. Partnership Blocker Structures

Notice 2010–41, 2010–22 I.R.B. 715, stated that forthcoming regulations would treat a domestic partnership as a foreign partnership for purposes of identifying the U.S. shareholder of a CFC required to include in gross income its pro rata share of the CFC's subpart F income in the circumstances described in the notice. The Treasury Department and the IRS have determined that the same rules should also apply to identify the U.S. shareholder of a CFC for purposes of section 951A. Accordingly, the proposed regulations treat certain controlled domestic partnerships as foreign partnerships for purposes of identifying a U.S. shareholder for purposes of sections 951 through 964. See also proposed § 1.965–1(e) (REG–104226–18, 83 FR 39514, August 9,

2018) (adopting a similar partnership blocker rule for purposes of the section 965 regulations).

### C. Other Modifications

The proposed regulations also update § 1.951–1 consistent with the modification in the Act of the definition of a U.S. shareholder and the elimination in the Act of the 30-day requirement. See proposed § 1.951–1(a) and (g)(1).

## III. Section 1502

### A. In General

Section 1502 provides the Secretary authority to

prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income-tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

A consolidated group member's inclusion of subpart F income under section 951(a)(1)(A) is determined at the member level. However, as discussed in section I.A of this Explanation of Provisions, a section 951(a)(1)(A) inclusion with respect to a CFC is determined solely by reference to the subpart F income of the CFC, and therefore determining a member's section 951(a)(1)(A) inclusion solely by reference to a CFC the stock of which is owned (within the meaning of section 958(a)) by the member is not distortive of the consolidated group's income tax liability. As a result, the location of the CFC within the group generally has no effect on the consolidated group's income tax liability by reason of section 951(a)(1)(A). In contrast, section 951A requires an aggregate, U.S. shareholder-level calculation, under which a member's pro rata share of the relevant items of one CFC can increase or decrease a member's GILTI inclusion amount otherwise resulting from its ownership of another CFC. Accordingly, a determination of a member's GILTI inclusion amount solely based on its pro rata share of the items of a CFC the stock of which is owned (within the meaning of section 958(a)) by that member may not result in a clear reflection of the consolidated group's income tax liability. For example, a consolidated group could segregate one CFC with tested interest expense under one member and another CFC with QBAI under another member, thereby increasing the net DTIR of the second

member relative to the consolidated group's net DTIR if determined at a group level. Alternatively, a strict, separate-entity application of section 951A could inappropriately increase a consolidated group's income tax liability, because one member's excess pro rata share of tested losses or QBAI over tested income would be unavailable to reduce another member's GILTI inclusion amount.

*B. Section 1.1502–51*

In response to comments, the Treasury Department and the IRS have determined that a member's GILTI inclusion amount should be determined by reference to the relevant items of each CFC owned by members of the same consolidated group. As discussed in section I.A of this Explanation of Provisions, a U.S. shareholder includes in gross income its GILTI inclusion amount for any taxable year. GILTI inclusion amount is defined under proposed § 1.951A–1(c)(1) as, with respect to a U.S. shareholder for a taxable year of the shareholder, the excess (if any) of the shareholder's net CFC tested income over the shareholder's net DTIR for the taxable year. Under proposed § 1.1502–51, this definition applies equally to a U.S. shareholder that is a member of a consolidated group. However, consistent with the authority in section 1502, the proposed regulations provide special definitions of net CFC tested income and net DTIR in order to clearly reflect the income tax liability of the consolidated group. Specifically, the proposed regulations provide that, to determine a member's GILTI inclusion amount, the pro rata shares of tested loss, QBAI, tested interest expense, and tested interest income of each member are aggregated, and then a portion of each aggregate amount is allocated to each member of the group that is a U.S. shareholder of a tested income CFC based on the proportion of such member's aggregate pro rata share of tested income to the total tested income of the consolidated group. See proposed § 1.1502–51(e).

As discussed in section I.G.3 of this Explanation of Provisions, proposed § 1.951A–6(e) provides that the adjusted basis of the stock of a CFC is adjusted immediately before its disposition. Proposed § 1.1502–51(c) provides special rules for making these adjustments to the adjusted basis of the stock of a CFC owned by a member in a manner that reflects the special definitions applicable to members.

*C. Section 1.1502–32*

Section 1.1502–32 provides rules for adjusting the basis of the stock of a subsidiary owned by another member to reflect, among other items, the subsidiary's items of income. Accordingly, no new rules are necessary to adjust the basis of the stock of a member because of a GILTI inclusion. However, as previously discussed, proposed §§ 1.951A–6(e) and 1.1502–51(c) provide rules for adjusting the basis of the stock of a CFC immediately before its disposition. As a result, proposed § 1.1502–32(b)(3)(ii)(E) and (iii)(C) provide for adjustments to the basis of the stock of a member to reflect those rules. Specifically, the proposed rules treat a portion of a member's offset tested income amount as tax-exempt income and all of a member's used tested loss amount as a noncapital, nondeductible expense.

As previously discussed, the Treasury Department and the IRS have determined that in the case of a corporate U.S. shareholder, gain recognized on the disposition of stock of a CFC attributable to offset tested income would, in most cases, be eliminated as a result of the application of section 964(e)(4) or section 1248(a) and (j), to the extent the gain or income is eligible for the dividends received deduction under section 245A. In order to not incentivize a sale of the stock of a CFC over a sale of stock of a member, proposed § 1.1502–32(b)(3)(ii)(F) provides that a member is also treated as receiving tax-exempt income immediately before another member recognizes income, gain, deduction, or loss with respect to a share of the first member's stock. The amount of this additional tax-exempt income is the net offset tested income amount allocable to the shares of any CFC owned by the first member to the extent that a distribution of such amount would have been characterized as a dividend eligible for a section 245A deduction and not subject to section 1059.

The Treasury Department and the IRS request comments regarding the coordination of the rules of proposed §§ 1.951A–6(e) and 1.1502–51(c) with the investment adjustment regime of § 1.1502–32. Comments are specifically requested on: (1) Whether the amount of the adjustments to the basis of member stock should be limited to the amount of the adjustments to the basis of the stock of a CFC under the rules of proposed § 1.951A–6(e); (2) whether the adjustments to the basis of member stock should all be made on a current basis, made to the extent of the basis adjustments provided in proposed

§ 1.951A–6(e) on a current basis with any remaining adjustments being made at the time of a disposition of stock of a CFC or of a member, or made only at the time of a disposition of the stock of a CFC or of a member; and (3) whether rules should provide that a deduction under section 245A should not be treated as tax-exempt income to the extent that the underlying dividend is attributable to offset tested income for which basis adjustments have already been made. Additionally, comments are specifically requested as to whether there are any circumstances in which there should be a deemed disposition of the stock of a CFC owned by a member, such that the rules of proposed § 1.951A–6(e) would apply, including, but not limited to, a deconsolidation or taxable disposition of the stock of a member that owns (directly or indirectly) the stock of a CFC to either a person outside of the consolidated group or to another member, and a transfer of the stock of a member in an intercompany transaction that is a nonrecognition transaction. Similarly, comments are specifically requested as to whether there are other transactions that should be described in the definition of transferred shares in proposed § 1.1502–32(b)(3)(ii)(F)(*1*), such as a deemed disposition pursuant to § 1.1502–19(c)(1)(iii)(B). Lastly, comments are specifically requested as to whether any other adjustments are necessary to prevent the duplication of gain or loss resulting from a member's ownership of a CFC, including situations where a member owning a CFC joins another consolidated group.

In response to comments received, no new rules are being proposed under § 1.1502–33, which provides rules for adjusting the earnings and profits of a subsidiary and any member owning stock of the subsidiary. The Treasury Department and the IRS request comments on whether additional rules under § 1.1502–33 or any other regulations issued under section 1502 are necessary.

## IV. Sections 1.6038–2(a) and 1.6038–5

Under section 6038(a)(1), U.S. persons that control foreign corporations must file certain information returns with respect to those corporations. Before the Act, a U.S. shareholder would not have had an income inclusion under section 951(a)(1) with respect to a foreign corporation unless the corporation had been a CFC for an uninterrupted period of at least 30 days during the taxable year. While section 6038 does not limit the reporting requirements to foreign corporations that a U.S. person controls for an uninterrupted period of at least

30 days, § 1.6038–2(a) does provide for such a limit. To coordinate with the amendment to section 951(a)(1) that removed the 30-day requirement, this notice of proposed rulemaking proposes to revise § 1.6038–2(a) to provide that certain information reporting is required for U.S. persons that control a foreign corporation at any time during an annual accounting period.

Section 6038(a)(4) allows the Secretary to require any U.S. shareholder of a CFC to provide information required under section 6038(a)(1), which includes information that is similar to the listed information in section 6038(a)(1)(A) through (a)(1)(E), as well as information that "the Secretary determines to be appropriate to carry out the provisions of this title." In order to effectively administer and enforce section 951A, the Treasury Department and the IRS have determined that, in general, U.S. shareholders must file a new Schedule I–1, Information for Global Intangible Low-Taxed Income, to Form 5471, Information Return of U.S. Persons With Respect To Certain Foreign Corporations, as well as new Form 8992, U.S Shareholder Calculation of Global Intangible Low-Taxed Income (GILTI), to provide the information that a U.S. shareholder needs with respect to each of its CFCs to determine the U.S. shareholder's GILTI inclusion amount for a taxable year. Proposed § 1.6038–5 provides the filing requirements for new Form 8992.

## V. Applicability Dates

Consistent with the applicability date of section 951A, proposed §§ 1.951–1(e)(1)(ii)(B), 1.951A–1 through 1.951A–6, 1.1502–32(b)(3)(ii)(E), (b)(3)(ii)(F), and (b)(3)(iii)(C), and 1.1502–51 are proposed to apply to taxable years of foreign corporations beginning after December 31, 2017, and to taxable years of U.S. shareholders in which or with which such taxable years of foreign corporations end. See section 7805(b)(2). Proposed § 1.951–1(e) (pro rata share of subpart F income) (other than § 1.951–1(e)(1)(ii)(B)) is proposed to apply to taxable years of U.S. shareholders ending on or after October 3, 2018. See section 7805(b)(1)(B). Consistent with the applicability date of the modification to section 951 in the Act, proposed § 1.951–1(a) (controlled foreign corporations) and § 1.951–1(g) (definition of U.S. shareholder) are proposed to apply to taxable years of foreign corporations beginning after December 31, 2017, and to taxable years of U.S. shareholders with or within which such taxable years of foreign corporations end. See section

7805(b)(2). Proposed § 1.951–1(h) (special rule for partnership blocker structure) is proposed to apply to taxable years of domestic partnerships ending on or after May 14, 2010. See Notice 2010–41 and section 7805(b)(1)(C). Although proposed § 1.951–1(h) applies for purposes of both section 951 and section 951A, the only practical effect of applying this rule to taxable years of domestic partnerships ending on or after May 14, 2010, and before January 1, 2018, concerns the application of section 951. The proposed rule does not have relevance to the application of section 951A until the first taxable year of a CFC owned by a domestic partnership beginning after December 31, 2017 (the effective date of section 951A). Proposed § 1.6038–2(a) (information returns required of U.S. persons with respect to annual accounting periods of certain foreign corporations) and proposed § 1.6038–5 (information returns required of certain U.S. persons to report amounts determined with respect to certain foreign corporations for GILTI purposes) are proposed to apply to taxable years of foreign corporations beginning on or after October 3, 2018. See sections 6038(a)(3) and 7805(b)(1)(B).

## Special Analyses

### *Regulatory Planning and Review— Economic Analysis*

Executive Orders 13563 and 12866 direct agencies to assess costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The Executive Order 13771 designation for any final rule resulting from these proposed regulations will be informed by comments received.

The proposed regulations have been designated by the Office of Information and Regulatory Affairs (OIRA) as subject to review under Executive Order 12866 pursuant to the Memorandum of Agreement (April 11, 2018) between the Treasury Department and the Office of Management and Budget regarding review of tax regulations. OIRA has determined that the proposed rulemaking is significant. Accordingly, the proposed regulations have been reviewed by OIRA. For more detail on

the economic analysis, please refer to the following analysis.

### *A. Overview*

The proposed regulations provide taxpayers with computational, definitional, and anti-avoidance guidance regarding the application of section 951A. They provide guidance for U.S. shareholders to determine the amount of GILTI to include in gross income and how to compute the components of GILTI. Among other benefits, this clarity helps ensure that taxpayers all calculate GILTI in a similar manner, which promotes efficiency and equity contingent on the provisions of the overall Code.

The proposed regulations under sections 951A, 1502, and 6038 (proposed §§ 1.951A–1 through 1.951A–7, 1.1502–12, 1.1502–13, 1.1502–32, and 1.1502–51, and 1.6038–5) provide details for taxpayers (including members of a consolidated group) regarding the computation of certain components of GILTI (for example, tested income and tested loss, QBAI, net deemed tangible income return, and specified interest expense), describe the consequences of a GILTI inclusion for purposes of other sections of the Code, and detail the reporting requirements associated with GILTI. These proposed regulations further establish anti-abuse rules to prevent taxpayers from taking measures to inappropriately reduce their GILTI through certain transfers of property. They also disallow certain losses that reduce GILTI from being used a second time.

The proposed regulations under sections 951 and 6038 (proposed §§ 1.951–1 and 1.6038–2) prevent taxpayers from avoiding an inclusion of subpart F income under section 951(a) or the inclusion of GILTI under section 951A through certain artificial arrangements involving the ownership of CFC stock, coordinate the calculation of a U.S. shareholder's subpart F with its GILTI, and conform the regulations to other amendments in the Act, including a modification to the definition of U.S. shareholder for purposes of sections 951(a) and 951A and the elimination of the 30-day CFC status requirement. This economic analysis describes the economic benefits and costs of the proposed regulations.

### *B. Economic Analysis of the Proposed Regulations*

#### 1. Background

Because section 951A is a new Code section, many of the details behind the relevant terms and necessary calculations required for the

computation of a U.S. shareholder's GILTI inclusion amount would benefit from greater specificity. Thus, as is expected after the passage of major tax reform legislation, the regulations answer open questions and provide detail and specificity for the definitions and concepts described in section 951A, so that U.S. shareholders can readily and accurately determine their GILTI inclusion amounts. For example, the regulations provide definitions of crucial terms, such as tested income, tested loss, specified tangible property, and specified interest expense.

As discussed in section I.A. of the Explanation of Provisions, although a GILTI inclusion is treated similarly to an inclusion of subpart F income for some purposes, it is determined in a manner fundamentally different from that of a subpart F inclusion. Therefore, in some cases it is appropriate for the regulations to rely on subpart F principles, but in other cases different rules are necessary. For example, the regulations apply subpart F rules for purposes of (1) determining a U.S. shareholder's pro rata share of certain items of a CFC, (2) translating foreign currency to U.S. dollars, (3) determining gross income and allowable deductions, and (4) allocating and apportioning allowable deductions to gross tested income. However, it would be inappropriate to rely on subpart F rules for the GILTI computations that are performed at the U.S. shareholder level because subpart F income is determined solely at the level of a CFC. For example, the regulations provide detail on how a U.S. shareholder determines its specified interest expense at the shareholder level based on the interest expense and interest income of each CFC owned by the shareholder.

Additionally, the proposed regulations provide rules regarding the interaction of certain aspects of section 951A with other provisions. For example, they clarify that, regarding the interaction of the earnings and profits limitation (including recapture) for subpart F income and the determination of gross income, tested income, tested income and tested loss are computed without regard to the earnings and profits limitation in section 952(c). In addition, the proposed regulations provide that GILTI inclusion amounts are considered net investment income under section 1411. Finally, the proposed regulations provide that certain deductions between related parties are not deferred under sections 163(e)(3)(B)(i) and 267(a)(3)(B) to the extent the income is taken into account in determining a U.S. shareholder's GILTI inclusion amount.

Section 951A provides the Secretary of the Treasury the authority to issue regulations and other guidance to prevent the avoidance of the purposes of section 951A(d). As such, regulations under §§ 1.951A–2 and 1.951A–3 provide that certain transactions that reduce a U.S. shareholder's GILTI inclusion amount, for example, by increasing a CFC's qualified business asset investment (QBAI) or decreasing a CFC's tested income, will be disregarded for purposes of the GILTI computation.

Further, the Treasury Department and the IRS have determined that, in the absence of any adjustment, inappropriate results may arise in cases that a U.S. shareholder's pro rata share of the tested loss of one CFC offsets the shareholder's pro rata share of the tested income of another CFC in determining the shareholder's GILTI inclusion amount. In particular, a U.S. shareholder disposing of the stock of a tested loss CFC could recognize second, duplicative benefits from a single economic loss. Therefore, the proposed regulations provide that, when determining gain or loss on the disposition of the stock of a tested loss CFC, the U.S. shareholder's basis in the stock of the tested loss CFC is reduced by the cumulative amount of tested losses that were used to offset tested income in determining the shareholder's net CFC tested income.

The statute is silent on the computation of GILTI for members of a consolidated group and for domestic partnerships and their partners. Absent these regulations, there would be uncertainty among taxpayers as to whether to calculate a GILTI inclusion amount at the level of a member or its consolidated group, or at the level of a domestic partnership or its partners. Without guidance, different taxpayers would likely take different positions on these matters. The proposed regulations provide clarity by (1) determining the GILTI inclusion amount of each member of a consolidated group by taking into account the relevant items of each CFC owned by members of such group, and (2) providing guidance on the computation of the GILTI inclusion amount of domestic partnerships and their partners.

Finally, these proposed regulations provide reporting requirements necessary to properly administer and enforce section 951A. In particular, the Treasury Department and the IRS have determined that U.S. shareholders must file a new Schedule I–1, Information for Global Intangible Low-Taxed Income, associated with Form 5471, Information Return of U.S. Persons With Respect To

Certain Foreign Corporations, as well as new Form 8992, U.S. Shareholder Calculation of Global Intangible Low-Taxed Income (GILTI), in order to provide the information that a U.S. shareholder is using with respect to each of its CFCs to determine the U.S. shareholder's GILTI inclusion amount for a taxable year. The proposed regulations also provide that a U.S. shareholder partnership must include on its Schedule K–1, associated with Form 1065, U.S. Return of Partnership Income, certain information necessary for its partners to determine their distributive share of the partnership's GILTI inclusion amount or, in the case of U.S. shareholder partners, to determine their own GILTI inclusion amounts. Finally, to coordinate with the amendment to section 951(a)(1) that removed the 30-day CFC status requirement for subpart F inclusions, the proposed regulations provide that certain information reporting is required for U.S. persons that control a foreign corporation at any time during an annual accounting period.

## 2. Anticipated Benefits and Costs of the Proposed Regulations

### a. Baseline

The Treasury Department and the IRS have assessed the benefits and costs of the proposed regulations against a baseline—the way the world would look in the absence of the proposed regulations.

### b. Anticipated Benefits

The Treasury Department and the IRS expect that the certainty and clarity provided by these proposed regulations, relative to the baseline, will enhance U.S. economic performance under the statute. Because a tax has not previously been imposed on GILTI and the statute is silent on certain aspects of definitions and calculations, taxpayers can particularly benefit from enhanced specificity regarding the relevant terms and necessary calculations they are required to apply under the statute. In the absence of this enhanced specificity, similarly situated taxpayers might interpret the statutory rules of section 951A differently, potentially resulting in inequitable outcomes. For example, different taxpayers might pursue income-generating activities based on different assumptions about whether that income will be counted as GILTI, and some taxpayers may forego specific investments that other taxpayers deem worthwhile based on different interpretations of the tax consequences alone. The guidance provided in these regulations helps to ensure that

taxpayers face more uniform incentives when making economic decisions, a tenet of economic efficiency. Consistent reporting across taxpayers also increases the IRS's ability to consistently enforce the tax rules, thus increasing equity and decreasing opportunities for tax evasion.

For example, the proposed regulations provide a definition of specified interest expense that adopts a netting approach. Alternatives would be to adopt a tracing approach or to remain silent. The Treasury Department and the IRS rejected a tracing approach because it would be more burdensome for taxpayers due to the complexity of matching, at the U.S. shareholder-level, of the shareholder's pro rata share of each item of interest expense with its pro rata share of each item of interest income. The Treasury Department and the IRS also rejected the option of remaining silent because if taxpayers relied on statutory language alone, taxpayers would adopt different approaches because the statute does not define what "attributable" means, leaving it open to differing interpretations.

As discussed above, there are similarities between GILTI and subpart F. Where appropriate, these proposed regulations rely on rules already developed under subpart F. Since taxpayers to whom GILTI applies are already subject to the subpart F regime, it is less costly to them to apply rules they are already familiar with, and they will benefit in reduced time and cost spent learning new rules. For example, the proposed regulations apply existing subpart F rules for determining allowable deductions for GILTI purposes. By relying on existing infrastructure, the proposed regulations allow taxpayers to use the same analysis that they already conduct for subpart F purposes. For additional discussion of the rules for determining allowable deductions, see section I.C.1 of the Explanation of Provisions section.

The Treasury Department and the IRS next considered the benefits and costs of providing these specific proposed terms, calculations, and other details regarding GILTI. In developing these proposed regulations, the Treasury Department and the IRS have generally aimed to apply the principle that an economically efficient tax system would treat income derived from similar economic decisions similarly, to the extent consistent with the statute and considerations of administrability of the tax system. Similar economic decisions, in the context of GILTI, are those that involve property of a similar degree of immobility and that demonstrate active business operations and presence in any particular jurisdiction. See, for example, Senate Explanation, at 366.

An economically efficient tax system would also generally keep the choice among businesses' ownership and organizational structures neutral contingent on the provisions of the corporate income tax and other tax provisions that may affect organizational structure. The Treasury Department and the IRS expect that the proposed regulations, in providing that GILTI be generally calculated on a consolidated group basis and at the partner level in the case of partners that are U.S. shareholders of one or more partnership CFCs, will ensure that shareholders face uniform tax treatment on their GILTI-relevant investments regardless of ownership or organizational structure, thus encouraging market-driven as opposed to tax-driven structuring decisions. If, as an alternative policy approach, GILTI were determined solely at the level of a member (in the case of consolidated groups) or solely at the level of a partnership (in the case of domestic partnerships and their partners), many taxpayers would be compelled to reorganize their ownership structures just to obtain the full aggregation of CFC attributes as envisioned by Congress. Yet other taxpayers would be incentivized to reorganize in an attempt to avoid full aggregation so as to reduce their inclusion below an amount that accurately reflects their GILTI. For an illustration, see section I.F of the Explanation of Provisions. Therefore, the Treasury Department and the IRS propose that GILTI be calculated on a consolidated group basis and at the partner level in the case of partners that are U.S. shareholders of one or more partnership CFCs. The preamble discusses further why those approaches were taken, as well as describing alternative approaches considered. The Treasury Department and the IRS request comments on this proposed approach.

c. Anticipated Impacts on Administrative and Compliance Costs

Because the statute requires payment of tax regardless of the issuance of regulations or instructions, the new forms, revisions to existing forms, and proposed regulations can lower the burden on taxpayers of determining their tax liability. The Treasury Department and the IRS expect that the proposed regulations will reduce the costs for taxpayers to comply with the Act, relative to the baseline of no promulgated regulations. The proposed regulations require that each U.S. shareholder partnership provide to each partner its distributive share of the partnership's GILTI inclusion amount and, if the partner is a U.S. shareholder of one or more partnership CFCs, the partner's proportionate share of the partnership's pro rata share of each relevant item of the partnership CFC. Under the baseline, the burden would potentially have fallen on each partner, who would be required to determine its own distributive share of the partnership's GILTI inclusion amount or, if a U.S. shareholder of a partnership CFC, determine its own GILTI inclusion amount by reference to the partnership's pro rata share of items of the partnership CFC. While this latter burden is difficult to assess, because it is unclear how partners would calculate these amounts in the absence of a determination by the partnership and it is similarly unclear what efforts might be made by the partnership to help the partners fulfill this obligation, the Treasury Department and the IRS expect that it would be significantly greater than the burden incurred under the proposed regulations.

Proposed § 1.6038–2(a) increases record-keeping requirements for taxpayers because it requires all taxpayers to file Form 5471 if they held stock in a CFC during the taxable year regardless of the duration of the holding period, rather than only if they held the stock for a 30-day period under the current regulation. The changes in the proposed regulation derive directly from statutory changes to the holding period requirement in the Act.

*C. Paperwork Reduction Act*

The collections of information in these proposed regulations with respect to section 951A are in proposed §§ 1.951A–5(f) and 1.6038–5. A separate collection of information applicable to controlling U.S. shareholders of a foreign corporation is in proposed § 1.6038–2(a).

The collection of information in proposed § 1.6038–5 is mandatory for each U.S. shareholder (including a U.S. shareholder partner) that owns (within the meaning of section 958(a)) stock of a CFC. The collection of information in proposed § 1.6038–5 is satisfied by submitting a new reporting form, Form 8992, U.S. Shareholder Calculation of Global Intangible Low-Taxed Income (GILTI), with an income tax return. In addition, for those U.S. shareholders that are required to file Form 5471, Information Return of U.S. Persons with Respect to Certain Foreign Corporations, a new Schedule I–1, Information for Global Intangible Low-Taxed Income, has been added. For purposes of the Paperwork Reduction Act of 1995 (44

U.S.C. 3507(d)) (''PRA''), the reporting burden associated with proposed § 1.6038–5 will be reflected in the IRS Form 14029, Paperwork Reduction Act Submission, associated with Form 5471 (OMB control number 1545–0704) and the new Form 8992 (OMB control number 1545–0123).

The collection of information in proposed § 1.951A–5(f) requires each U.S. shareholder partnership to provide to its partners their distributive share of the partnership's GILTI inclusion amount, as well as provide to each U.S. shareholder partner their proportionate share of the partnership's pro rata share (if any) of each CFC tested item of each partnership CFC of the partnership. The Treasury Department and the IRS anticipate revising Schedule K–1 (Form 1065), Partner's Share of Income, Deductions, Credits, etc., or its instructions to require the provision of this information. For purposes of the PRA, the reporting burden associated with proposed § 1.951A–5(f) will be reflected in the IRS Form 14029, Paperwork Reduction Act Submission, associated with Schedule K–1 (Form 1065, OMB control number 1545–0123).

The collection of information currently required from a U.S. person that controls a foreign corporation is revised by proposed § 1.6038–2(a). Section 1.6038–2(a) presently requires only those U.S. persons with uninterrupted control of a foreign corporation for 30 days or more during the shareholder's annual accounting period to file Form 5471 for that period.

Consistent with statutory changes in the Act, the revised collection of information in proposed § 1.6038–2(a) eliminates the 30-day holding period as a precondition to reporting and requires every U.S. person that controls a foreign corporation at any time during an annual accounting period to file Form 5471 for that period. For purposes of the PRA, the reporting burden associated with proposed § 1.6038–2(a) will be reflected in the IRS Form 14029, Paperwork Reduction Act Submission, associated with Form 5471.

When available, drafts of IRS forms are posted for comment at *https:// apps.irs.gov/app/picklist/list/ draftTaxForms.html.*

### RELATED NEW OR REVISED TAX FORMS

|  | New | Revision of existing form | Number of respondents (estimated) |
|---|---|---|---|
| Schedule I–1 (Form 5471) | ✓ | ...................... | 25,000–35,000 |
| Form 8992 | ✓ | ...................... | 25,000–35,000 |
| Form 1065/1120S, Schedule K | ...................... | ✓ | 8,000–12,000 |
| Form 5471 (30 days) | ...................... | ✓ | <1,000 |

### D. Regulatory Flexibility Act

It is hereby certified that this notice of proposed rulemaking will not have a significant economic impact on a substantial number of small entities within the meaning of section 601(6) of the Regulatory Flexibility Act (5 U.S.C. chapter 6).

The domestic small business entities that are subject to section 951A and this notice of proposed rulemaking are those domestic small business entities that are U.S. shareholders of a CFC.[2] Generally, a U.S. shareholder is any U.S. person that owns 10 percent or more of a foreign corporation's stock, measured either by value or voting power. A CFC is a foreign corporation in which more than 50 percent of its stock is owned by U.S. shareholders, again measured either by value or voting power. Data about the number of domestic small business entities potentially affected by these regulations are not readily available.

The domestic small business entities that are subject to the requirements of proposed § 1.951A–5(f) or 1.6038–5 of this notice of proposed rulemaking are U.S. shareholders of one or more CFCs.

The Treasury Department and the IRS do not have data to assess the number of small entities potentially affected by § 1.951A–5(f) or 1.6038–5. However, businesses that are U.S. shareholders of CFCs are generally not small businesses because the ownership of sufficient stock in a CFC in order to be a U.S. shareholder generally entails significant resources and investment. Therefore, the Treasury Department and the IRS do not believe that a substantial number of domestic small business entities will be subject to proposed § 1.951A–5(f) or 1.6038–5. Consequently, the Treasury Department and the IRS do not believe that proposed § 1.951A–5(f) or 1.6038–5 will have a significant economic impact on a substantial number of domestic small business entities. Therefore, a Regulatory Flexibility Analysis under the Regulatory Flexibility Act is not required with respect to the collection of information requirements of proposed § 1.951A–5(f) or 1.6038–5.

Existing § 1.6038–2(a) requires only those U.S. persons with uninterrupted control of a foreign corporation for 30 days or more during the shareholder's annual accounting period to file Form 5471 for that period. Proposed § 1.6038–2(a) eliminates the 30-day holding period as a precondition to reporting and requires every U.S. person that controls a foreign corporation at any time during an annual accounting

period to file Form 5471 for that period. As a result, those U.S. shareholders that control a foreign corporation for less than 30 days will now be required to file Form 5471 pursuant to proposed § 1.6038–2(a). The domestic small business entities subject to the requirements of proposed § 1.6038–2(a) are those domestic small business entities that control a foreign corporation at any time during a taxable year. For these purposes, a domestic small business entity controls a foreign corporation by owning more than 50 percent of that foreign corporation's stock, measured either by voting power or value. The Treasury Department and the IRS do not believe that a substantial number of domestic small business entities that are controlling shareholders of a foreign corporation will become Form 5471 filers due to the information collection in proposed § 1.6038–2(a) for the following reasons. First, significant resources and investment are required for a U.S. person to own and operate a business in a foreign country as a corporation. Second, the Treasury Department and the IRS believe that satisfying the stock ownership requirement for control for purposes of § 1.6038–2(a) requires a potential outlay of significant resources and investment, including active involvement in managing the foreign corporation due to controlling ownership of the corporation, such that

---

[2] The Treasury Department and the IRS estimate that there are 25,000–35,000 respondents of all sizes that are likely to file Schedule I–1, Form 5471. Only a small proportion of these are likely to be small businesses. The Treasury Department and the IRS request comments on the number of small businesses that are likely to file Schedule I–1.

few domestic small business entities are likely to control foreign corporations for purposes of proposed § 1.6038–2(a). For these reasons, the Treasury Department and the IRS do not believe it likely that a domestic small business entity would have controlling ownership of a foreign corporation for less than a 30-day period in a taxable year. As a result, the Treasury Department and the IRS do not believe that a substantial number of domestic small business entities will be affected by the proposed § 1.6038–2(a) eliminating the 30-day holding period as a precondition to filing Form 5471. Consequently, the Treasury Department and the IRS do not believe that proposed § 1.6038–2(a) will have a significant economic impact on a substantial number of domestic small business entities. Therefore, a Regulatory Flexibility Analysis under the Regulatory Flexibility Act is not required with respect to the requirements of proposed § 1.6038–2(a).

Notwithstanding this certification, the Treasury Department and the IRS invite comments from the public about the impact of this proposed rule on small entities.

Pursuant to section 7805(f), this notice of proposed rulemaking has been submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small businesses. The IRS invites the public to comment on this certification.

### E. Unfunded Mandates Reform Act

Section 202 of the Unfunded Mandates Reform Act of 1995 requires that agencies assess anticipated costs and benefits and take certain other actions before issuing a final rule that includes any Federal mandate that may result in expenditures in any one year by a state, local, or tribal government, in the aggregate, or by the private sector, of $100 million in 1995 dollars, updated annually for inflation. In 2018, that threshold is approximately $150 million. This rule does not include any Federal mandate that may result in expenditures by state, local, or tribal governments, or by the private sector in excess of that threshold.

### F. Executive Order 13132: Federalism

Executive Order 13132 (entitled "Federalism") prohibits an agency from publishing any rule that has federalism implications if the rule either imposes substantial, direct compliance costs on state and local governments, and is not required by statute, or preempts state law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. This proposed rule does not have federalism implications and does not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order.

### Comments and Requests for Public Hearing

Before the proposed regulations are adopted as final regulations, consideration will be given to any comments that are submitted timely to the IRS as prescribed in this preamble under the **ADDRESSES** heading. The Treasury Department and the IRS request comments on all aspects of the proposed regulations, and specifically on the issues identified in sections I.B.3, I.C.1, I.D.4, I.F, I.G.1, I.G.3, and III.C of the Explanations of Provisions. All comments will be available at *www.regulations.gov* or upon request. A public hearing will be scheduled if requested in writing by any person that timely submits written comments. If a public hearing is scheduled, then notice of the date, time, and place for the public hearing will be published in the **Federal Register**.

### Drafting Information

The principal authors of the proposed regulations are Melinda E. Harvey and Michael Kaercher of the Office of Associate Chief Counsel (International) and Austin Diamond-Jones and Kevin M. Jacobs of the Office of Associate Chief Counsel (Corporate). However, other personnel from the IRS and the Treasury Department participated in the development of the proposed regulations.

### Statement of Availability of IRS Documents

IRS Revenue Procedures, Revenue Rulings, notices, and other guidance cited in this document are published in the Internal Revenue Bulletin (or Cumulative Bulletin) and are available from the Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402, or by visiting the IRS website at *http://www.irs.gov*.

### List of Subjects in 26 CFR Part 1

Income taxes, Reporting and recordkeeping requirements.

### Proposed Amendments to the Regulations

Accordingly, 26 CFR part 1 is proposed to be amended as follows:

### PART 1—INCOME TAXES

■ **Paragraph 1.** The authority citation for part 1 is amended by adding entries in numerical order to read in part as follows:

**Authority:** 26 U.S.C. 7805 * * *
Section 1.951–1 also issued under 26 U.S.C. 7701(a). * * *
Sections 1.951A–2 and 1.951A–3 also issued under 26 U.S.C. 951A(d). * * *
Section 1.951A–5 also issued under 26 U.S.C. 6031.
Section 1.951A–6 also issued under 26 U.S.C. 951A(f)(1)(B). * * *
Section 1.1502–51 also issued under 26 U.S.C. 1502. * * *
Section 1.6038–2 also issued under 26 U.S.C. 6038. * * *
Section 1.6038–5 also issued under 26 U.S.C. 6038. * * *

■ **Par. 2.** Section 1.951–1 is amended by:
■ 1. Revising the introductory language in paragraph (a).
■ 2. Revising paragraphs (e) and (g)(1).
■ 3. Adding paragraphs (h) and (i).
The revisions and additions read as follows:

**§ 1.951–1    Amounts included in gross income of United States shareholders.**

(a) *In general.* If a foreign corporation is a controlled foreign corporation (within the meaning of section 957) at any time during any taxable year of such corporation, every person—

\*    \*    \*    \*    \*

(e) *Pro rata share of subpart F income defined*—(1) *In general*—(i) *Hypothetical distribution.* For purposes of paragraph (b) of this section, a United States shareholder's pro rata share of a controlled foreign corporation's subpart F income for a taxable year is the amount that bears the same ratio to the corporation's subpart F income for the taxable year as the amount of the corporation's current earnings and profits that would be distributed with respect to the stock of the corporation which the United States shareholder owns (within the meaning of section 958(a)) for the taxable year bears to the total amount of the corporation's current earnings and profits that would be distributed with respect to the stock owned by all the shareholders of the corporation if all the current earnings and profits of the corporation for the taxable year (not reduced by actual distributions during the year) were distributed (*hypothetical distribution*) on the last day of the corporation's taxable year on which such corporation is a controlled foreign corporation (*hypothetical distribution date*).

(ii) *Determination of current earnings and profits.* For purposes of this paragraph (e), the amount of current earnings and profits of a controlled foreign corporation for a taxable year is treated as the greater of the following two amounts:

(A) The earnings and profits of the corporation for the taxable year determined under section 964; or

(B) The sum of the subpart F income (as determined under section 952 and increased as provided under section 951A(c)(2)(B)(ii) and § 1.951A–6(d)) of the corporation for the taxable year and the tested income (as defined in section 951A(c)(2)(A) and § 1.951A–2(b)(1)) of the corporation for the taxable year.

(2) *One class of stock.* If a controlled foreign corporation for a taxable year has only one class of stock outstanding, the amount of the corporation's current earnings and profits distributed in the hypothetical distribution with respect to each share in the class of stock is determined as if the hypothetical distribution were made pro rata with respect to each share in the class of stock.

(3) *More than one class of stock.* If a controlled foreign corporation for a taxable year has more than one class of stock outstanding, the amount of the corporation's current earnings and profits distributed in the hypothetical distribution with respect to each class of stock is determined under this paragraph (e)(3) based on the distribution rights of each class of stock on the hypothetical distribution date, and then further distributed pro rata with respect to each share in the class of stock. Subject to paragraphs (e)(4) through (6) of this section, the distribution rights of a class of stock are determined taking into account all facts and circumstances related to the economic rights and interest in the current earnings and profits of the corporation of each class, including the terms of the class of stock, any agreement among the shareholders and, where appropriate, the relative fair market value of shares of stock.

(4) *Special rules*—(i) *Redemptions, liquidations, and returns of capital.* Notwithstanding the terms of any class of stock of the controlled foreign corporation or any agreement or arrangement with respect thereto, no amount of current earnings and profits is distributed in the hypothetical distribution with respect to a particular class of stock to the extent that a distribution of such amount would constitute a distribution in redemption of stock (even if such redemption would be treated as a distribution of property to which section 301 applies pursuant to section 302(d)), a distribution in liquidation, or a return of capital.

(ii) *Certain cumulative preferred stock.* If a controlled foreign corporation has outstanding a class of redeemable preferred stock with cumulative dividend rights and dividend arrearages

that do not compound at least annually at a rate that equals or exceeds the applicable Federal rate (as defined in section 1274(d)(1)) (*AFR*), the amount of the corporation's current earnings and profits distributed in the hypothetical distribution with respect to the class of stock may not exceed the amount of dividends actually paid during the taxable year with respect to the class of stock plus the present value of the unpaid current dividends with respect to the class determined using the AFR that applies on the date the stock is issued for the term from such issue date to the mandatory redemption date and assuming the dividends will be paid at the mandatory redemption date. For purposes of this paragraph (e)(4)(ii), if the class of preferred stock does not have a mandatory redemption date, the mandatory redemption date is the date that the class of preferred stock is expected to be redeemed based on all facts and circumstances.

(iii) *Dividend arrearages.* If there is an arrearage in dividends for prior taxable years with respect to a class of preferred stock of a controlled foreign corporation, an amount of the corporation's current earnings and profits is distributed in the hypothetical distribution to the class of preferred stock by reason of the arrearage only to the extent the arrearage exceeds the accumulated earnings and profits of the controlled foreign corporation remaining from prior taxable years beginning after December 31, 1962, as of the beginning of the taxable year, or the date on which such stock was issued, whichever is later. If there is an arrearage in dividends for prior taxable years with respect to more than one class of preferred stock, the previous sentence is applied to each class in order of priority, except that the accumulated earnings and profits remaining after the applicable date are reduced by the earnings and profits necessary to satisfy arrearages with respect to classes of stock with a higher priority. For purposes of this paragraph (e)(4)(iii), the amount of any arrearage is determined by taking into account the time value of money principles in paragraph (e)(4)(ii) of this section.

(5) *Restrictions or limitations on distributions*—(i) *In general.* A restriction or other limitation on distributions of an amount of earnings and profits by a controlled foreign corporation is not taken into account in determining the amount of the corporation's current earnings and profits distributed in a hypothetical distribution to a class of stock of the controlled foreign corporation.

(ii) *Definition.* For purposes of paragraph (e)(5)(i) of this section, a restriction or other limitation on distributions includes any limitation that has the effect of limiting the distribution of an amount of earnings and profits by a controlled foreign corporation with respect to a class of stock of the corporation, other than currency or other restrictions or limitations imposed under the laws of any foreign country as provided in section 964(b).

(iii) *Exception for certain preferred distributions.* For purposes of paragraph (e)(5)(i) of this section, the right to receive periodically a fixed amount (whether determined by a percentage of par value, a reference to a floating coupon rate, a stated return expressed in terms of a certain amount of U.S. dollars or foreign currency, or otherwise) with respect to a class of stock the distribution of which is a condition precedent to a further distribution of earnings and profits that year with respect to any class of stock (not including a distribution in partial or complete liquidation) is not a restriction or other limitation on the distribution of earnings and profits by a controlled foreign corporation.

(iv) *Illustrative list of restrictions and limitations.* Except as provided in paragraph (e)(5)(iii) of this section, restrictions or other limitations on distributions include, but are not limited to—

(A) An arrangement that restricts the ability of a controlled foreign corporation to pay dividends on a class of stock of the corporation until a condition or conditions are satisfied (for example, until another class of stock is redeemed);

(B) A loan agreement entered into by a controlled foreign corporation that restricts or otherwise affects the ability to make distributions on its stock until certain requirements are satisfied; or

(C) An arrangement that conditions the ability of a controlled foreign corporation to pay dividends to its shareholders on the financial condition of the corporation.

(6) *Transactions and arrangements with a principal purpose of reducing pro rata shares.* For purposes of this paragraph (e), any transaction or arrangement that is part of a plan a principal purpose of which is the avoidance of Federal income taxation, including, but not limited to, a transaction or arrangement to reduce a United States shareholder's pro rata share of a controlled foreign corporation, which transaction or arrangement would avoid Federal income taxation without regard

to this paragraph (e)(6), is disregarded in determining such United States shareholder's pro rata share of the subpart F income of the corporation. This paragraph (e)(6) also applies for purposes of the pro rata share rules described in § 1.951A–1(d) that reference this paragraph (e), including the rules in § 1.951A–1(d)(3) that determine the pro rata share of qualified business asset investment based on the pro rata share of tested income.

(7) *Examples.* The application of this section is illustrated by the examples in this paragraph (e)(7).

(i) *Common facts for examples in paragraph (e)(7).* Except as otherwise stated, the following facts are assumed for purposes of the examples.

(A) FC1 is a controlled foreign corporation.

(B) USP1, USP2, and USP3 are domestic corporations and United States shareholders of FC1.

(C) Individual A is a foreign individual, and FC2 is a foreign corporation.

(D) All persons use the calendar year as their taxable year.

(E) Any ownership of FC1 by any shareholder is for all of Year 1.

(F) The common shareholders of FC1 are entitled to dividends when declared by FC1's board of directors.

(G) There are no accrued but unpaid dividends with respect to preferred shares, and common shares have positive liquidation value.

(H) FC1 makes no distributions during Year 1.

(I) There are no other facts and circumstances related to the economic rights and interest of any class of stock in the current earnings and profits of a foreign corporation, and no transaction or arrangement was entered into as part of a plan a principal purpose of which is the avoidance of Federal income taxation.

(J) FC1 does not have tested income within the meaning of section 951A(c)(2)(A) and § 1.951A–2(b)(1) or tested loss within the meaning of section 951A(c)(2)(B) and § 1.951A–2(b)(2).

(ii) *Example 1: Single class of stock*— (A) *Facts.* FC1 has outstanding 100 shares of one class of stock. USP1 owns 60 shares of FC1. USP2 owns 40 shares of FC1. For Year 1, FC1 has $1,000x of earnings and profits and $100x of subpart F income within the meaning of section 952.

(B) *Facts. Analysis.* FC1 has one class of stock. Therefore, under paragraph (e)(2) of this section, FC1's current earnings and profits of $1,000x are distributed in the hypothetical distribution pro rata to each share of stock. Accordingly, under paragraph (e)(1) of this section, for Year 1, USP1's pro rata share of FC1's subpart F income is $60x

($100x × $600x/$1,000x) and USP2's pro rata share of FC1's subpart F income is $40x ($100x × $400x/$1,000x).

(iii) *Example 2: Common and preferred stock*— (A) *Facts.* FC1 has outstanding 70 shares of common stock and 30 shares of 4% nonparticipating, voting preferred stock with a par value of $10x per share. USP1 owns all of the common shares. Individual A owns all of the preferred shares. For Year 1, FC1 has $100x of earnings and profits and $50x of subpart F income within the meaning of section 952. In Year 1, FC1 distributes as a dividend $12x to Individual A with respect to Individual A's preferred shares.

(B) *Analysis.* The distribution rights of the preferred shares are not a restriction or other limitation within the meaning of paragraph (e)(5) of this section. Under paragraph (e)(3) of this section, the amount of FC1's current earnings and profits distributed in the hypothetical distribution with respect to Individual A's preferred shares is $12x and with respect to USP1's common shares is $88x. Accordingly, under paragraph (e)(1) of this section, USP1's pro rata share of FC1's subpart F income is $44x ($50x × $88x/$100x) for Year 1.

(iv) *Example 3: Restriction based on cumulative income*— (A) *Facts.* FC1 has outstanding 10 shares of common stock and 400 shares of 2% nonparticipating, voting preferred stock with a par value of $1x per share. USP1 owns all of the common shares. FC2 owns all of the preferred shares. USP1 and FC2 cause the governing documents of FC1 to provide that no dividends may be paid to the common shareholders until FC1 cumulatively earns $100,000x of income. For Year 1, FC1 has $50x of earnings and profits and $50x of subpart F income within the meaning of section 952. In Year 1, FC1 distributes as a dividend $8x to FC2 with respect to FC2's preferred shares.

(B) *Analysis.* The agreement restricting FC1's ability to pay dividends to common shareholders until FC1 cumulatively earns $100,000x of income is a restriction or other limitation within the meaning of paragraph (e)(5) of this section. Therefore, the restriction is disregarded for purposes of determining the amount of FC1's current earnings and profits distributed in the hypothetical distribution to a class of stock. The distribution rights of the preferred shares are not a restriction or other limitation within the meaning of paragraph (e)(5) of this section. Under paragraph (e)(3) of this section, the amount of FC1's current earnings and profits distributed in the hypothetical distribution with respect to FC2's preferred shares is $8x and with respect to USP1's common shares is $42x. Accordingly, under paragraph (e)(1) of this section, USP1's pro rata share of FC1's subpart F income is $42x for Year 1.

(v) *Example 4: Redemption rights*— (A) *Facts.* FC1 has outstanding 40 shares of common stock and 10 shares of 4% nonparticipating, voting preferred stock with a par value of $50x per share. Pursuant to the terms of the preferred stock, FC1 has the right to redeem at any time, in whole or in part, the preferred stock. FC2 owns all of the preferred shares. USP1, wholly owned by FC2, owns all of the common shares. For

Year 1, FC1 has $100x of earnings and profits and $100x of subpart F income within the meaning of section 952. In Year 1, FC1 distributes as a dividend $20x to FC2 with respect to FC2's preferred shares.

(B) *Analysis.* If FC1 were treated as having redeemed any preferred shares, the redemption would be treated as a distribution to which section 301 applies under section 302(d) due to FC2's constructive ownership of the common shares. However, under paragraph (e)(4)(i) of this section, no amount of earnings and profits is distributed in the hypothetical distribution to the preferred shareholders on the hypothetical distribution date as a result of FC1's right to redeem, in whole or in part, the preferred shares. FC1's redemption rights with respect to the preferred shares cannot affect the distribution of current earnings and profits in the hypothetical distribution to FC1's shareholders. As a result, the amount of FC1's current earnings and profits distributed in the hypothetical distribution with respect to FC2's preferred shares is $20x and with respect to USP1's common shares is $80x. Accordingly, under paragraph (e)(1) of this section, USP1's pro rata share of FC1's subpart F income is $80x for Year 1.

(vi) *Example 5: Shareholder owns common and preferred stock*— (A) *Facts.* FC1 has outstanding 40 shares of common stock and 60 shares of 6% nonparticipating, nonvoting preferred stock with a par value of $100x per share. USP1 owns 30 shares of the common stock and 15 shares of the preferred stock during Year 1. The remaining 10 shares of common stock and 45 shares of preferred stock of FC1 are owned by Individual A. For Year 1, FC1 has $1,000x of earnings and profits and $500x of subpart F income within the meaning of section 952.

(B) *Analysis.* Under paragraph (e)(5)(iii) of this section, the right of the holder of the preferred stock to receive 6% of par value is not a restriction or other limitation within the meaning of paragraph (e)(5) of this section. The amount of FC1's current earnings and profits distributed in the hypothetical distribution with respect to FC1's preferred shares is $360x (0.06 × $100x × 60) and with respect to its common shares is $640x ($1,000x − $360x). As a result, the amount of FC1's current earnings and profits distributed in the hypothetical distribution to USP1 is $570x, the sum of $90x ($360x × 15/60) with respect to its preferred shares and $480x ($640x × 30/40) with respect to its common shares. Accordingly, under paragraph (e)(1) of this section, USP1's pro rata share of the subpart F income of FC1 is $285x ($500x × $570x/$1,000x).

(vii) *Example 6: Subpart F income and tested income*— (A) *Facts.* FC1 has outstanding 700 shares of common stock and 300 shares of 4% nonparticipating, voting preferred stock with a par value of $100x per share. USP1 owns all of the common shares. USP2 owns all of the preferred shares. For Year 1, FC1 has $10,000x of earnings and profits, $2,000x of subpart F income within the meaning of section 952, and $9,000x of tested income within the meaning of section 951A(c)(2)(A) and § 1.951A–2(b)(1).

(B) *Analysis*—(1) *Pro rata share of subpart F income.* The current earnings and profits of

FC1 determined under paragraph (e)(1)(ii) of this section are $11,000x, the greater of FC1's earnings and profits as determined under section 964 ($10,000x) or the sum of FC1's subpart F income and tested income ($2,000x + $9,000x). The amount of FC1's current earnings and profits distributed in the hypothetical distribution with respect to USP2's preferred shares is $1,200x (.04 × $100x × 300) and with respect to USP1's common shares is $9,800x ($11,000x − $1,200x). Accordingly, under paragraph (e)(1) of this section, USP1's pro rata share of FC1's subpart F income is $1,782x ($2,000x × $9,800x/$11,000x), and USP2's pro rata share of FC1's subpart F income is $218x ($2,000x × $1,200x/$11,000x).

(2) *Pro rata share of tested income.* The same analysis applies for the hypothetical distribution with respect to the tested income as under paragraph (ii)(A) of this *Example 6* with respect to the subpart F income. Accordingly, under § 1.951A–1(d)(2), USP1's pro rata share of FC1's tested income is $8,018x ($9,000x × $9,800x/$11,000x), and USP2's pro rata share of FC1's tested income is $982x ($9,000x × $1,200x/$11,000x) for Year 1.

(viii) *Example 7: Subpart F income and tested loss*—(A) *Facts.* The facts are the same as in paragraph (A) of *Example 6,* except that for Year 1, FC1 has $8,000x of earnings and profits, $10,000x of subpart F income within the meaning of section 952 (but without regard to the limitation in section 952(c)), and $2,000x of tested loss within the meaning of section 951A(c)(2)(B) and § 1.951A–2(b)(2). Under section 951A(c)(2)(B)(ii) and § 1.951A–6(d), the earnings and profits of FC1 are increased for purposes of section 952 by the amount of FC1's tested loss. Accordingly, taking into account section 951A(c)(2)(B)(ii) and § 1.951A–6(d), the subpart F income of FC1 is $10,000x.

(B) *Analysis*—(1) *Pro rata share of subpart F income.* The current earnings and profits determined under paragraph (e)(1)(ii) of this section are $10,000x, the greater of the earnings and profits of FC1 determined under section 964 ($8,000x) or the sum of FC1's subpart F income and tested income ($10,000x + $0). The amount of FC1's current earnings and profits distributed in the hypothetical distribution with respect to USP2's preferred shares is $1,200x (.04 × $100x × 300) and with respect to Corp A's common shares is $8,800x ($10,000x − $1,200x). Accordingly, under paragraph (e)(1) of this section, for Year 1, USP1's pro rata share of FC1's subpart F income is $8,800x and USP2's pro rata share of FC1's subpart F income is $1,200x.

(2) *Pro rata share of tested loss.* The current earnings and profits determined under § 1.951A–1(d)(4)(i)(B) are $2,000x, the amount of FC1's tested loss. Under § 1.951A–1(d)(4)(i)(C), the entire $2,000x tested loss is distributed in the hypothetical distribution with respect to USP1's common shares. Accordingly, USP1's pro rata share of the tested loss is $2,000x.

*    *    *    *    *

(g) * * *

(1) *In general.* For purposes of sections 951 through 964, the term ''United States shareholder'' means, with respect to a foreign corporation, a United States person (as defined in section 957(c)) who owns within the meaning of section 958(a), or is considered as owning by applying the rules of ownership of section 958(b), 10 percent or more of the total combined voting power of all classes of stock entitled to vote of such foreign corporation, or 10 percent or more of the total value of shares of all classes of stock of such foreign corporation.

*    *    *    *    *

(h) *Special rule for partnership blocker structures*—(1) *In general.* For purposes of sections 951 through 964, a controlled domestic partnership is treated as a foreign partnership in determining the stock of a controlled foreign corporation owned (within the meaning of section 958(a)) by a United States person if the following conditions are satisfied—

(i) Without regard to this paragraph (h), the controlled domestic partnership owns (within the meaning of section 958(a)) stock of a controlled foreign corporation; and

(ii) If the controlled domestic partnership (and all other controlled domestic partnerships in the chain of ownership of the controlled foreign corporation) were treated as foreign—

(A) The controlled foreign corporation would continue to be a controlled foreign corporation; and

(B) At least one United States shareholder of the controlled foreign corporation would be treated as owning (within the meaning of section 958(a)) stock of the controlled foreign corporation through another United States person that is a direct or indirect partner in the controlled domestic partnership.

(2) *Definition of a controlled domestic partnership.* For purposes of paragraph (h)(1) of this section, the term *controlled domestic partnership* means, with respect to a United States shareholder described in paragraph (h)(1)(ii)(B) of this section, a domestic partnership that is controlled by the United States shareholder and persons related to the United States shareholder. For purposes of this paragraph (h)(2), control generally is determined based on all the facts and circumstances, except that a partnership will be deemed to be controlled by a United States shareholder and related persons in any case in which those persons, in the aggregate, own (directly or indirectly through one or more partnerships) more than 50 percent of the interests in the

partnership capital or profits. For purposes of this paragraph (h)(2), a related person is, with respect to a United States shareholder, a person that is related to the United States shareholder within the meaning of section 267(b) or 707(b)(1).

(3) *Example*—(i) *Facts.* USP, a domestic corporation, owns all of the stock of CFC1 and CFC2. CFC1 and CFC2 own 60% and 40%, respectively, of the interests in the capital and profits of DPS, a domestic partnership. DPS owns all of the stock of CFC3. Each of CFC1, CFC2, and CFC3 is a controlled foreign corporation. USP, DPS, CFC1, CFC2, and CFC3 all use the calendar year as their taxable year. For Year 1, CFC3 has $100x of subpart F income (as defined under section 952) and $100x of earnings and profits.

(ii) *Analysis.* DPS is a controlled domestic partnership with respect to USP within the meaning of paragraph (h)(2) of this section because more than 50% of the interests in its capital or profits are owned by persons related to USP within the meaning of section 267(b) (that is, CFC1 and CFC2), and thus DPS is controlled by USP and related persons. Without regard to paragraph (h) of this section, DPS is a United States shareholder that owns (within the meaning of section 958(a)) stock of CFC3, a controlled foreign corporation. If DPS were treated as foreign, CFC3 would continue to be a controlled foreign corporation, and USP would be treated as owning (within the meaning of section 958(a)) stock in CFC3 through CFC1 and CFC2, which are both partners in DPS. Thus, under paragraph (h)(1) of this section, DPS is treated as a foreign partnership for purposes of determining the stock of CFC3 owned (within the meaning of section 958(a)) by USP. Accordingly, USP's pro rata share of CFC3's subpart F income for Year 1 is $100x, and USP includes in its gross income $100x under section 951(a)(1)(A). DPS is not a United States shareholder of CFC3 for purposes of sections 951 through 964.

(i) *Applicability dates.* Paragraphs (a), (e)(1)(ii)(B), and (g)(1) of this section apply to taxable years of foreign corporations beginning after December 31, 2017, and to taxable years of United States shareholders with or within which such taxable years of foreign corporations end. Except for paragraph (e)(1)(ii)(B), paragraph (e) of this section applies to taxable years of United States shareholders ending on or after October 3, 2018. Paragraph (h) of this section applies to taxable years of domestic partnerships ending on or after May 14, 2010.

*    *    *    *    *

■ **Par. 3.** Section 1.951A–0 is added to read as follows:

### § 1.951A–0  Outline of section 951A regulations.

This section lists the headings for §§ 1.951A–1 through 1.951A–7.

**§ 1.951A–1    General provisions.**

(a) Overview.

(1) In general.

(2) Scope.

(b) Inclusion of global intangible low-taxed income.

(c) Determination of GILTI inclusion amount.

(1) In general.

(2) Definition of net CFC tested income.

(3) Definition of net deemed tangible income return.

(i) In general.

(ii) Definition of deemed tangible income return.

(iii) Definition of specified interest expense.

(4) Determination of GILTI inclusion amount for consolidated groups.

(d) Determination of pro rata share.

(1) In general.

(2) Tested income.

(i) In general.

(ii) Special rule for prior allocation of tested loss.

(3) Qualified business asset investment.

(i) In general.

(ii) Special rule for preferred stock in case of excess QBAI.

(iii) Examples.

(4) Tested loss.

(i) In general.

(ii) Special rule in case of accrued but unpaid dividends.

(iii) Special rule for stock with no liquidation value.

(iv) Examples.

(5) Tested interest expense.

(6) Tested interest income.

(e) Definitions.

(1) CFC inclusion date.

(2) CFC inclusion year.

(3) Section 958(a) stock.

(4) U.S. shareholder inclusion year.

**§ 1.951A–2    Tested income and tested loss.**

(a) Scope.

(b) Definitions related to tested income and tested loss.

(1) Tested income and tested income CFC.

(2) Tested loss and tested loss CFC.

(c) Rules relating to the determination of tested income and tested loss.

(1) Definition of gross tested income.

(2) Determination of gross tested income and allowable deductions.

(3) Allocation of deductions to gross tested income.

(4) Nonapplication of section 952(c).

(i) In general.

(ii) Example.

(5) Disregard of basis in property related to certain transfers during the disqualified period.

(i) In general.

(ii) Definition of specified property.

(iii) Definition of disqualified basis.

(iv) Example.

**§ 1.951A–3    Qualified business asset investment.**

(a) Scope.

(b) Definition of qualified business asset investment.

(c) Specified tangible property.

(1) In general.

(2) Tangible property.

(d) Dual use property.

(1) In general.

(2) Dual use ratio.

(3) Example.

(e) Determination of adjusted basis of specified tangible property.

(1) In general.

(2) Effect of change in law.

(3) Specified tangible property placed in service before enactment of section 951A.

(f) Special rules for short taxable years.

(1) In general.

(2) Determination of quarter closes.

(3) Reduction of qualified business asset investment.

(4) Example.

(g) Partnership property.

(1) In general.

(2) Definitions related to partnership QBAI.

(i) In general.

(ii) Partnership QBAI ratio.

(iii) Partnership specified tangible property.

(3) Determination of adjusted basis.

(4) Examples.

(h) Anti-abuse rules for certain transfers of property.

(1) Disregard of basis in specified tangible property held temporarily.

(2) Disregard of basis in specified tangible property related to transfers during the disqualified period.

(i) In general.

(ii) Determination of disqualified basis.

(A) In general.

(B) Definition of qualified gain amount.

(C) Definition of disqualified transfer.

(D) Definition of disqualified period.

(E) Related person.

(iii) Examples.

**§ 1.951A–4    Tested interest expense and tested interest income.**

(a) Scope.

(b) Definitions related to specified interest expense.

(1) Tested interest expense.

(i) In general.

(ii) Interest expense.

(iii) Qualified interest expense.

(iv) Qualified CFC.

(2) Tested interest income.

(i) In general.

(ii) Interest income.

(iii) Qualified interest income.

(c) Examples.

**§ 1.951A–5    Domestic partnerships and their partners.**

(a) Scope.

(b) In general.

(1) Determination of GILTI inclusion amount of a U.S. shareholder partnership.

(2) Determination of distributive share of U.S. shareholder partnership's GILTI inclusion amount of partner other than a U.S. shareholder partner.

(c) Determination of GILTI inclusion amount of a U.S. shareholder partner.

(d) Tiered U.S. shareholder partnerships.

(e) Definitions.

(1) CFC tested item.

(2) Partnership CFC.

(3) U.S. shareholder partner.

(4) U.S. shareholder partnership.

(f) Reporting requirement.

(g) Examples.

**§ 1.951A–6    Treatment of GILTI inclusion amount and adjustments to earnings and profits and basis related to tested loss CFCs.**

(a) Scope.

(b) Treatment as subpart F income for certain purposes.

(1) In general.

(2) Allocation of GILTI inclusion amount to tested income CFCs.

(i) In general.

(ii) Example.

(iii) Translation of portion of GILTI inclusion amount allocated to tested income CFC.

(c) Treatment as an amount includible in the gross income of a United States person.

(1) In general.

(2) Special rule for a United States shareholder that is a domestic partnership.

(d) Increase of earnings and profits of tested loss CFC for purposes of section 952(c)(1)(A).

(e) Adjustments to basis related to net used tested loss.

(1) In general.

(i) Disposition of stock of a controlled foreign corporation.

(ii) Disposition of stock of an upper-tier controlled foreign corporation.

(iii) Disposition of an interest in a foreign entity other than a controlled foreign corporation.

(iv) Order of application of basis reductions.

(v) No duplicative adjustments.

(2) Net used tested loss amount.

(i) In general.

(ii) Used tested loss amount.

(3) Net offset tested income amount.

(i) In general.
(ii) Offset tested income amount.
(4) Attribution to stock.
(i) In general.
(ii) Nonrecognition transactions.
(5) Section 381 transactions.
(6) Other definitions.
(i) Domestic corporation.
(ii) Disposition.
(7) Special rule for disposition by controlled foreign corporation less than 100 percent owned by a single domestic corporation.
(8) Special rules for members of a consolidated group.
(9) Examples.

### § 1.951A–7   Applicability dates.

■ **Par. 4.** Section 1.951A–1 is added to read as follows:

### § 1.951A–1   General provisions.

(a) *Overview*—(1) *In general.* This section and §§ 1.951A–2 through 1.951A–7 (collectively, the *section 951A regulations*) provide rules to determine a United States shareholder's income inclusion under section 951A and certain definitions for purposes of section 951A and the section 951A regulations. This section provides general rules for determining a United States shareholder's inclusion of global intangible low-taxed income. Section 1.951A–2 provides rules for determining a controlled foreign corporation's tested income or tested loss. Section 1.951A–3 provides rules for determining a controlled foreign corporation's qualified business asset investment. Section 1.951A–4 provides rules for determining a controlled foreign corporation's tested interest expense and tested interest income. Section 1.951A–5 provides rules relating to the application of section 951A and the section 951A regulations to domestic partnerships and their partners. Section 1.951A–6 provides rules relating to the treatment of the inclusion of global intangible low-taxed income for certain purposes and adjustments to earnings and profits and basis of a controlled foreign corporation related to a tested loss. Section 1.951A–7 provides dates of applicability.

(2) *Scope.* Paragraph (b) of this section provides the general rule requiring a United States shareholder to include in gross income its global intangible low-taxed income for a U.S. shareholder inclusion year. Paragraph (c) of this section provides rules for determining the amount of a United States shareholder's global intangible low-taxed income for the U.S. shareholder inclusion year, including a rule for the application of section 951A and the section 951A regulations to

consolidated groups. Paragraph (d) of this section provides rules for determining a United States shareholder's pro rata share of certain items for purposes of determining the United States shareholder's global intangible low-taxed income. Paragraph (e) of this section provides additional general definitions for purposes of this section and the section 951A regulations.

(b) *Inclusion of global intangible low-taxed income.* Each person who is a United States shareholder (as defined in section 951(b)) of any controlled foreign corporation (as defined in section 957) and owns section 958(a) stock (as defined in paragraph (e)(3) of this section) in any such controlled foreign corporation includes in gross income in the U.S. shareholder inclusion year (as defined in paragraph (e)(4) of this section) the shareholder's GILTI inclusion amount (as defined in paragraph (c) of this section), if any, for the U.S. shareholder inclusion year.

(c) *Determination of GILTI inclusion amount*—(1) *In general.* Except as provided in paragraph (c)(4) of this section, the term *GILTI inclusion amount* means, with respect to a United States shareholder and a U.S. shareholder inclusion year, the excess (if any) of—

(i) The shareholder's net CFC tested income (as defined in paragraph (c)(2) of this section) for the year, over

(ii) The shareholder's net deemed tangible income return (as defined in paragraph (c)(3) of this section) for the year.

(2) *Definition of net CFC tested income.* The term *net CFC tested income* means, with respect to a United States shareholder and a U.S. shareholder inclusion year, the excess (if any) of—

(i) The aggregate of the shareholder's pro rata share of the tested income of each tested income CFC (as defined in § 1.951A–2(b)(1)) for the year, over

(ii) The aggregate of the shareholder's pro rata share of the tested loss of each tested loss CFC (as defined in § 1.951A–2(b)(2)) for the year.

(3) *Definition of net deemed tangible income return*—(i) *In general.* The term *net deemed tangible income return* means, with respect to a United States shareholder and a U.S. shareholder inclusion year, the excess (if any) of—

(A) The shareholder's deemed tangible income return (as defined in paragraph (c)(3)(ii) of this section) for the year, over

(B) The shareholder's specified interest expense (as defined in paragraph (c)(3)(iii) of this section) for the year.

(ii) *Definition of deemed tangible income return.* The term *deemed tangible income return* means, with respect to a United States shareholder and a U.S. shareholder inclusion year, 10 percent of the aggregate of the shareholder's pro rata share of the qualified business asset investment (as defined in § 1.951A–3(b)) of each tested income CFC for the year.

(iii) *Definition of specified interest expense.* The term *specified interest expense* means, with respect to a United States shareholder and a U.S. shareholder inclusion year, the excess (if any) of—

(A) The aggregate of the shareholder's pro rata share of the tested interest expense (as defined in § 1.951A–4(b)(1)) of each controlled foreign corporation for the year, over

(B) The aggregate of the shareholder's pro rata share of the tested interest income (as defined in § 1.951A–4(b)(2)) of each controlled foreign corporation for the year.

(4) *Determination of GILTI inclusion amount for consolidated groups.* For purposes of section 951A and the section 951A regulations, a member of a consolidated group (as defined in § 1.1502–1(h)) determines its GILTI inclusion amount under the rules provided in § 1.1502–51.

(d) *Determination of pro rata share*—(1) *In general.* For purposes of paragraph (c) of this section, each United States shareholder that owns section 958(a) stock in a controlled foreign corporation as of a CFC inclusion date (as defined in paragraph (e)(1) of this section) determines for a U.S. shareholder inclusion year that includes such CFC inclusion date its pro rata share (if any) of the controlled foreign corporation's tested income, tested loss, qualified business asset investment, tested interest expense, and tested interest income (each a *CFC tested item*), as applicable, for the CFC inclusion year (as defined in paragraph (e)(2) of this section). Except as otherwise provided in this paragraph (d), a United States shareholder's pro rata share of each CFC tested item is determined independently of its pro rata share of any other CFC tested item. Except as modified in this paragraph (d), a United States shareholder's pro rata share of any CFC tested item is determined under the rules of section 951(a)(2) and § 1.951–1(b) and (e) in the same manner as those provisions apply to subpart F income. Under section 951(a)(2) and § 1.951–1(b) and (e), as modified by this paragraph (d), a United States shareholder's pro rata share of any CFC tested item for a U.S. shareholder inclusion year is

determined with respect to the section 958(a) stock of the controlled foreign corporation owned by the United States shareholder on the CFC inclusion date. A United States shareholder's pro rata share of any CFC tested item is translated into United States dollars using the average exchange rate for the CFC inclusion year of the controlled foreign corporation. Paragraphs (d)(2) through (5) of this section provide rules for determining a United States shareholder's pro rata share of each CFC tested item of a controlled foreign corporation.

(2) *Tested income*—(i) *In general.* Except as provided in paragraph (d)(2)(ii) of this section, a United States shareholder's pro rata share of the tested income of each tested income CFC for a U.S. shareholder inclusion year is determined under section 951(a)(2) and § 1.951–1(b) and (e), substituting "tested income" for "subpart F income" each place it appears, other than in § 1.951–1(e)(1)(ii)(B).

(ii) *Special rule for prior allocation of tested loss.* In any case in which tested loss has been allocated to any class of stock in a prior CFC inclusion year under paragraph (d)(4)(iii) of this section, tested income is first allocated to each such class of stock in the order of its liquidation priority to the extent of the excess (if any) of the sum of the tested loss allocated to each such class of stock for each prior CFC inclusion year under paragraph (d)(4)(iii) of this section, over the sum of the tested income allocated to each such class of stock for each prior CFC inclusion year under this paragraph (d)(2)(ii). Paragraph (d)(2)(ii) of this section applies for purposes of determining a United States shareholder's pro rata share of the remainder of the tested income, except that, for purposes of the hypothetical distribution of section 951(a)(2)(A) and § 1.951–1(b) and (e), the amount of current earnings and profits of the tested income CFC is reduced by the amount of tested income allocated under the first sentence of this paragraph (d)(2)(ii). For an example of the application of this paragraph (d)(2), see *Example 2* of paragraph (d)(4)(iv) of this section.

(3) *Qualified business asset investment*—(i) *In general.* Except as provided in paragraph (d)(3)(ii) of this section, a United States shareholder's pro rata share of the qualified business asset investment of a tested income CFC for a U.S. shareholder inclusion year bears the same ratio to the total qualified business asset investment of the tested income CFC for the CFC inclusion year as the United States shareholder's pro rata share of the tested

income of the tested income CFC for the U.S. shareholder inclusion year bears to the total tested income of the tested income CFC for the CFC inclusion year.

(ii) *Special rule for preferred stock in case of excess QBAI.* If a tested income CFC's qualified business asset investment for a CFC inclusion year exceeds 10 times its tested income for the CFC inclusion year (such excess, *excess QBAI*), a United States shareholder's pro rata share of the tested income CFC's qualified business asset investment is the sum of its pro rata share determined under paragraph (d)(3)(i) of this section without regard to the excess QBAI, plus its pro rata share determined under paragraph (d)(3)(i) of this section solely with respect to the excess QBAI and without regard to tested income allocated to any share of preferred stock of the tested income CFC under paragraph (d)(2) of this section.

(iii) *Examples.* The following examples illustrate the application of paragraphs (d)(2) and (3) of this section. See also § 1.951–1(e)(7), *Example 6* (illustrating a United States shareholder's pro rata share of tested income).

(A) *Example 1*—(1) *Facts.* FS, a controlled foreign corporation, has outstanding 70 shares of common stock and 30 shares of 4% nonparticipating, cumulative preferred stock with a par value of $10x per share. P Corp, a domestic corporation and a United States shareholder of FS, owns all of the common shares. Individual A, a United States shareholder, owns all of the preferred shares. Both FS and P Corp use the calendar year as their taxable year. Individual A and P Corp are shareholders of FS for all of Year 4. At the beginning of Year 4, FS had no dividend arrearages with respect to its preferred stock. For Year 4, FS has $100x of earnings and profits, $120x of tested income, and no subpart F income within the meaning of section 952. FS also has $750x of qualified business asset investment for Year 4.

(2) *Analysis*—(i) *Determination of pro rata share of tested income.* For purposes of determining P Corp's pro rata share of FS's tested income under paragraph (d)(2) of this section, the amount of FS's current earnings and profits for purposes of the hypothetical distribution described in § 1.951–1(e)(1)(i) is $120x, the greater of its earnings and profits as determined under section 964 ($100x) or the sum of its subpart F income and tested income ($0 + $120x). Under paragraph (d)(2) of this section and § 1.951–1(e)(3), the amount of FS's current earnings and profits distributed in the hypothetical distribution is $12x (.04 × $10x × 30) with respect to Individual A's preferred shares and $108x ($120x − $12x) with respect to P Corp's common shares. Accordingly, under paragraph (d)(2) of this section and § 1.951–1(e)(1), Individual A's pro rata share of FS's tested income is $12x, and P Corp's pro rata share of FS's tested income is $108x for Year 4.

(ii) *Determination of pro rata share of qualified business asset investment.* The special rule of paragraph (d)(3)(ii) of this section does not apply because FS's qualified business asset investment of $750x does not exceed $1,200x, which is 10 times FS's tested income of $120x. Accordingly, under the general rule of paragraph (d)(3)(i) of this section, Individual A's and P Corp's pro rata share of FS's qualified business asset investment bears the same ratio to FS's total qualified business asset investment as Individual A's and P Corp's pro rata share, respectively, of FS's tested income bears to FS's total tested income. Thus, Individual A's pro rata share of FS's qualified business asset investment is $75x ($750x × $12x/$120x), and P Corp's pro rata share of FS's qualified business asset investment is $675x ($750x × $108x/$120x).

(B) *Example 2*—(1) *Facts.* The facts are the same as in paragraph (1) of *Example 1*, except that FS has $1,500x of qualified business asset investment for Year 4.

(2) *Analysis.* (i) *Determination of pro rata share of tested income.* The analysis and the result are the same as in paragraph (2)(i) of *Example 1.*

(ii) *Determination of pro rata share of qualified business asset investment.* The special rule of paragraph (d)(3)(ii) of this section applies because FS's qualified business asset investment of $1,500x exceeds $1,200x, which is 10 times FS's tested income of $120x. Under paragraph (d)(3)(ii) of this section, Individual A's and P Corp's pro rata share of FS's qualified business asset investment is the sum of their pro rata share determined under paragraph (d)(3)(i) of this section without regard to the excess QBAI plus their pro rata share with respect to the excess QBAI but without regard to tested income allocated to preferred stock under paragraph (d)(2) of this section. Without regard to the excess QBAI of $300x, Individual A's pro rata share of FS's qualified business asset investment is $120x ($1,200x × $12x/$120x), and P Corp's pro rata share of FS's qualified business asset investment is $1,080x ($1,200x × $108x/$120x). Solely with respect to the excess QBAI and without regard to tested income allocated to the preferred stock under paragraph (d)(2) of this section, Individual A's pro rata share of FS's qualified business asset investment is $0 ($300x × $0/$108x), and P Corp's pro rata share of FS's qualified business asset investment is $300x ($300x × $108x/$108x). Thus, Individual A's pro rata share of FS's qualified business asset investment is $120x ($120x + $0), and P Corp's pro rata share of FS's qualified business asset investment is $1,380x ($1,080x + $300x).

(4) *Tested loss*—(i) *In general.* A United States shareholder's pro rata share of the tested loss of each tested loss CFC for a U.S. shareholder inclusion year is determined under section 951(a)(2) and § 1.951–1(b) and (e) with the following modifications—

(A) "Tested loss" is substituted for "subpart F income" each place it appears;

(B) For purposes of the hypothetical distribution described in section

951(a)(2)(A) and § 1.951–1(e)(1)(i), the amount of current earnings and profits of a controlled foreign corporation for a CFC inclusion year is treated as being equal to the tested loss of the tested loss CFC for the CFC inclusion year;

(C) Except as provided in paragraphs (d)(4)(ii) and (iii) of this section, the hypothetical distribution described in section 951(a)(2)(A) and § 1.951–1(e)(1)(i) is treated as made solely with respect to the common stock of the tested loss CFC; and

(D) The amount of the dividend received by any other person for purposes of section 951(a)(2)(B) and § 1.951–1(b)(1)(ii) is treated as being equal to the amount of the tested loss of the tested loss CFC for the CFC inclusion year (regardless of whether, or the extent to which, the other person actually receives a dividend).

(ii) *Special rule in case of accrued but unpaid dividends.* If a tested loss CFC's earnings and profits that have accumulated since the issuance of preferred shares are reduced below the amount necessary to satisfy any accrued but unpaid dividends with respect to such preferred shares, then the amount by which the tested loss reduces the earnings below the amount necessary to satisfy the accrued but unpaid dividends is distributed in the hypothetical distribution described in section 951(a)(2)(A) and § 1.951–1(e)(1)(i) with respect to the preferred stock of the tested loss CFC and the remainder of the tested loss is distributed with respect to the common stock of the tested loss CFC.

(iii) *Special rule for stock with no liquidation value.* If a tested loss CFC's common stock has a liquidation value of zero and there is at least one other class of equity with a liquidation preference relative to the common stock, then the tested loss is distributed in the hypothetical distribution described in section 951(a)(2)(A) and § 1.951–1(e)(1)(i) with respect to the most junior class of equity with a positive liquidation value to the extent of such liquidation value. Thereafter, tested loss is distributed with respect to the next most junior class of equity to the extent of its liquidation value and so on. All determinations of liquidation value are to be made as of the beginning of the CFC inclusion year of the tested loss CFC.

(iv) *Examples.* The following examples illustrate the application of this paragraph (d)(4). See also § 1.951–1(e)(7), *Example 7* (illustrating a United States shareholder's pro rata share of subpart F income and tested loss).

(A) *Example—* (1) *Facts.* FS, a controlled foreign corporation, has outstanding 70

shares of common stock and 30 shares of 4% nonparticipating, cumulative preferred stock with a par value of $10x per share. P Corp, a domestic corporation and a United States shareholder of FS, owns all of the common shares. Individual A, a United States citizen and a United States shareholder, owns all of the preferred shares. FS, Individual A, and P Corp all use the calendar year as their taxable year. Individual A and P Corp are shareholders of FS for all of Year 5. At the beginning of Year 5, FS had earnings and profits of $120x, which accumulated after the issuance of the preferred stock. At the end of Year 5, the accrued but unpaid dividends with respect to the preferred stock are $36x. For Year 5, FS has a $100x tested loss, and no other items of income, gain, deduction or loss. At the end of Year 5, FS has earnings and profits of $20x.

(2) *Analysis.* FS is a tested loss CFC for Year 5. Before taking into account the tested loss in Year 5, FS had sufficient earnings and profits to satisfy the accrued but unpaid dividends of $36x. The amount of the reduction in earnings below the amount necessary to satisfy the accrued but unpaid dividends attributable to the tested loss is $16x ($36x − ($120x − $100x)). Accordingly, under paragraph (d)(4)(ii) of this section, Individual A's pro rata share of the Year 5 tested loss is $16x, and P Corp's pro rata share of the tested loss is $84x ($100x–$16x).

(B) *Example 2*—(1) *Facts.* FS, a controlled foreign corporation, has outstanding 100 shares of common stock and 50 shares of 4% nonparticipating, cumulative preferred stock with a par value of $100x per share. P Corp, a domestic corporation and a United States shareholder of FS, owns all of the common shares. Individual A, a United States citizen and a United States shareholder, owns all of the preferred shares. FS, Individual A, and P Corp all use the calendar year as their taxable year. Individual A and P Corp are shareholders of FS for all of Year 1 and Year 2. At the beginning of Year 1, the common stock had no liquidation value and the preferred stock had a liquidation value of $5,000x and no accrued but unpaid dividends. In Year 1, FS has a tested loss of $1,000x and no other items of income, gain, deduction, or loss. In Year 2, FS has tested income of $3,000x and no other items of income, gain, deduction, or loss and paid no dividends. FS has earnings and profits of $3,000x for Year 2. At the end of Year 2, FS has accrued but unpaid dividends of $400x with respect to the preferred stock ($5000x × 0.04 for Year 1 and $5000x × 0.04 for Year 2). (2) *Analysis*—(i) *Year 1.* FS is a tested loss CFC in Year 1. The common stock of FS has liquidation value of zero and the preferred stock has a liquidation preference relative to the common stock. The tested loss ($1,000x) does not exceed the liquidation value of the preferred stock ($5,000x). Accordingly, under paragraph (d)(4)(iii) of this section, the tested loss is distributed with respect to the preferred stock in the hypothetical distribution described in section 951(a)(2)(A) and § 1.951–1(e). Individual A's pro rata share of the tested loss is $1,000x, and P Corp's pro rata share of the tested loss is $0.

(ii) *Year 2.* FS is a tested income CFC in Year 2. Because $1,000x of tested loss was

allocated to the preferred stock in Year 1 under paragraph (d)(4)(iii) of this section, the first $1,000x of tested income in Year 2 is allocated to the preferred stock under paragraph (d)(2)(iii) of this section. P Corp's and Individual A's pro rata shares of the remaining $2,000x of tested income are determined under the general rule of paragraph (d)(2)(i) of this section, except that for purposes of the hypothetical distribution the amount of FS's current earnings and profits is reduced by the tested income allocated under paragraph (d)(2)(i) of this section to $2,000x ($3,000x − $1,000x). Accordingly, under paragraph (d)(2)(i) of this section, the amount of FS's current earnings and profits distributed in the hypothetical distribution with respect to Individual A's preferred stock is $400x ($400x of accrued but unpaid dividends) and with respect to P Corp's common stock is $1,600x ($2,000x − $400x). Individual A's pro rata share of the tested income is $1,400x ($1,000x + $400x), and P Corp's pro rata share of the tested income is $1,600x.

(5) *Tested interest expense.* A United States shareholder's pro rata share of tested interest expense of a controlled foreign corporation for a U.S. shareholder inclusion year is equal to the amount by which the tested interest expense reduces the shareholder's pro rata share of tested income of the controlled foreign corporation for the U.S. shareholder inclusion year, increases the shareholder's pro rata share of tested loss of the controlled foreign corporation for the U.S. shareholder inclusion year, or both.

(6) *Tested interest income.* A United States shareholder's pro rata share of tested interest income of a controlled foreign corporation for a U.S. shareholder inclusion year is equal to the amount by which the tested interest income increases the shareholder's pro rata share of tested income of the controlled foreign corporation for the U.S. shareholder inclusion year, reduces the shareholder's pro rata share of tested loss of the controlled foreign corporation for the U.S. shareholder inclusion year, or both.

(e) *Definitions.* This paragraph (e) provides additional definitions that apply for purposes of the section 951A regulations. Other definitions relevant to the section 951A regulations are included in §§ 1.951A–2 through 1.951A–6.

(1) *CFC inclusion date.* The term *CFC inclusion date* means the last day of a CFC inclusion year on which a foreign corporation is a controlled foreign corporation.

(2) *CFC inclusion year.* The term *CFC inclusion year* means any taxable year of a foreign corporation beginning after December 31, 2017, at any time during which the corporation is a controlled foreign corporation.

(3) *Section 958(a) stock.* The term *section 958(a) stock* means stock of a controlled foreign corporation owned (directly or indirectly) by a United States shareholder within the meaning of section 958(a).

(4) *U.S. shareholder inclusion year.* The term *U.S. shareholder inclusion year* means a taxable year of a United States shareholder that includes a CFC inclusion date of a controlled foreign corporation of the United States shareholder.

■ **Par. 5.** Section 1.951A–2 is added to read as follows:

### § 1.951A–2  Tested income and tested loss.

(a) *Scope.* This section provides general rules for determining the tested income or tested loss of a controlled foreign corporation for purposes of determining a United States shareholder's net CFC tested income under § 1.951A–1(c)(2). Paragraph (b) of this section provides definitions related to tested income and tested loss. Paragraph (c) of this section provides rules for determining the gross tested income of a controlled foreign corporation and the deductions that are properly allocable to gross tested income.

(b) *Definitions related to tested income and tested loss*—(1) *Tested income and tested income CFC.* The term *tested income* means the excess (if any) of a controlled foreign corporation's gross tested income for a CFC inclusion year, over the allowable deductions (including taxes) properly allocable to the gross tested income for the CFC inclusion year (a controlled foreign corporation with tested income for a CFC inclusion year, a *tested income CFC*).

(2) *Tested loss and tested loss CFC.* The term *tested loss* means the excess (if any) of a controlled foreign corporation's allowable deductions (including taxes) properly allocable to gross tested income (or that would be allocable to gross tested income if there were gross tested income) for a CFC inclusion year, over the gross tested income of the controlled foreign corporation for the CFC inclusion year (a controlled foreign corporation without tested income for a CFC inclusion year, a *tested loss CFC*).

(c) *Rules relating to the determination of tested income and tested loss*—(1) *Definition of gross tested income.* The term *gross tested income* means the gross income of a controlled foreign corporation for a CFC inclusion year determined without regard to—

(i) Items of income described in section 952(b),

(ii) Gross income taken into account in determining the subpart F income of the corporation,

(iii) Gross income excluded from the foreign base company income (as defined in section 954) or the insurance income (as defined in section 953) of the corporation solely by reason of an election made under section 954(b)(4) and § 1.954–1(d)(5),

(iv) Dividends received by the corporation from related persons (as defined in section 954(d)(3)), and

(v) Foreign oil and gas extraction income (as defined in section 907(c)(1)) of the corporation.

(2) *Determination of gross income and allowable deductions.* For purposes of determining tested income and tested loss, the gross income and allowable deductions of a controlled foreign corporation for a CFC inclusion year are determined under the rules of § 1.952–2 for determining the subpart F income of a controlled foreign corporation.

(3) *Allocation of deductions to gross tested income.* Any deductions of a controlled foreign corporation allowable under paragraph (c)(2) of this section are allocated and apportioned to gross tested income under the principles of section 954(b)(5) and § 1.954–1(c), by treating gross tested income that falls within a single separate category (as defined in § 1.904–5(a)(1)) as a single item of gross income, in addition to the items set forth in § 1.954–1(c)(1)(iii).

(4) *Nonapplication of section 952(c)*—(i) *In general.* The gross tested income and allowable deductions properly allocable to gross tested income of a controlled foreign corporation for a CFC inclusion year are determined without regard to the application of section 952(c).

(ii) *Example.* The following example illustrates the application of this paragraph (c)(4).

*(A) Example*—(1) *Facts. A Corp, a domestic corporation, owns 100% of the single class of stock of FS, a controlled foreign corporation. Both A Corp and FS use the calendar year as their taxable year. In Year 1, FS has foreign base company income of $100x, a loss in foreign oil and gas extraction income of $100x, and earnings and profits of $0. FS has no other income. In Year 2, FS has gross income of $100x and earnings and profits of $100x. Without regard to section 952(c)(2), in Year 2 FS has no income described in any of the categories of income excluded from gross tested income in paragraphs (c)(1)(i) through (v) of this section. FS has no allowable deductions properly allocable to gross tested income for Year 2.* (2) *Analysis.* As a result of the earnings and profits limitation of section 952(c)(1), FS has no subpart F income in Year 1, and A Corp has no inclusion with respect to FS under section 951(a)(1)(A). Under paragraph (c)(4)(i) of this*

section, the gross tested income of FS is determined without regard to section 952(c)(1). Therefore, in determining the gross tested income of FS in Year 1, the $100x foreign base company income of FS in Year 1 is excluded under paragraph (c)(1)(ii) of this section, and FS has no gross tested income in Year 1. In Year 2, under section 952(c)(2), FS's earnings and profits ($100x) in excess of its subpart F income ($0) are treated as subpart F income. Therefore, FS has subpart F income of $100x in Year 2, and A Corp has an inclusion of $100x with respect to FS under section 951(a)(1)(A). Under paragraph (c)(4)(i) of this section, the gross tested income of FS is determined without regard to section 952(c)(2). Accordingly, FS's income in Year 2 is not subpart F income described in paragraph (c)(1)(ii) of this section, and FS has $100x of gross tested income in Year 2.

(5) *Disregard of basis in property related to certain transfers during the disqualified period*—(i) *In general.* Any deduction or loss attributable to disqualified basis of any specified property allocated and apportioned to gross tested income under paragraph (c)(3) of this section is disregarded for purposes of determining tested income or tested loss of a controlled foreign corporation. For purposes of this paragraph (c)(5), in the case that a deduction or loss arises with respect to specified property with disqualified basis and adjusted basis other than disqualified basis, the deduction or loss is treated as attributable to the disqualified basis in the same proportion that the disqualified basis bears to the total adjusted basis of the property.

(ii) *Definition of specified property.* The term *specified property* means property that is of a type with respect to which a deduction is allowable under section 167 or 197.

(iii) *Definition of disqualified basis.* Solely for purposes of paragraph (c)(5)(i) of this section, the term *disqualified basis* has the meaning set forth in § 1.951A–3(h)(2)(ii) (including with respect to property owned by a partnership by reason of § 1.951A–3(g)(3)), except that, in applying the provisions of § 1.951A–3(h)(2) to determine the disqualified basis, the term "specified property" is substituted for "specified tangible property" and the term "controlled foreign corporation" is substituted for "tested income CFC" each place they appear.

(iv) *Example*— (A) *Facts.* USP, a domestic corporation, owns all of the stock of CFC1 and CFC2, each a controlled foreign corporation. Both USP and CFC1 use the calendar year as their taxable year. CFC2 uses a taxable year ending November 30. On November 1, 2018, before the start of its first CFC inclusion year, CFC2 sells intangible property to CFC1 that is amortizable under

section 197 in exchange for $100x of cash. The intangible property has a basis of $20x in the hands of CFC2, and CFC2 recognizes $80x of gain as a result of the sale ($100x − $20x). CFC2's gain is not subject to U.S. tax or taken into account in determining USP's inclusion under section 951(a)(1)(A).

(B) *Analysis.* The sale by CFC1 is a disqualified transfer (within the meaning of § 1.951A–3(h)(2)(ii)(C), as modified by paragraph (c)(5)(iii) of this section) because it is a transfer of specified property, CFC2 and CFC1 are related persons, and the transfer occurs during the disqualified period (within the meaning of § 1.951A–3(h)(2)(ii)(D)). The disqualified basis is $80x, the excess of CFC1's adjusted basis in the property immediately after the disqualified transfer ($100x), over the sum of CFC2's basis in the property immediately before the transfer ($20x) and the qualified gain amount (as defined in § 1.951A–3(h)(2)(ii)(B)) ($0). Accordingly, under paragraph (c)(5)(i) of this section, any deduction or loss attributable to the disqualified basis is disregarded for purposes of determining the tested income or tested loss of any CFC for any CFC inclusion year.

■ **Par. 6.** Section 1.951A–3 is added to read as follows:

### § 1.951A–3  Qualified business asset investment.

(a) *Scope.* This section provides general rules for determining the qualified business asset investment of a controlled foreign corporation for purposes of determining a United States shareholder's deemed tangible income return under § 1.951A–1(c)(3)(ii). Paragraph (b) of this section defines qualified business asset investment. Paragraph (c) of this section defines tangible property and specified tangible property. Paragraph (d) of this section provides rules and examples for determining the portion of property that is specified tangible property when the property is used in the production of both gross tested income and gross income that is not gross tested income. Paragraph (e) of this section provides rules for determining the adjusted basis of specified tangible property. Paragraph (f) of this section provides rules for determining qualified business asset investment of a tested income CFC with a short taxable year. Paragraph (g) of this section provides rules and examples for increasing the qualified business asset investment of a tested income CFC by reason of property owned through a partnership. Paragraph (h) of this section provides anti-abuse rules that disregard the basis of specified tangible property transferred in certain transactions when determining the qualified business asset investment of a tested income CFC.

(b) *Definition of qualified business asset investment.* The term *qualified business asset investment* means the average of a tested income CFC's aggregate adjusted bases as of the close of each quarter of a CFC inclusion year in specified tangible property that is used in a trade or business of the tested income CFC and is of a type with respect to which a deduction is allowable under section 167. A tested loss CFC has no qualified business asset investment. See paragraph (f) of this section for rules relating to the qualified business asset investment of a tested income CFC with a short taxable year.

(c) *Specified tangible property*—(1) *In general.* The term *specified tangible property* means, subject to paragraph (d) of this section, tangible property used in the production of gross tested income. None of the tangible property of a tested loss CFC is specified tangible property.

(2) *Tangible property.* The term *tangible property* means property for which the depreciation deduction provided by section 167(a) is eligible to be determined under section 168 without regard to section 168(f)(1), (2), or (5) and the date placed in service.

(d) *Dual use property*—(1) *In general.* In the case of tangible property of a tested income CFC that is used in both the production of gross tested income and the production of gross income that is not gross tested income in a CFC inclusion year, the portion of the adjusted basis in the property treated as adjusted basis in specified tangible property for the CFC inclusion year is determined by multiplying the average of the tested income CFC's adjusted basis in the property by the dual use ratio with respect to the property for the CFC inclusion year.

(2) *Dual use ratio.* The term *dual use ratio* means, with respect to specified tangible property:

(i) In the case of specified tangible property that produces directly identifiable income for a CFC inclusion year, the ratio of the gross tested income produced by the property for the CFC inclusion year to the total amount of gross income produced by the property for the CFC inclusion year.

(ii) In the case of specified tangible property that does not produce directly identifiable income for a CFC inclusion year, the ratio of the gross tested income of the tested income CFC for the CFC inclusion year to the total amount of gross income of the tested income CFC for the CFC inclusion year.

(3) *Example.* The following example illustrates the application of this paragraph (d).

(i) *Example*— (A) *Facts.* FS is a tested income CFC. FS owns a machine that only packages Product A. In Year 1, FS sells Product A to related and unrelated resellers and earns $1,000x of gross income. For Year 1, sales of Product A produce gross tested income of $750x and foreign base company sales income (as defined in section 954(d)) of $250x. The average adjusted basis of the machine for Year 1 in the hands of FS is $4,000x. FS also owns an office building for its administrative functions with an average adjusted basis for Year 1 of $10,000x. The office building does not produce directly identifiable income. FS has no other specified tangible property. For year 1, FS also earns $1,250x of gross tested income and $2,750x of foreign base company sales income from sales of Product B. Neither the machine nor the office building is used in the production of income related to Product B. For Year 1, FS's gross tested income is $2,000x and its total gross income is $5,000x.

(B) *Analysis.* The machine and office building are both property for which the depreciation deduction provided by section 167(a) is eligible to be determined under section 168. Therefore, under paragraph (c)(2) of this section, the machine and office building are tangible property. Under paragraph (d)(1) of this section, the portion of the basis in the machine treated as basis in specified tangible property is equal to FS's average basis in the machine for the year ($4,000x), multiplied by the dual use ratio under paragraph (d)(2)(i) of this section (75%), which is the proportion that the gross tested income produced by the property ($750x) bears to the total gross income produced by the property ($1,000x). Accordingly, $3,000x ($4,000x × 75%) of FS's adjusted basis in the machine is taken into account in determining the average of FS's aggregate adjusted bases described in paragraph (b) of this section. Under paragraph (d)(1) of this section, the portion of the basis in the office building treated as basis in specified tangible property is equal to FS's average basis in the office building for the year ($10,000x), multiplied by the dual use ratio under paragraph (d)(2)(ii) of this section (40%), which is the ratio of FS's gross tested income for Year 1 ($2,000x) to FS's total gross income for Year 1 ($5,000x). Accordingly, $4,000x ($10,000x × 40%) of FS's adjusted basis in the office building is taken into account in determining the average of FS's aggregate adjusted bases described in paragraph (b) of this section.

(e) *Determination of adjusted basis of specified tangible property*—(1) *In general.* The adjusted basis in specified tangible property is determined by using the alternative depreciation system under section 168(g), and by allocating the depreciation deduction with respect to such property for the CFC inclusion year ratably to each day during the period in the taxable year to which such depreciation relates.

(2) *Effect of change in law.* The determination of adjusted basis for purposes of paragraph (b) of this section is made without regard to any provision of law enacted after December 22, 2017, unless such later enacted law specifically and directly amends the

definition of qualified business asset investment under section 951A.

(3) *Specified tangible property placed in service before enactment of section 951A.* The adjusted basis in property placed in service before December 22, 2017, is determined using the alternative depreciation system under section 168(g), as if this system had applied from the date that the property was placed in service.

(f) *Special rules for short taxable years*—(1) *In general.* In the case of a tested income CFC that has a CFC inclusion year that is less than twelve months (a *short taxable year*), the rules for determining the qualified business asset investment of the tested income CFC under this section are modified as provided in paragraphs (f)(2) and (3) of this section with respect to the CFC inclusion year.

(2) *Determination of quarter closes.* For purposes of determining quarter closes, in determining the qualified business asset investment of a tested income CFC for a short taxable year, the quarters of the tested income CFC for purposes of this section are the full quarters beginning and ending within the short taxable year (if any), determining quarter length as if the tested income CFC did not have a short taxable year, plus one or more short quarters (if any).

(3) *Reduction of qualified business asset investment.* The qualified business asset investment of a tested income CFC for a short taxable year is the sum of—

(i) The sum of the tested income CFC's aggregate adjusted bases in specified tangible property as of the close of each full quarter (if any) in the CFC inclusion year divided by four, plus

(ii) The tested income CFC's aggregate adjusted bases in specified tangible property as of the close of each short quarter (if any) in the CFC inclusion year multiplied by the sum of the number of days in each short quarter divided by 365.

(4) *Example.* The following example illustrates the application of this paragraph (f).

*(i) Example—* (A) *Facts.* USP1, a domestic corporation, owns all of the stock of FS, a controlled foreign corporation. USP1 owns FS from the beginning of Year 1. On July 15, Year 1, USP1 sells FS to USP2, an unrelated person. USP2 makes a section 338(g) election with respect to the purchase of FS, as a result of which FS's taxable year is treated as ending on July 15. USP1, USP2, and FS all use the calendar year as their taxable year. FS's aggregate adjusted bases in specified tangible property are $250x as of March 31, $300x as of June 30, $275x as of July 15, $500x as of September 30, and $450x as of December 31.

(B) *Analysis*—(1) *Determination of short taxable years and quarters.* FS has two short taxable years in Year 1. The first short taxable year is from January 1 to July 15, with two full quarters (January 1–March 31 and April 1–June 30) and one short quarter (July 1–July 15). The second taxable year is from July 16 to December 31, with one short quarter (July 16–September 30) and one full quarter (October 1–December 31).

(2) *Calculation of qualified business asset investment for the first short taxable year.* Under paragraph (f)(2) of this section, for the first short taxable year in Year 1, FS has three quarter closes (March 31, June 30, and July 15). Under paragraph (f)(3) of this section, the qualified business asset investment of FS for the first short taxable year is $148.80x, the sum of $137.50x (($250x + $300x)/4) attributable to the two full quarters and $11.30x ($275x × 15/365) attributable to the short quarter.

(3) *Calculation of qualified business asset investment for the second short taxable year.* Under paragraph (f)(2) of this section, for the second short taxable year in Year 1, FS has two quarter closes (September 30 and December 31). Under paragraph (f)(3) of this section, the qualified business asset investment of FS for the second short taxable year is $217.98x, the sum of $112.50x ($450x/4) attributable to the one full quarter and $105.48x ($500x × 77/365) attributable to the short quarter.

(g) *Partnership property*—(1) *In general.* For purposes of paragraph (b) of this section, if a tested income CFC holds an interest in one or more partnerships as of the close of the CFC inclusion year, the qualified business asset investment of the tested income CFC for the CFC inclusion year is increased by the sum of the tested income CFC's partnership QBAI with respect to each partnership for the CFC inclusion year. A tested loss CFC has no partnership QBAI for a CFC inclusion year.

(2) *Definitions related to partnership QBAI*—(i) *In general.* The term *partnership QBAI* means the sum of the tested income CFC's share of the partnership's adjusted basis in partnership specified tangible property as of the close of a partnership taxable year that ends with or within a CFC inclusion year. A tested income CFC's share of the partnership's adjusted basis in partnership specified tangible property is determined separately with respect to each partnership specified tangible property of the partnership by multiplying the partnership's adjusted basis in the property by the partnership QBAI ratio with respect to the property. If the partnership's taxable year is less than twelve months, the principles of paragraph (f) of this section apply in determining a tested income CFC's partnership QBAI with respect to the partnership.

(ii) *Partnership QBAI ratio.* The term *partnership QBAI ratio* means, with respect to partnership specified tangible property:

(A) In the case of partnership specified tangible property that produces directly identifiable income for a partnership taxable year, the ratio of the tested income CFC's distributive share of the gross income produced by the property for the partnership taxable year that is included in the gross tested income of the tested income CFC for the CFC inclusion year to the total gross income produced by the property for the partnership taxable year.

(B) In the case of partnership specified tangible property that does not produce directly identifiable income for a partnership taxable year, the ratio of the tested income CFC's distributive share of the gross income of the partnership for the partnership taxable year that is included in the gross tested income of the tested income CFC for the CFC inclusion year to the total amount of gross income of the partnership for the partnership taxable year.

(iii) *Partnership specified tangible property.* The term *partnership specified tangible property* means tangible property (as defined in paragraph (c)(2) of this section) of a partnership that is—

(A) Used in the trade or business of the partnership,

(B) Of a type with respect to which a deduction is allowable under section 167, and

(C) Used in the production of tested income.

(3) *Determination of adjusted basis.* For purposes of this paragraph (g), a partnership's adjusted basis in partnership specified tangible property is determined based on the average of the partnership's adjusted basis in the property as of the close of each quarter in the partnership taxable year. The principles of paragraphs (e) and (h) of this section apply for purposes of determining a partnership's adjusted basis in partnership specified tangible property and the portion of such adjusted basis taken into account in determining a tested income CFC's partnership QBAI.

(4) *Examples.* The following examples illustrate the rules of this paragraph (g).

*(i) Example 1—* (A) *Facts.* FC, a tested income CFC, is a partner in PRS. Both FC and PRS use the calendar year as their taxable year. PRS owns two assets, Asset A and Asset B, both of which are tangible property used in PRS's trade or business that it depreciates under section 168. The average of PRS's adjusted basis as of the close of each quarter of PRS's taxable year in Asset A is $100x and the average of PRS's adjusted basis as of the end of each quarter of PRS's taxable year in

Asset B is $50x. Asset A produces $10x of directly identifiable gross income in Year 1, and Asset B produces $50x of directly identifiable gross income in Year 1. FC's distributive share of the gross income from Asset A is $8x and its distributive share of the gross income from Asset B is $10x. FC's entire distributive share of income from Asset A and Asset B is included in FC's gross tested income for Year 1. PRS partners' distributive shares satisfy the requirements of section 704.

(B) *Analysis.* Each of Asset A and Asset B is partnership specified tangible property because each is tangible property, of a type with respect to which a deduction is allowable under section 167, used in PRS's trade or business, and used in the production of tested income. FC's partnership QBAI ratio for Asset A is 80%, the ratio of FC's distributive share of the gross income from Asset A for Year 1 that is included in FC's gross tested income ($8x) to the total gross income produced by Asset A for Year 1 ($10x). FC's partnership QBAI ratio for Asset B is 20%, the ratio of FC's distributive share of the gross income from Asset B for Year 1 that is included in FC's gross tested income ($10x) to the total gross income produced by Asset B for Year 1 ($50x). FC's share of the average of PRS's adjusted basis of Asset A is $80x, PRS's adjusted basis in Asset A of $100x multiplied by FC's partnership QBAI ratio for Asset A of 80%. FC's share of the average of PRS's adjusted basis of Asset B is $10x, PRS's adjusted basis in Asset B of $50x multiplied by FC's partnership QBAI ratio for Asset B of 20%. Therefore, FC's partnership QBAI with respect to PRS is $90x ($80x + $10x). Accordingly, under paragraph (g)(1) of this section, FC increases its qualified business asset investment for Year 1 by $90x.

*(ii) Example 2*— (A) *Facts.* FC, a tested income CFC, owns a 50% interest in PRS. PRS owns Asset A, which is specified tangible property. The average of PRS's adjusted basis as of the close of each quarter of PRS's taxable year in Asset A is $100x. FC has the same taxable year as PRS. Asset A produces $20x of directly identifiable gross income in Year 1, and PRS has $22x of expenses in Year 1 that are properly allocable to such income. Therefore, FC's allocation of net income or loss from PRS is $1x loss, which is comprised of FC's distributive share of the gross income from Asset A of $10x, all of which is included in FC's gross tested income for Year 1, and FC's distributive share of the expenses related to Asset A of $11x, all of which is taken into account in determining its tested income under § 1.951–2(c). PRS has no other income or loss in Year 1. FC also has $8x of gross tested income from other sources in Year 1, and no deductions properly allocable to such income. PRS partners' distributive shares satisfy the requirements of section 704.

(B) *Analysis.* FC's partnership QBAI ratio for Asset A is 50%, the ratio of FC's distributive share of the gross income from Asset A for Year 1 that is included in FC's gross tested income ($10x) to the total gross income produced by Asset A for Year 1 ($20x). FC's share of the average of PRS's adjusted basis in Asset A is $50x, PRS's adjusted basis in Asset A of $100x multiplied by FC's partnership QBAI ratio for Asset A of 50%. FC increases its qualified business asset investment by $50x, notwithstanding that FC would not be a tested income CFC but for its $8x of gross tested income from other sources.

(h) *Anti-abuse rules for certain transfers of property*—(1) *Disregard of basis in specified tangible property held temporarily.* If a tested income CFC (*acquiring CFC*) acquires specified tangible property (as defined in paragraph (c)(1) of this section) with a principal purpose of reducing the GILTI inclusion amount of a United States shareholder for any U.S. shareholder inclusion year, and the tested income CFC holds the property temporarily but over at least the close of one quarter, the specified tangible property is disregarded in determining the acquiring CFC's average adjusted basis in specified tangible property for purposes of determining the acquiring CFC's qualified business asset investment for any CFC inclusion year during which the tested income CFC held the property. For purposes of this paragraph (h)(1), specified tangible property held by the tested income CFC for less than a twelve month period that includes at least the close of one quarter during the taxable year of a tested income CFC is treated as temporarily held and acquired with a principal purpose of reducing the GILTI inclusion amount of a United States shareholder for a U.S. shareholder inclusion year if such acquisition would, but for this paragraph (h)(1), reduce the GILTI inclusion amount of a United States shareholder for a U.S. shareholder inclusion year.

(2) *Disregard of basis in specified tangible property related to transfers during the disqualified period*—(i) *In general.* For purposes of determining the qualified business asset investment of a tested income CFC for a CFC inclusion year, in applying the alternative depreciation system under section 168(g) to determine the tested income CFC's adjusted basis in specified tangible property, any disqualified basis with respect to the specified tangible property is not taken into account.

(ii) *Determination of disqualified basis*—(A) *In general.* The term *disqualified basis* means, with respect to specified tangible property, the excess (if any) of the property's adjusted basis immediately after a disqualified transfer, over the sum of the property's adjusted basis immediately before the disqualified transfer and the qualified gain amount with respect to the disqualified transfer. Disqualified basis may be reduced or eliminated through

depreciation, amortization, sales or exchanges, section 362(e), and other methods. In such circumstances, in the case of specified tangible property with disqualified basis and adjusted basis other than disqualified basis, the disqualified basis is reduced or eliminated in the same proportion that the disqualified basis bears to the total adjusted basis of the property.

(B) *Definition of qualified gain amount.* The term *qualified gain amount* means, with respect to a disqualified transfer, the sum of the following amounts:

(*1*) The amount of gain recognized by a controlled foreign corporation (*transferor CFC*) on the disqualified transfer of the specified tangible property that is subject to U.S. federal income tax under section 882 (except to the extent the gain is subject to a reduced rate of tax, or is exempt from tax, pursuant to an applicable treaty obligation of the United States); and

(*2*) Any United States shareholder's pro rata share of the gain recognized by the transferor CFC on the disqualified transfer of the specified tangible property (determined without regard to properly allocable deductions) taken into account in determining the United States shareholder's inclusion under section 951(a)(1)(A), excluding any amount that is described in paragraph (h)(2)(ii)(B)(*1*) of this section.

(C) *Definition of disqualified transfer.* The term *disqualified transfer* means a transfer of specified tangible property during a transferor CFC's disqualified period by the transferor CFC to a related person in which gain was recognized, in whole or in part, by the transferor CFC, regardless of whether the property was specified tangible property in the hands of the transferor CFC. For purposes of the preceding sentence, a transfer includes any disposition, sale or exchange, contribution, or distribution of the specified tangible property, and includes an indirect transfer (for example, a transfer of an interest in a partnership is treated as a transfer of the assets of the partnership and transfer by or to a partnership is treated as a transfer by or to its partners).

(D) *Definition of disqualified period.* The term *disqualified period* means, with respect to a transferor CFC, the period beginning on January 1, 2018, and ending as of the close of the transferor CFC's last taxable year that is not a CFC inclusion year. A transferor CFC that has a CFC inclusion year beginning January 1, 2018, has no disqualified period.

(E) *Related person.* For purposes of this paragraph (h)(2), a person is related to a controlled foreign corporation if the

person bears a relationship to the controlled foreign corporation described in section 267(b) or 707(b) immediately before or immediately after the transfer.

(iii) *Examples.* The following examples illustrate the application of this paragraph (h)(2).

(A) *Example 1*—(1) *Facts.* USP, a domestic corporation, owns all of the stock of CFC1 and CFC2, each a controlled foreign corporation. Both USP and CFC1 use the calendar year as their taxable year. CFC2 uses a taxable year ending November 30. On November 1, 2018, before the start of its first CFC inclusion year, CFC2 sells specified tangible property that has a basis of $10x in the hands of CFC2 to CFC1 in exchange for $100x of cash. CFC2 recognizes $90x of gain as a result of the sale ($100x − $10x), $30x of which is foreign base company income (within the meaning of section 954). USP includes in gross income under section 951(a)(1)(A) its pro rata share of the subpart F income of $30x. CFC2's gain is not otherwise subject to U.S. tax or taken into account in determining USP's inclusion under section 951(a)(1)(A).

(2) *Analysis.* The transfer is a disqualified transfer because it is a transfer of specified tangible property; CFC1 and CFC2 are related persons; and the transfer occurs during the disqualified period, the period that begins on January 1, 2018, and ends the last day before the first CFC inclusion year of CFC2 (November 30, 2018). The disqualified basis is $60x, the excess of CFC1's adjusted basis in the property immediately after the disqualified transfer ($100x), over the sum of CFC2's basis in the property immediately before the transfer ($10x) and USP's pro rata share of the gain recognized by CFC1 on the transfer of the property taken into account by USP under section 951(a)(1)(A) ($30x). Accordingly, under paragraph (h)(2)(i) of this section, for purposes of determining the qualified business asset investment of any tested income CFC for any CFC inclusion year, in applying section 168(g) to determine the CFC's basis in the specified tangible property, the $60x disqualified basis of the property is not taken into account.

(B) *Example 2*— (1) *Facts.* The facts are the same as in paragraph (1) of *Example 1*, except that CFC2 uses the calendar year as its taxable year.

(2) *Analysis.* Because CFC2 has a taxable year beginning January 1, 2018, CFC2 has no disqualified period. Accordingly, the property was not transferred during a disqualified period of CFC2, and there is no disqualified basis with respect to the property.

■ **Par. 7** Section 1.951A–4 is added to read as follows:

## §1.951A–4  Tested interest expense and tested interest income.

(a) *Scope.* This section provides general rules for determining the tested interest expense and tested interest income of a controlled foreign corporation for purposes of determining a United States shareholder's specified interest expense under § 1.951A–

1(c)(3)(iii). Paragraph (b) of this section provides the definitions related to tested interest expense and tested interest income. Paragraph (c) of this section provides examples illustrating these definitions and the application of § 1.951A–1(c)(3)(iii). The amount of specified interest expense determined under § 1.951A–1(c)(3)(iii) and this section is the amount of interest expense described in section 951A(b)(2)(B).

(b) *Definitions related to specified interest expense*—(1) *Tested interest expense*—(i) *In general.* The term *tested interest expense* means interest expense paid or accrued by a controlled foreign corporation taken into account in determining the tested income or tested loss of the controlled foreign corporation for the CFC inclusion year under § 1.951A–2(c), reduced by the qualified interest expense of the controlled foreign corporation.

(ii) *Interest expense.* The term *interest expense* means any expense or loss that is treated as interest expense by reason of the Internal Revenue Code or the regulations thereunder, and any other expense or loss incurred in a transaction or series of integrated or related transactions in which the use of funds is secured for a period of time if such expense or loss is predominately incurred in consideration of the time value of money.

(iii) *Qualified interest expense.* The term *qualified interest expense* means, with respect to a qualified CFC, the interest expense paid or accrued by the qualified CFC taken into account in determining the tested income or tested loss of the qualified CFC for the CFC inclusion year, multiplied by the fraction (not to exceed one) described in paragraph (b)(1)(iii)(A) of this section, and then reduced (but not to less than zero) by the amount described in paragraph (b)(1)(iii)(B) of this section.

(A) The numerator of the fraction described in this paragraph (b)(1)(iii)(A) is the average of the aggregate adjusted bases as of the close of each quarter of obligations or financial instruments held by the qualified CFC that give rise to income excluded from foreign personal holding company income (as defined in section 954(c)(1)) by reason of section 954(h) or (i), and the denominator is the average of the aggregate adjusted bases as of the close of each quarter of all assets held by the qualified CFC. For purposes of this paragraph (b)(1)(iii)(A), the basis of the stock of another qualified CFC held by a qualified CFC is treated as basis of an obligation or financial instrument giving rise to income excluded from foreign personal holding company income by

reason of section 954(h) or (i) in an amount equal to the basis of the stock multiplied by the fraction described in this paragraph (b)(1)(iii)(A) determined with respect to the assets of such other qualified CFC.

(B) The amount described in this paragraph (b)(1)(iii)(B) is the amount of interest income of the qualified CFC for the CFC inclusion year that is excluded from foreign personal holding company income (as defined in section 954(c)(1)) by reason of section 954(c)(3) or (6).

(iv) *Qualified CFC.* The term *qualified CFC* means an eligible controlled foreign corporation (within the meaning of section 954(h)(2)) or a qualifying insurance company (within the meaning of section 953(e)(3)).

(2) *Tested interest income*—(i) *In general.* The term *tested interest income* means interest income included in the gross tested income of a controlled foreign corporation for the CFC inclusion year, reduced by qualified interest income of the controlled foreign corporation.

(ii) *Interest income.* The term *interest income* means any income or gain that is treated as interest income by reason of the Internal Revenue Code or the regulations thereunder, and any other income or gain recognized in a transaction or series of integrated or related transactions in which the forbearance of funds is secured for a period of time if such income or gain is predominately derived from consideration of the time value of money.

(iii) *Qualified interest income.* The term *qualified interest income* means, with respect to a qualified CFC, interest income of the qualified CFC included in the gross tested income of the qualified CFC for the CFC inclusion year that is excluded from foreign personal holding company income (as defined in section 954(c)(1)) by reason of section 954(h) or (i).

(c) *Examples.* The following examples illustrate the application of this section.

(1) *Example 1: Wholly-owned CFCs— (i) Facts.* A Corp, a domestic corporation, owns 100% of the single class of stock of each of FS1 and FS2, each a controlled foreign corporation. A Corp, FS1, and FS2 all use the calendar year as their taxable year. In Year 1, FS1 pays $100x of interest to FS2. Also, in Year 1, FS2 pays $100x of interest to a bank that is not related to A Corp, FS1, or FS2. The interest paid by each of FS1 and FS2 is taken into account in determining the tested income and tested loss of FS1 and FS2 under § 1.951A–2(c), and the interest received by FS2 is not foreign personal holding company income (as defined in section 954(c)(1)) by reason of section 954(c)(6) and thus is included in gross tested income. For Year 1, taking into account

interest income and expense, FS1 has $500x of tested income and FS2 has $400x of tested loss. Neither FS1 nor FS2 is a qualified CFC.

(ii) *Analysis*—(A) *CFC-level determination; tested interest expense and tested interest income.* FS1 has $100x of tested interest expense for Year 1. FS2 has $100x of tested interest expense and $100x of tested interest income for Year 1.

(B) *United States shareholder-level determination; pro rata share and specified interest expense.* Under § 1.951A–1(d)(5) and (6), A Corp's pro rata share of FS1's tested interest expense is $100x, its pro rata share of FS2's tested interest expense is $100x, and its pro rata share of FS2's tested interest income is $100x. For Year 1, A Corp's aggregate pro rata share of tested interest expense is $200x and its aggregate pro rata share of tested interest income is $100x. Accordingly, under § 1.951A–1(c)(3)(iii), A Corp's specified interest expense is $100x ($200x − $100x) for Year 1.

(2) *Example 2:* Less than wholly-owned CFCs— *(i) Facts.* The facts are the same as in paragraph (i) of *Example 1,* except that A Corp owns 50% of the single class of stock of FS1 and 80% of the single class of stock of FS2.

(ii) *Analysis.* (A) *CFC-level determination; tested interest expense and tested interest income.* The analysis is the same as in paragraph (ii)(A) of *Example 1.*

(B) *United States shareholder-level determination; pro rata share and specified interest expense.* Under § 1.951A–1(d)(5) and (6), A Corp's pro rata share of FS1's tested interest expense is $50x ($100x × 0.50), its pro rata share of FS2's tested interest expense is $80x ($100x × 0.80), and its pro rata share of FS2's tested interest income is $80x ($100x × 0.80). For Year 1, A Corp's aggregate pro rata share of the tested interest expense is $130x and its aggregate pro rata share of the tested interest income is $80x. Accordingly, under § 1.951A–1(c)(3)(iii), A Corp's specified interest expense is $50x ($130x − $80x) for Year 1.

*(3) Example 3: Qualified CFC—(i) Facts.* B Corp, a domestic corporation, owns 100% of the single class of stock of each of FS1 and FS2, each a controlled foreign corporation. B Corp, FS1, and FS2 all use the calendar year as their taxable year. FS2 is an eligible controlled foreign corporation within the meaning of section 954(h)(2). In Year 1, FS1 pays $100x of interest to FS2, which interest income is excluded from the foreign personal holding company income (as defined in section 954(c)(1)) of FS2 by reason of section 954(c)(6). Also, in Year 1, FS2 pays $250x of interest to a bank, and receives an additional $300x of interest from customers that are not related to FS2, which interest income is excluded from foreign personal holding company income by reason of section 954(h). The interest paid by each of FS1 and FS2 is taken into account in determining the tested income and tested loss of FS1 and FS2, and the interest received by FS2 is included in gross tested income. FS1 is not a qualified CFC. FS2 does not own stock in any qualified CFC. FS2's average adjusted bases in obligations or financial instruments that give rise to income excluded from foreign personal holding company income by reason

of section 954(h) is $8,000x, and FS2's average adjusted bases in all its assets is $10,000x.

(ii) *Analysis*—(A) *CFC-level determination; tested interest expense and tested interest income.* FS1 has $100x of tested interest expense for Year 1. FS2 is a qualified CFC because it is an eligible controlled foreign corporation within the meaning of section 954(h)(2). As a result, in determining the tested interest income and tested interest expense of FS2, the qualified interest income and qualified interest expense of FS2 are excluded. FS2 has qualified interest income of $300x, the amount of FS2's interest income that is excluded from foreign personal holding company income by reason of section 954(h). In addition, FS2 has qualified interest expense of $100x, the amount of FS2's interest expense taken into account in determining FS2's tested income or tested loss under § 1.951A–2(c) ($250x), multiplied by a fraction, the numerator of which is FS2's average adjusted bases in obligations or financial instruments that give rise to income excluded from foreign personal holding company income by reason of section 954(h) ($8,000x), and the denominator of which is F2's average adjusted bases in all its assets ($10,000x), and then reduced by the amount of the interest income received from FS1 excluded from foreign personal holding company income by reason of section 954(c)(6) ($100x). Therefore, for Year 1, FS2 has tested interest income of $100x ($400x − $300x) and tested interest expense of $150x ($250x − $100x).

(B) *United States shareholder-level determination; pro rata share and specified interest expense.* Under § 1.951A–1(d)(5) and (6), B Corp's pro rata share of FS1's tested interest expense is $100x, its pro rata share of FS2's tested interest expense is $150x, and its pro rata share of FS2's tested interest income is $100x. For Year 1, B Corp's aggregate pro rata share of tested interest expense is $250x ($100x + $150x) and its aggregate pro rata share of tested interest income is $100x ($0 + $100x). Accordingly, under § 1.951A–1(c)(3)(iii), B Corp's specified interest expense is $150x ($250x − $100x) for Year 1.

■ **Par. 8.** Section 1.951A–5 is added to read as follows:

**§ 1.951A–5    Domestic partnerships and their partners.**

(a) *Scope.* This section provides rules regarding the application of section 951A and the section 951A regulations to domestic partnerships that own (within the meaning of section 958(a)) stock in one or more controlled foreign corporations and to partners of such domestic partnerships, including United States persons (within the meaning of section 957(c)). Paragraph (b) of this section provides rules for the determination of the GILTI inclusion amount of a domestic partnership and the distributive share of such amount of a partner that is not a United States shareholder with respect to one or more controlled foreign corporations owned

by the domestic partnership. Paragraph (c) of this section provides rules for the determination of the GILTI inclusion amount of a partner that is a United States shareholder with respect to one or more controlled foreign corporations owned by a domestic partnership. Paragraph (d) of this section provides rules for tiered domestic partnerships. Paragraph (e) of this section provides the definitions of CFC tested item, partnership CFC, U.S. shareholder partner, and U.S. shareholder partnership. Paragraph (f) of this section requires a domestic partnership to provide certain information to each partner necessary for the partner to determine its GILTI inclusion amount or its distributive share of the partnership's GILTI inclusion amount. Paragraph (g) of this section provides examples illustrating the rules of this section. For rules regarding the treatment of certain controlled domestic partnerships owned through one or more foreign corporations as foreign partnerships for purposes of sections 951 through 964, including section 951A and the section 951A regulations, see § 1.951–1(h).

(b) *In general*—(1) *Determination of GILTI inclusion amount of a U.S. shareholder partnership.* A U.S. shareholder partnership determines its GILTI inclusion amount for its U.S. shareholder inclusion year under the general rules applicable to United States shareholders in section 951A and the section 951A regulations.

(2) *Determination of distributive share of U.S. shareholder partnership's GILTI inclusion amount of a partner other than a U.S. shareholder partner.* Each partner of a U.S. shareholder partnership that is not a U.S. shareholder partner takes into account its distributive share of the U.S. shareholder partnership's GILTI inclusion amount (if any) for the U.S. shareholder inclusion year in accordance with section 702 and § 1.702–1a(a)(8)(ii).

(c) *Determination of GILTI inclusion amount of a U.S. shareholder partner.* For purposes of section 951A and the section 951A regulations, section 958(a) stock of a partnership CFC owned by a U.S. shareholder partnership is treated as section 958(a) stock owned proportionately by each U.S. shareholder partner that is a United States shareholder of the partnership CFC in the same manner as if the U.S. shareholder partnership were a foreign partnership under section 958(a)(2) and § 1.958–1(b). Accordingly, for purposes of determining a U.S. shareholder partner's GILTI inclusion amount, the U.S. shareholder partner determines its pro rata share of any CFC tested item of

Case 1:20-cv-01544-CKK    Document 36-2    Filed 04/21/25    Page 31 of 40

a partnership CFC based on the section 958(a) stock owned by the U.S. shareholder partner by reason of this paragraph (c). In addition, a U.S. shareholder partner's distributive share of the GILTI inclusion amount of a U.S. shareholder partnership is determined without regard to the partnership's pro rata share of any CFC tested item of a partnership CFC with respect to which the U.S. shareholder partner is a United States shareholder.

(d) *Tiered U.S. shareholder partnerships.* In the case of tiered U.S. shareholder partnerships, section 958(a) stock of a partnership CFC treated as owned under paragraph (c) of this section by a U.S. shareholder partner that is also a U.S. shareholder partnership is treated as section 958(a) stock owned by the U.S. shareholder partnership for purposes of applying paragraph (c) of this section to a U.S. shareholder partner of such U.S. shareholder partnership.

(e) *Definitions.* The following definitions apply for purposes of this section:

(1) *CFC tested item.* The term *CFC tested item* has the meaning set forth in § 1.951A–1(d)(1).

(2) *Partnership CFC.* The term *partnership CFC* means, with respect to a U.S. shareholder partnership, a controlled foreign corporation stock of which is owned (within the meaning of section 958(a)) by the U.S. shareholder partnership.

(3) *U.S. shareholder partner.* The term *U.S. shareholder partner* means, with respect to a U.S. shareholder partnership and a partnership CFC of the U.S. shareholder partnership, a United States person that is a partner in the U.S. shareholder partnership and that is also a United States shareholder (as defined in section 951(b)) of the partnership CFC.

(4) *U.S. shareholder partnership.* The term *U.S. shareholder partnership* means a domestic partnership (within the meaning of section 7701(a)(4)) that is a United States shareholder of one or more controlled foreign corporations.

(f) *Reporting requirement.* A U.S. shareholder partnership must furnish to each partner on or with such partner's Schedule K–1 (Form 1065 or successor form) for each U.S. shareholder inclusion year of the partnership the partner's distributive share of the partnership's GILTI inclusion amount (if any) and, with respect to a U.S. shareholder partner, the partner's proportionate share of the partnership's pro rata share (if any) of each CFC tested item of each partnership CFC of the partnership and any other information

required in the form or instructions. See section 6031(b).

(g) *Examples.* The following examples illustrate the rules of this section. None of the persons in the following examples own an interest in any controlled foreign corporation other than as described.

*(1) Example 1: Domestic partnership with partners that are not United States shareholders*— (i) *Facts.* Eleven U.S. citizens ("individuals") each own a 9% interest of PRS, a domestic partnership. The remaining 1% interest of PRS is owned by X Corp, a domestic corporation. None of the individuals or X Corp are related. PRS owns 100% of the single class of stock of FC, a controlled foreign corporation. The individuals, X Corp, PRS, and FC all use the calendar year as their taxable year. In Year 1, FC has $130x of tested income and $50x of qualified business asset investment.

(ii) *Analysis*—(A) *Partnership-level calculation.* PRS is a U.S. shareholder partnership with respect to FC. Under paragraph (b)(1) of this section, PRS determines its GILTI inclusion amount for Year 1. PRS's pro rata share of FC's tested income is $130x. PRS's pro rata share of FC's qualified business asset investment is $50x. PRS's net CFC tested income is $130x. PRS's net deemed tangible income return is $5x ($50x × 0.10). PRS's GILTI inclusion amount for Year 1 is $125x ($130x − $5x).

(B) *Partner-level calculation.* Neither X Corp nor the individuals are U.S. shareholder partners with respect to FC. Accordingly, under paragraph (b)(2) of this section, each of the individuals and X Corp includes its distributive share of PRS's GILTI inclusion amount ($11.25x each for the individuals and $1.25x for X Corp) in gross income for Year 1.

*(2) Example 2: Domestic partnership with partners that are United States shareholders; multiple partnership CFCs*—

(i) *Facts.* X Corp and Y Corp are domestic corporations that own 40% and 60%, respectively, of PRS, a domestic partnership. PRS owns 100% of the single class of stock of FC1 and of FC2, each a controlled foreign corporation. X Corp, Y Corp, PRS, FC1, and FC2 all use the calendar year as their taxable year. In Year 1, FC1 has $130x of tested income and $50x of qualified business asset investment, and FC2 has $30x of tested loss.

(ii) *Analysis*—(A) *Partnership-level calculation.* PRS is a U.S. shareholder partnership with respect to each of FC1 and FC2. Under paragraph (b)(1) of this section, PRS determines its GILTI inclusion amount for Year 1. PRS's pro rata share of FC1's tested income is $130x and of FC2's tested loss is $30x. PRS's pro rata share of FC1's qualified business asset investment is $50x. PRS's net CFC tested income is $100x ($130x − $30x). PRS's net deemed tangible income return is $5x ($50x × 0.10). PRS's GILTI inclusion amount for Year 1 is $95x ($100x − $5x).

(B) *Partner-level calculation.* X Corp and Y Corp are U.S. shareholder partners with respect to FC1 and FC2. Accordingly, under paragraph (c) of this section, X Corp and Y Corp are treated as owning section 958(a)

stock of FC1 and FC2 proportionately as if PRS were a foreign partnership. Thus, X Corp's pro rata share of FC1's tested income is $52x ($130x × 0.40), and its pro rata share of FC2's tested loss is $12x ($30x × 0.40). X Corp's pro rata share of FC1's qualified business asset investment is $20x ($50x × 0.40). Accordingly, X Corp's net CFC tested income is $40x ($52x − $12x), and its net deemed tangible income return is $2x ($20x × 0.10). X Corp's GILTI inclusion amount for Year 1 is $38x ($40x − $2x). Y Corp's pro rata share of FC1's tested income is $78x ($130x × 0.60), and its pro rata share of FC2's tested loss is $18x ($30x × 0.60). Y Corp's pro rata share of FC1's qualified business asset investment is $30x ($50x × 0.60). Accordingly, Y Corp's net CFC tested income is $60x ($78x − $18x), and its net deemed tangible income return is $3x ($30x × 0.10). Y Corp's GILTI inclusion amount for Year 1 is $57x ($60x − $3x). Because X Corp and Y Corp are both U.S. shareholder partners with respect to FC1 and FC2, the only partnership CFCs of PRS, X Corp and Y Corp each includes its proportionate share of PRS's share of each CFC tested item of FC1 and FC2 under paragraph (c) of this section rather than including a distributive share of the GILTI inclusion amount of PRS.

*(3) Example 3: Domestic partnership with partners that are United States shareholders with respect to some, but not all, of the controlled foreign corporations owned by the domestic partnership*— (i) *Facts.* X Corp and Y Corp are domestic corporations that own 40% and 60%, respectively, of PRS, a domestic partnership. PRS owns 20% of the single class of stock of FC1 and 10% of the single class of stock of FC2. In addition, Y Corp owns 100% of the single class of stock of FC3. FC1, FC2, and FC3 are controlled foreign corporations. X Corp, Y Corp, PRS, FC1, FC2, and FC3 all use the calendar year as their taxable year. In Year 1, FC1 has $100x of tested income, FC2 has $80x of tested income, and FC3 has $10x of tested loss.

(ii) *Analysis.* (A) *Partnership-level calculation.* PRS is a U.S. shareholder partnership with respect to each of FC1 and FC2. Under paragraph (b)(1) of this section, PRS determines its GILTI inclusion amount for Year 1. PRS's pro rata share of FC1's tested income is $20x ($100x × 0.20) and of FC2's tested income is $8x ($80x × 0.10). PRS's net CFC tested income is $28x ($20x + $8x). PRS has no net deemed tangible income return. PRS's GILTI inclusion amount for Year 1 is $28x.

(B) *Partner-level calculation*—(1) *X Corp.* X Corp is not a U.S. shareholder partner with respect to either FC1 or FC2 because X Corp owns (within the meaning of section 958) less than 10% of each of FC1 (40% × 20% = 8%) and FC2 (40% × 10% = 4%). Accordingly, under paragraph (b)(2) of this section, X Corp includes in income its distributive share, or $11.20x ($28x × 0.40), of PRS's GILTI inclusion amount in Year 1.

(2) *Y Corp.* Y Corp is a United States shareholder of FC3. Y Corp is also a U.S. shareholder partner with respect to FC1, because it owns (within the meaning of section 958) at least 10% (60% × 20% = 12%) of the stock of FC1, but not with respect to

FC2, because Y Corp owns (within the meaning of section 958) less than 10% of the stock of FC2 (60% × 10% = 6%). Accordingly, under paragraph (c) of this section, Y Corp is treated as owning section 958(a) stock of FC1 proportionately as if PRS were a foreign partnership. Thus, Y Corp's pro rata share of FC1's tested income is $12x ($20x × 0.60). Y Corp's pro rata share of FC3's tested loss is $10x ($10x × 1). Accordingly, Y Corp's net CFC tested income is $2x ($12x − $10x) and Y Corp has no net deemed tangible income return. Y Corp's GILTI inclusion amount for Year 1 is $2x. In addition, under paragraph (c) of this section, for purposes of determining Y Corp's distributive share of PRS's GILTI inclusion amount, Y Corp's distributive share of PRS's GILTI inclusion amount is determined without regard to PRS's pro rata share of any item of FC1. PRS's GILTI inclusion amount computed solely with respect to FC2 is $8x ($80x × 0.10). Y Corp's distributive share of PRS's GILTI inclusion amount is $4.80x ($8x × 0.60) in Year 1.

(4) *Example 4: Tiered domestic partnerships*—(i) *Facts.* X Corp and Y Corp are domestic corporations that own, respectively, a 20% interest and an 80% interest in PRS1, an upper-tier domestic partnership. PRS1 owns a 40% interest in PRS2, a lower-tier domestic partnership. The remaining 60% of PRS2 is owned by Z Corp, a controlled foreign corporation. PRS2 is not a controlled domestic partnership within the meaning of § 1.951–1(h)(2) (because no United States shareholder of Z Corp (or related persons) controls PRS2). PRS2 owns 80% of the single class of stock of FC, a controlled foreign corporation. X Corp, Y Corp, Z Corp, PRS1, PRS2, and FC all use the calendar year as their taxable year. In Year 1, FC has $100x of tested income and $50x of qualified business asset investment.

(ii) *Analysis.* (A) *Lower-tier partnership-level calculation.* PRS2 is a U.S. shareholder partnership with respect to FC, because PRS2 directly owns 80% of the single class of stock of FC. Under paragraph (b)(1) of this section, PRS2 determines its GILTI inclusion amount for its taxable year. PRS2's pro rata share of FC's tested income is $80x ($100x × 0.80). PRS2's pro rata share of FC's qualified business asset investment is $40x ($50x × 0.80). PRS2's net CFC tested income is $80x, and its net deemed tangible income return is $4x ($40x × 0.10). PRS2's GILTI inclusion amount for Year 1 is $76x ($80x − $4x).

(B) *Non-U.S. shareholder partner calculation.* Z Corp is not a U.S. shareholder partner of FC. Therefore, under paragraph (b)(2) of this section, in Year 1, Z Corp includes in income Z Corp's distributive share of PRS2's GILTI inclusion amount, or $45.60x ($76x × 0.60). Z Corp's gross tested income in Year 1 includes this amount.

(C) *Upper-tier partnership-level calculation.* PRS1 is a U.S. shareholder partner with respect to FC because it owns (within the meaning of section 958) more than 10% of the stock of FC (40% × 100% (by reason of the application of section 958(b)(2)) = 40%). Accordingly, under paragraph (c) of this section, PRS1 is treated as owning section 958(a) stock of FC proportionately as if PRS2 were a foreign

partnership. Thus, PRS1's pro rata share of FC's tested income is $32x ($100x × 0.80 × 0.40), and its pro rata share of FC's qualified business asset investment is $16x ($50x × 0.80 × 0.40). PRS1's net CFC tested income is $32x, and its net deemed tangible income return is $1.60x ($16x × 0.10). PRS1's GILTI inclusion amount for Year 1 is $30.40x ($32x − $1.60x).

(D) *Upper-tier partnership partner-level calculation*—(1) *Treatment of upper-tier partnership.* For purposes of applying paragraph (c) of this section to determine X Corp and Y Corp's GILTI inclusion amount, PRS1 is treated as owning section 958(a) stock of FC.

(2) *X Corp.* X Corp is not a U.S. shareholder partner with respect to FC because it owns (within the meaning of section 958) less than 10% (20% × 40% × 100% (by reason of the application of section 958(b)(2)) = 8%) of the stock of FC. Accordingly, under paragraph (b)(2) of this section, X Corp includes its distributive share of PRS1's GILTI inclusion amount in Year 1, which is $6.08x ($30.40x × 0.20).

(3) *Y Corp.* Y Corp is a U.S. shareholder partner with respect to FC because it owns (within the meaning of section 958) more than 10% (80% × 40% × 100% (by reason of the application of section 958(b)(2) = 32%) of the stock of FC. Accordingly, under paragraphs (c) and (d) of this section, Y Corp is treated as owning section 958(a) stock of FC proportionately as if PRS1 and PRS2 were foreign partnerships. Thus, Y Corp's pro rata share of FC's tested income is $25.60x ($100x × 0.80 × 0.40 × 0.80), and its pro rata share of FC's qualified business asset investment is $12.80x ($50x × 0.80 × 0.40 × 0.80). Y Corp's net CFC tested income is $25.60x, its net deemed tangible income return is $1.28x ($12.80x × 0.10), and its GILTI inclusion amount is $24.32x ($25.60x − $1.28x). Because Y Corp is a U.S. shareholder partner with respect to FC, the only partnership CFC of PRS1, Y Corp has no distributive share of the GILTI inclusion amount of PRS1 under paragraph (c) of this section.

(5) *Example 5: S corporation and its shareholders*— (i) *Facts.* Individual A, a U.S. citizen, and Grantor Trust, a trust all of which is treated under sections 671 through 679 as owned by Individual B, a U.S. citizen, respectively own 5% and 95% of the single class of stock of Corporation X, an S corporation. Corporation X owns 100% of the single class of stock of FC, a controlled foreign corporation. Individual A, Grantor Trust, Individual B, Corporation X, and FC all use the calendar year as their taxable year. In Year 1, FC has $200x of tested income and $100x of qualified business asset investment.

(ii) *Analysis*—(A) *S corporation-level calculation.* An S corporation is treated as a partnership for purposes of sections 951 through 965 under section 1373. Corporation X is a U.S. shareholder partnership with respect to FC, a partnership CFC. Accordingly, under paragraph (b)(1) of this section, Corporation X determines its GILTI inclusion amount for Year 1. Corporation X's pro rata share of FC's tested income is $200x, and its pro rata share of FC's qualified business asset investment is $100x. Corporation X's net CFC tested income is

$200x, and its net deemed tangible income return is $10x ($100x × 0.10). Corporation X's GILTI inclusion amount for Year 1 is $190x ($200x − $10x).

(B) *S corporation shareholder-level calculation*—(1) *Individual A.* Individual A is not a U.S. shareholder partner with respect to FC because it owns (within the meaning of section 958) less than 10% (5% × 100% = 5%) of the FC stock. Accordingly, under paragraph (b)(2) of this section, Individual A includes in gross income its proportionate share of Corporation X's GILTI inclusion amount, which is $9.50x ($190x × 0.05).

(2) *Grantor Trust.* Because Individual B is treated as owning all of Grantor Trust under sections 671 through 679, Individual B is treated as if it directly owns the shares of stock in Corporation X owned by Grantor Trust. As a result, Individual B is treated as a U.S. shareholder partner with respect to FC because it owns (within the meaning of section 958) more than 10% (95% × 100% = 95%) of the FC stock. Accordingly, under paragraph (c) of this section, Individual B is treated as owning section 958(a) stock of FC proportionately as if Corporation X were a foreign partnership. Thus, Individual B's pro rata share of FC's tested income is $190x ($200x × 0.95) and its pro rata share of FC's qualified business asset investment is $95x ($100x × 0.95). Individual B's net CFC tested income is $190x, and its net deemed tangible income return is $9.50x ($95x × 0.10). Individual B's GILTI inclusion amount for Year 1 is $180.5x ($190x − $9.50x). Because Individual B is a U.S. shareholder partner with respect to FC, the only partnership CFC of Corporation X, Individual B has no distributive share of the GILTI inclusion amount of Corporation X under paragraph (c) of this section.

(6) *Example 6: Domestic partnership with no GILTI inclusion amount*— (i) *Facts.* X Corp is a domestic corporation that owns a 90% interest in PRS, a domestic partnership. The remaining 10% of PRS is owned by Y, a foreign individual. PRS owns 100% of the single class of stock of FC1, a controlled foreign corporation, and 100% of the single class of stock of FC2, a controlled foreign corporation. X Corp owns 100% of the single class of stock of FC3, a controlled foreign corporation. X Corp, PRS, FC1, FC2, and FC3 all use the calendar year as their taxable year. In Year 1, FC1 has $100x of tested loss and $80x of tested interest expense, FC2 has $50x of tested income, and FC3 has $150x of tested income and $500x of qualified business asset investment in Year 1.

(ii) *Analysis*—(A) *Partnership-level calculation.* PRS is a U.S. shareholder partnership with respect to FC1 and FC2. Under paragraph (b)(1) of this section, PRS determines its GILTI inclusion amount for Year 1. PRS's pro rata share of FC1's tested loss is $100x, and PRS's pro rata share of FC2's tested income is $50x. PRS's net CFC tested income is $0 ($50x − $100x), and therefore PRS has no GILTI inclusion amount for Year 1.

(B) *Partner-level calculation.* X Corp is a U.S. shareholder partner with respect to FC1 and FC2 because X Corp owns (within the meaning of section 958) at least 10% of each (90% × 100% = 90%). Accordingly, under

paragraph (c) of this section, X Corp is treated as owning section 958(a) stock of FC1 and FC2 proportionately as if PRS were a foreign partnership. X Corp's pro rata share of FC1's tested loss is $90x ($100x × 0.90), and X Corp's pro rata share of FC1's tested interest expense is $72x ($80 × 0.90). X Corp's pro rata share of FC2's tested income is $45x ($50x × 0.90). X Corp's pro rata share of FC3's tested income is $150x, and its pro rata share of FC3's qualified business asset investment is $500x. X Corp's net CFC tested income is $105x ($45x + $150x − $90x). X Corp's deemed tangible income return is $50x ($500x × 0.10), but its net deemed tangible income return is $0 ($50x − $72x). X Corp has a GILTI inclusion amount of $105x ($105x − $0) for Year 1.

■ *Par. 9.* Section 1.951A–6 is added to read as follows:

**§ 1.951A–6  Treatment of GILTI inclusion amount and adjustments to earnings and profits and basis related to tested loss CFCs.**

(a) *Scope.* This section provides rules relating to the treatment of GILTI inclusion amounts and adjustments to earnings and profits and basis to account for tested losses. Paragraph (b) of this section provides that a GILTI inclusion amount is treated in the same manner as an amount included under section 951(a)(1)(A) for purposes of applying certain sections of the Code. Paragraph (c) of this section provides rules for the treatment of amounts taken into account in determining the net CFC tested income when applying sections 163(e)(3)(B)(i) and 267(a)(3)(B). Paragraph (d) of this section provides rules that increase the earnings and profits of a tested loss CFC for purposes of section 952(c)(1)(A). Paragraph (e) of this section provides rules for certain basis adjustments to the stock of a controlled foreign corporation by reason of tested losses used to reduce a domestic corporation's net CFC tested income upon the disposition of the stock of the controlled foreign corporation.

(b) *Treatment as subpart F income for certain purposes*—(1) *In general.* A GILTI inclusion amount is treated in the same manner as an amount included under section 951(a)(1)(A) for purposes of applying sections 168(h)(2)(B), 535(b)(10), 851(b), 904(h)(1), 959, 961, 962, 993(a)(1)(E), 996(f)(1), 1248(b)(1), 1248(d)(1), 1411, 6501(e)(1)(C), 6654(d)(2)(D), and 6655(e)(4), and with respect to other sections of the Internal Revenue Code as provided in other guidance published in the Internal Revenue Bulletin.

(2) *Allocation of GILTI inclusion amount to tested income CFCs*—(i) *In general.* For purposes of the sections referred to in paragraph (b)(1) of this section, the portion of the GILTI

inclusion amount of a United States shareholder treated as being with respect to each controlled foreign corporation of the United States shareholder for the U.S. shareholder inclusion year is—

(A) In the case of a tested loss CFC, zero, and

(B) In the case of a tested income CFC, the portion of the GILTI inclusion amount of the United States shareholder which bears the same ratio to such inclusion amount as the United States shareholder's pro rata share of the tested income of the tested income CFC for the U.S. shareholder inclusion year bears to the aggregate amount of the United States shareholder's pro rata share of the tested income of each tested income CFC for the U.S. shareholder inclusion year.

(ii) *Example*— (A) *Facts.* USP, a domestic corporation, owns all of the stock of three controlled foreign corporations, CFC1, CFC2, and CFC3. USP, CFC1, CFC2, and CFC3 all use the calendar year as their taxable year. In Year 1, CFC1 has tested income of $100x, CFC2 has tested income of $300x, and CFC3 has tested loss of $50x. Neither CFC1 nor CFC2 has qualified business asset investment.

(B) *Analysis.* In Year 1, USP has a GILTI inclusion amount of $350x ($100x + $300x − $50x). The aggregate amount of USP's pro rata share of tested income from CFC1 and CFC2 is $400x ($100x + $300x). The portion of USP's GILTI inclusion amount treated as being with respect to CFC1 is $87.50x ($350x × $100x/$400x). The portion of USP's GILTI inclusion amount treated as being with respect to CFC2 is $262.50x ($350x × $300x/$400x). The portion of USP's GILTI inclusion amount treated as being with respect to CFC3 is $0 because CFC3 is a tested loss CFC.

(iii) *Translation of portion of GILTI inclusion amount allocated to tested income CFC.* The portion of the GILTI inclusion amount of a United States shareholder allocated to a tested income CFC under section 951A(f)(2) and paragraph (b)(2)(i) of this section is translated into the functional currency of the tested income CFC using the average exchange rate for the CFC inclusion year of the tested income CFC.

(c) *Treatment as an amount includible in the gross income of a United States person*—(1) *In general.* For purposes of sections 163(e)(3)(B)(i) and 267(a)(3)(B), an item (including original issue discount) is treated as includible in the gross income of a United States person to the extent that such item increases a United States shareholder's pro rata share of tested income of a controlled foreign corporation for a U.S. shareholder inclusion year, reduces the shareholder's pro rata share of tested loss of a controlled foreign corporation

for the U.S. shareholder inclusion year, or both.

(2) *Special rule for a United States shareholder that is a domestic partnership.* In the case of a United States shareholder that is a domestic partnership (within the meaning of section 7701(a)(4)), an item is described in paragraph (c)(1) of this section only to the extent one or more United States persons (other than domestic partnerships) that are direct or indirect partners of the domestic partnership include in gross income their distributive share of the GILTI inclusion amount (if any) of the domestic partnership for the U.S. shareholder inclusion year of the domestic partnership in which such item accrues or such item is taken into account under paragraph (c)(1) of this section by a U.S. shareholder partner (within the meaning of § 1.951A–5(e)(3)) of the domestic partnership by reason of § 1.951A–5(c).

(d) *Increase of earnings and profits of tested loss CFC for purposes of section 952(c)(1)(A).* For purposes of section 952(c)(1)(A) with respect to a CFC inclusion year, the earnings and profits of a tested loss CFC are increased by an amount equal to the tested loss of the tested loss CFC for the CFC inclusion year.

(e) *Adjustments to basis related to net used tested loss*—(1) *In general*—(i) *Disposition of stock of a controlled foreign corporation.* In the case of a disposition of section 958(a) stock of a controlled foreign corporation owned (directly or indirectly) by a domestic corporation (*specified stock*), the adjusted basis of the specified stock is reduced immediately before the disposition by the domestic corporation's net used tested loss amount with respect to the controlled foreign corporation (if any) attributable to the specified stock. If the reduction described in the preceding sentence exceeds the adjusted basis in the specified stock immediately before the disposition, such excess is treated as gain from the sale or exchange of the stock for the taxable year in which the disposition occurs.

(ii) *Disposition of stock of an upper-tier controlled foreign corporation.* In the case of a disposition of specified stock of a controlled foreign corporation (*upper-tier CFC*) by reason of which a domestic corporation owns, or has owned, section 958(a) stock of any other controlled foreign corporation (*lower-tier CFC*), for purposes of determining the reduction under paragraph (e)(1)(i) of this section, the domestic corporation's net used tested loss amount (if any) with respect to the

upper-tier CFC attributable to the specified stock is—

(A) Increased by the sum of the domestic corporation's net used tested loss amounts with respect to each lower-tier CFC attributable to the specified stock; and

(B) Reduced (but not below zero) by the sum of the domestic corporation's net offset tested income amounts with respect to the upper-tier CFC and each lower-tier CFC attributable to the specified stock.

(iii) *Disposition of an interest in a foreign entity other than a controlled foreign corporation.* In the case of a disposition of an interest in a foreign entity other than a controlled foreign corporation through which entity a domestic corporation owns section 958(a) stock of a controlled foreign corporation, for purposes of paragraph (e)(1)(i) and (ii) of this section, the controlled foreign corporation is treated as a lower-tier CFC, the interest in the entity is treated as specified stock of a controlled foreign corporation, and the entity is treated as an upper-tier CFC with respect to which the domestic corporation has neither a net used tested loss amount nor a net offset tested income amount.

(iv) *Order of application of basis reductions.* In the event of an indirect disposition described in paragraph (e)(6)(ii)(B) of this section, the basis reduction described in paragraph (e)(1)(i) of this section is deemed to occur at the lowest-tier CFC first and, thereafter, up the chain of ownership until adjustments are made to the specified stock directly owned by the person making the disposition described in paragraph (e)(6)(ii)(A) of this section.

(v) *No duplicative adjustments.* No item is taken into account under this paragraph (e)(1) to adjust the basis of specified stock of a controlled foreign corporation to the extent that such amount has previously been taken into account with respect to a prior basis adjustment with respect to such stock under this paragraph (e)(1). Moreover, the basis of specified stock is not reduced to the extent a taxpayer can demonstrate to the satisfaction of the Secretary that such adjustments would duplicate prior reductions to the basis of such stock under section 362(e)(2).

(2) *Net used tested loss amount*—(i) *In general.* The term *net used tested loss amount* means, with respect to a domestic corporation and a controlled foreign corporation, the excess (if any) of—

(A) The aggregate of the domestic corporation's used tested loss amount with respect to the controlled foreign

corporation for each U.S. shareholder inclusion year, over

(B) The aggregate of the domestic corporation's offset tested income amount with respect to the controlled foreign corporation for each U.S. shareholder inclusion year.

(ii) *Used tested loss amount.* The term *used tested loss amount* means, with respect to a domestic corporation and a tested loss CFC for a U.S. shareholder inclusion year—

(A) In the case of a domestic corporation that has net CFC tested income for the U.S. shareholder inclusion year, the domestic corporation's pro rata share of the tested loss of the tested loss CFC for the U.S. shareholder inclusion year, or

(B) In the case of a domestic corporation without net CFC tested income for the U.S. shareholder inclusion year, the amount that bears the same ratio to the domestic corporation's pro rata share of the tested loss of the tested loss CFC for the U.S. shareholder inclusion year as the aggregate of the domestic corporation's pro rata share of the tested income of each tested income CFC for the U.S. shareholder inclusion year bears to the aggregate of the domestic corporation's pro rata share of the tested loss of each tested loss CFC for the U.S. shareholder inclusion year.

(3) *Net offset tested income amount*—(i) *In general.* The term *net offset tested income amount* means, with respect to a domestic corporation and a controlled foreign corporation, the excess (if any) of the amount described in paragraph (e)(2)(i)(B) of this section over the amount described in paragraph (e)(2)(i)(A) of this section.

(ii) *Offset tested income amount.* The term *offset tested income amount* means, with respect to a domestic corporation and a tested income CFC for a U.S. shareholder inclusion year—

(A) In the case of a domestic corporation that has net CFC tested income for the U.S. shareholder inclusion year, the amount that bears the same ratio to the domestic corporation's pro rata share of the tested income of the tested income CFC for the U.S. shareholder inclusion year as the aggregate of the domestic corporation's pro rata share of the tested loss of each tested loss CFC for the U.S. shareholder inclusion year bears to the aggregate of the domestic corporation's pro rata share of the tested income of each tested income CFC for the U.S. shareholder inclusion year, or

(B) In the case of a domestic corporation without net CFC tested income for the U.S. shareholder inclusion year, the domestic

corporation's pro rata share of the tested income of the tested income CFC for the U.S. shareholder inclusion year.

(4) *Attribution to stock*—(i) *In general.* The portion of a domestic corporation's net used tested loss amount or net offset tested income amount with respect to a controlled foreign corporation (including a lower-tier CFC) attributable to specified stock for purposes of paragraph (e)(1) of this section is determined based on the domestic corporation's pro rata share of the tested loss and tested income, as applicable, of the controlled foreign corporation for each U.S. shareholder inclusion year with respect to such specified stock. See § 1.951A–1(d)(1), (2), and (4) for rules regarding the determination of pro rata share amounts of tested income and tested loss.

(ii) *Nonrecognition transactions.* In the case of specified stock acquired by a domestic corporation in a nonrecognition transaction (as defined in section 7701(a)(45)), the principles of § 1.1248–8 apply to determine the domestic corporation's net used tested loss amount or net offset tested income amount with respect to a controlled foreign corporation attributable to specified stock. For purposes of applying the principles of § 1.1248–8, tested income is treated as earnings and profits and tested loss is treated as a deficit in earnings and profits.

(5) *Section 381 transactions.* If a controlled foreign corporation with respect to which a United States shareholder has a net used tested loss amount or net offset tested income amount is a distributor or transferor corporation in a transaction described in section 381(a) (*acquired CFC*) in which a controlled foreign corporation is the acquiring corporation (*acquiring CFC*), the domestic corporation's net used tested loss amount or net offset tested income amount with respect to the acquiring CFC is increased by the amount of the net used tested loss amount or net offset tested income amount of the acquired CFC. This paragraph (e)(5) does not apply to the extent that the acquiring CFC is an upper-tier CFC and such amounts would be taken into account under paragraph (e)(1)(ii) of this paragraph if the stock of the acquiring CFC were disposed of.

(6) *Other definitions.* The following additional definitions apply for purposes of this paragraph (e):

(i) *Domestic corporation.* The term *domestic corporation* means a domestic corporation other than a real estate investment trust (as defined in section 856) or a regulated investment company (as defined in section 851).

(ii) *Disposition.* The term *disposition* means—

(A) Any transfer of specified stock that is taxable, in whole or in part, including a sale or exchange, contribution, or distribution of the stock, including a deemed sale or exchange by reason of the specified stock becoming worthless within the meaning of section 165(g), or

(B) Any indirect disposition of specified stock of a lower-tier CFC as a result of a disposition described in paragraph (e)(6)(ii)(A) of this section of specified stock of an upper-tier CFC.

(7) *Special rule for disposition by controlled foreign corporation less than 100 percent owned by a single domestic corporation.* In the case of a disposition by a controlled foreign corporation that is not 100 percent owned, within the meaning of section 958(a), by a single domestic corporation, if a reduction to basis described in paragraph (e)(1) of this section by reason of a domestic corporation's net used tested loss amount results in an increase to the controlled foreign corporation's foreign personal holding company income (as defined in section 954(c)(1)), the domestic corporation's pro rata share of the subpart F income of the controlled foreign corporation, as otherwise determined under section 951(a)(2) and § 1.951–1(b) and (e), is increased by the amount of such increase, and no other shareholder takes such subpart F income into account under section 951(a)(1)(A).

(8) *Special rules for members of a consolidated group.* For purposes of the section 951A regulations, a member determines its net used tested loss amount and the adjustments made as a result of the amount under the rules provided in § 1.1502–51(c).

(9) *Examples.* The following examples illustrate the application of the rules in this paragraph (e).

(i) *Example 1*—(A) *Facts.* USP, a domestic corporation, owns 100% of the single class of stock of CFC1 and CFC2. USP1, CFC1, and CFC2 all use the calendar year as their taxable year. In Year 1, CFC2 has $90x of tested loss and CFC1 has $100x of tested income. At the beginning of Year 2, USP sells all of the stock of CFC2 to an unrelated buyer for cash. USP has no used tested loss amount or offset tested income amount with respect to CFC2 in any year prior to Year 1. USP has not owned stock in any other CFC by reason of owning stock of CFC1 and CFC2.

(B) *Analysis.* At the time of the disposition, USP has a net used tested loss amount of $90x with respect to CFC2 attributable to the CFC2 stock, which is the specified stock. Because USP does not own (and has not owned), within the meaning of section 958(a)(2), stock in any lower-tier CFCs by reason of the CFC2 stock, there is no

adjustment to the net used tested loss amount of $90x pursuant to paragraph (e)(1)(ii) of this section. Accordingly, immediately before the disposition of the CFC2 stock, the basis of the CFC2 stock is reduced by $90x under paragraph (e)(1)(i) of this section.

(ii) *Example 2*—(A) *Facts.* The facts are the same as in paragraph (A) of *Example 1,* except that USP sells only 90% of the shares of CFC2.

(B) *Analysis.* The analysis is the same as in paragraph (B) of *Example 1,* except that USP's net used tested loss amount attributable to the CFC2 stock that was disposed of is only $81x (90% x $90x) under paragraph (e)(4)(i) of this section. Accordingly, immediately before the disposition of such stock, the basis in the CFC2 stock disposed of is reduced by $81x under paragraph (e)(1)(i) of this section.

(iii) *Example 3*—(A) Facts. The facts are the same as in paragraph (A) of *Example 1,* except that USP sells the CFC2 stock at the beginning of Year 3 and during Year 2 CFC1 has $10x of tested loss that offsets Year 2 tested income of CFC2.

(B) *Analysis.* USP has a net used tested loss amount of $80x with respect to CFC2 attributable to the CFC2 stock, the amount of USP's used tested loss amount with respect to CFC2 attributable to the CFC2 stock in Year 1 of $90x reduced by USP's offset tested income amount with respect to CFC2 attributable to the CFC2 stock in Year 2 of $10x. Accordingly, immediately before the disposition of the CFC2 stock, the basis of the CFC2 stock is reduced by $80x under paragraph (e)(1)(i) of this section.

(iv) *Example 4*—(A) Facts. USP, a domestic corporation, owns 100% of the single class of stock of CFC1, and CFC1 owns 100% of the single class of stock of CFC2. USP1, CFC1, and CFC2 all use the calendar year as their taxable year. In Year 1, CFC1 has $100x of tested loss that offsets CFC2's $100x of tested income. USP sells the stock of CFC1 at the beginning of Year 2. USP has no used tested loss amount or offset tested income amount with respect to CFC1 or CFC2 in any year prior to Year 1. USP has not owned stock in any other CFC by reason of owning stock of CFC1 and CFC2.

(B) *Analysis*—(1) *Direct disposition.* At the time of the disposition, USP has a net used tested loss amount of $100x with respect to CFC1 attributable to the CFC1 stock. However, because USP owns, within the meaning of section 958(a)(2), CFC2 stock by reason of the CFC1 stock, USP's $100x net used tested loss amount with respect to CFC1 attributable to the CFC1 stock is reduced by USP's $100x net offset tested income amount with respect to CFC2 attributable to the CFC1 stock. Accordingly, there is no adjustment to the basis of the CFC1 stock under paragraph (e)(1)(i) of this section.

(2) *Indirect disposition.* Under paragraph (e)(6)(ii)(B) of this section, USP's disposition of the CFC1 stock also constitutes an indirect disposition of the CFC2 stock because CFC1 is an upper-tier CFC and CFC2 is a lower-tier CFC within the meaning of paragraph (e)(1)(ii) of this section. However, USP has no net used tested loss amount with respect to CFC2 attributable to the CFC2 stock. Accordingly, there is no adjustment to the

basis of the CFC2 stock under paragraph (e)(1) of this section.

(v) *Example 5*—(A) *Facts.* The facts are the same as in paragraph (A) of *Example 4,* except that in Year 1 CFC2 has $100x of tested loss that offsets CFC1's $100x of tested income. CFC1 sells the stock of CFC2 at the beginning of Year 2.

(B) *Analysis.* USP, a domestic corporation, owns within the meaning of section 958(a) stock of CFC2. Accordingly, immediately before the disposition, CFC1's basis in the CFC2 stock is reduced by USP's net used tested loss amount with respect to CFC2 attributable to the CFC2 stock of $100x under paragraph (e)(1)(i) of this section.

(2) *Indirect disposition.*

(vi) *Example 6*—(A) *Facts.* The facts are the same as in paragraph (A) of *Example 5,* except that instead of CFC1 selling the stock of CFC2, USP sells the stock of CFC1.

(B) *Analysis*—(1) *Direct disposition.* USP has no net used tested loss amount with respect to CFC1 attributable to the stock of CFC1. However, because USP owns, within the meaning of section 958(a)(2), stock of CFC2 by reason of owning stock of CFC1, under paragraph (e)(1)(ii) of this section, USP's net used tested loss amount attributable to the stock of CFC1 ($0) is increased by USP's net used tested loss amount with respect to CFC2 attributable to the CFC1 stock ($100x), and reduced by USP's net offset tested income amount with respect to CFC1 attributable to the CFC1 stock ($100x). Accordingly, there is no adjustment to the basis of the CFC1 stock under paragraph (e)(1) of this section.

(2) *Indirect disposition.* Under paragraph (e)(6)(ii)(B) of this section, USP's disposition of CFC1 stock also constitutes an indirect disposition of the CFC2 stock because CFC1 is an upper-tier CFC and CFC2 is a lower-tier CFC within the meaning of paragraph (e)(1)(ii) of this section. Accordingly, immediately before the disposition, CFC1's basis in the CFC2 stock is reduced by USP's net used tested loss amount with respect to CFC2 attributable to the CFC2 stock of $100x under paragraph (e)(1)(i) of this section. Under paragraph (e)(1)(iv) of this section, the basis reduction to CFC2's shares is deemed to occur immediately before any reductions occur with respect to the stock of CFC1, of which there are none.

(vii) *Example 7*—(A) *Facts.* USP1, a domestic corporation, owns 90% of the single class of stock of CFC1, and CFC1 owns 100% of the single class of stock of CFC2. USP1 also owns 100% of the single class of stock of CFC3. The remaining 10% of the stock of CFC1 is owned by USP2, a person unrelated to USP1. USP2 owns no other CFCs. USP1, USP2, CFC1, CFC2, and CFC3 all use the calendar year as their taxable year. In Year 1, CFC1 has no tested income or tested loss, CFC2 has tested loss of $100x, and CFC3 has tested income of $100x. CFC1 has no other earnings or income in Year 1. At the beginning of Year 2, CFC1 sells CFC2. Without regard to this paragraph (e), CFC1 would recognize no gain or loss with respect to the CFC2 stock. USP1 has not owned stock in any other controlled foreign corporation by reason of owning stock of CFC1, CFC2, and CFC3.

(B) *Analysis.* At the time of the disposition, USP2 has no net used tested loss amount with respect to CFC2. At the time of the disposition, USP1 has a net used tested loss amount of $90x with respect to CFC2 attributable to the CFC2 stock, which is the specified stock. Because USP1 does not own (and has not owned), within the meaning of section 958(a)(2), stock in any lower-tier CFCs by reason of the CFC2 stock, there is no adjustment to the net used tested loss amount of $90x pursuant to paragraph (e)(1)(ii) of this section. Accordingly, immediately before the disposition of the CFC2 stock, the basis of the CFC2 stock is reduced by $90x under paragraph (e)(1)(i) of this section. As a result, CFC1 recognizes gain of $90x on the disposition of the CFC2 stock, which results in $90x of foreign personal holding company income and $90x of earnings and profits. Under paragraph (e)(7) of this section, USP1's pro rata share of the subpart F income of CFC1 is increased by $90x, and USP2 does not take such subpart F income into account under section 951(a)(1)(A).

(viii) *Example 8*—(A) *Facts.* USP, a domestic corporation, owns 100% of the single class of stock of CFC1 and CFC2, and CFC1 owns 100% of the single class of stock of CFC3 and CFC4. USP, CFC1, CFC2, CFC3, and CFC4 all use the calendar year as their taxable year. In Year 1, CFC1 has no tested income or tested loss, CFC2 has $200x of tested income, and CFC3 and CFC4 each have tested loss of $100x. During Year 2, CFC3 liquidates into CFC1 in a nontaxable transaction described under section 332, and CFC1 sells the stock of CFC4 to an unrelated third party for cash. During Year 2, none of CFC1, CFC2, CFC3, or CFC4 earn tested income or tested loss. At the beginning of Year 3, USP sells the stock of CFC1 to an unrelated third party for cash. USP has not owned stock in any other CFC by reason of owning stock in CFC1, CFC2, CFC3, or CFC4.

(B) *Analysis.* (*1*) CFC3's liquidation into CFC1 is not a disposition within the meaning of paragraph (e)(6)(ii)(A) of this section because CFC1 does not recognize gain or loss in whole or in part with respect to the stock of CFC3 under section 332. Furthermore, CFC1 does not inherit CFC3's net used tested loss amount under paragraph (e)(5) of this section because CFC1 is an upper-tier CFC with respect to CFC3 and would take such amounts into account under paragraph (e)(1)(ii) of this section at the time of a future disposition. That is, the CFC3 stock is section 958(a) stock that USP has owned by reason of its ownership of CFC1 within the meaning of paragraph (e)(1)(ii) of this section.

(*2*) At the time of CFC1's sale of the stock of CFC4, USP has a $100x net used tested loss amount with respect to CFC4 attributable to the CFC4 stock, which is the specified stock. Because USP has not owned, within the meaning of section 958(a)(2), stock in any lower-tier CFCs by reason of the CFC4 stock, there is no adjustment to the net used tested loss amount of $100x pursuant to paragraph (e)(1)(ii) of this section. Accordingly, immediately before the disposition of the CFC4 stock, the basis of the CFC4 stock is reduced by $100x under paragraph (e)(1)(i) of this section.

(*3*) At the time of USP's sale of CFC1, USP has no net used tested loss amount with respect to CFC1 attributable to the CFC1 stock. However, USP has owned, within the meaning of section 958(a)(2), stock of lower-tier CFCs (CFC3 and CFC4) by reason of its ownership of CFC1. Thus, USP's net used tested loss amount attributable to the stock of CFC1 ($0) is increased by USP's net used tested loss amounts with respect to CFC3 and CFC4 attributable to the CFC1 stock ($200x). Accordingly, immediately before the disposition of the CFC1 stock, the basis of the CFC1 stock is reduced by $200x under paragraph (e)(1)(i) of this section. The rule prohibiting duplicative adjustments under paragraph (e)(1)(v) of this section does not prevent this basis reduction because the net used tested loss amounts with respect to the CFC3 and CFC4 were not previously taken into account to reduce the basis of CFC1 stock.

■ **Par. 10.** Section 1.951A–7 is added to read as follows:

**§ 1.951A–7   Applicability dates.**

Sections 1.951A–1 through 1.951A–6 apply to taxable years of foreign corporations beginning after December 31, 2017, and to taxable years of United States shareholders in which or with which such taxable years of foreign corporations end.

■ **Par. 11.** Section 1.1502–12 is amended by adding paragraph (s) to read as follows:

**§ 1.1502–12   Separate taxable income.**

\*    \*    \*    \*    \*

(s) See § 1.1502–51 for rules relating to the computation of a member's GILTI inclusion amount under section 951A and related basis adjustments.

■ **Par. 12.** Section 1.1502–13 is amended by adding paragraph (c) to *Example 4* in paragraph (f)(7).

The addition reads as follows:

**§ 1.1502–13   Intercompany transactions.**

\*    \*    \*    \*    \*

(f) \*    \*    \*

(7) \*    \*    \*

*Example 4.* \*    \*    \*

(c) *Application of § 1.1502–51(c)(5) to all cash intercompany reorganization under section 368(a)(1)(D).* The facts are the same as in paragraph (a) of this *Example 4,* except that S's sole asset is stock of a controlled foreign corporation, within the meaning of section 957, with respect to which S has a net used tested loss amount (within the meaning of § 1.1502–51(e)(15)) of $15. As in paragraph (b) of this *Example 4,* S is treated as receiving additional B stock with a fair market value of $100 (in lieu of the $100) and, under section 358, a basis of $25 which S distributes to M in liquidation. Immediately after the sale, pursuant to § 1.1502–51(c)(5), the basis in the B stock received by M is reduced by $15 (the amount of the net used tested loss amount with respect to the controlled foreign corporation) to $10. Following the basis reduction

pursuant to § 1.1502–51(c)(5), the B stock (with the exception of the nominal share which is still held by M) received by M is treated as redeemed for $100, and the redemption is treated under section 302(d) as a distribution to which section 301 applies. M's basis of $10 in the B stock is reduced under § 1.1502–32(b)(3)(v), resulting in an excess loss account of $90 in the nominal share. (See § 1.302–2(c).) M's deemed distribution of the nominal share of B stock to P under § 1.368–2(l) will result in M generating an intercompany gain under section 311(b) of $90, to be subsequently taken into account under the matching and acceleration rules.

\*    \*    \*    \*    \*

■ **Par. 13.** Section 1.1502–32 is amended by:
■ 1. Adding paragraphs (b)(3)(ii)(E), (b)(3)(ii)(F), and (b)(3)(iii)(C).
■ 2. Revising paragraph (j).
The revision and additions read as follows:

**§ 1.1502–32   Investment adjustments.**

\*    \*    \*    \*    \*

(b) \*    \*    \*

(3) \*    \*    \*

(ii) \*    \*    \*

(E) *Adjustment for the offset tested income amount of a controlled foreign corporation in relation to section 951A.* S's tax-exempt income for a taxable year includes the aggregate of S's offset tested income amounts (within the meaning of § 1.1502–51(c)(3)) with respect to a controlled foreign corporation (within the meaning of section 957) for all of its U.S. shareholder inclusion years (within the meaning of § 1.951A–1(e)(4)), to the extent such aggregate does not exceed the excess (if any) of—

(*1*) The aggregate of S's used tested loss amounts (within the meaning of § 1.1502–51(c)(2)) with respect to the controlled foreign corporation for all of its U.S. shareholder inclusion years, over

(*2*) The aggregate of S's offset tested income amounts with respect to the controlled foreign corporation for all of its U.S. shareholder inclusion years previously treated as tax-exempt income pursuant to this paragraph.

(F) *Adjustment for the net offset tested income amount of a controlled foreign corporation in relation to section 951A.* S will be treated as having tax-exempt income immediately prior to a transaction (*recognition event*) in which another member of the group recognizes income, gain, deduction, or loss with respect to a share of S's stock to the extent provided in this paragraph (b)(3)(ii)(F). S's tax-exempt income is equal to the portion of the allocable amount that would have been characterized as a dividend to which

**51108** **Federal Register** / Vol. 83, No. 196 / Wednesday, October 10, 2018 / Proposed Rules

section 245A, but not section 1059, would have applied if the allocable amount had been distributed by a controlled foreign corporation to the owner of the transferred shares immediately before the recognition event. For purposes of this paragraph—

(*1*) The term *transferred shares* means the shares of a controlled foreign corporation that S owns within the meaning of section 958(a) or is considered to own by applying the rules of ownership of section 958(b) and that are indirectly transferred as part of the recognition event; and

(*2*) The term *allocable amount* means the net offset tested income amount (within the meaning of § 1.1502–51(e)(14)) allocable to the transferred shares.

(iii) * * *

(C) *Adjustment for the used tested loss amount of a controlled foreign corporation in relation to section 951A.* S's noncapital, nondeductible expense includes its amount of used tested loss amount (within the meaning of § 1.1502–51(c)(2)) with respect to a controlled foreign corporation (within the meaning of section 957) for a U.S. shareholder inclusion year (within the meaning of § 1.951A–1(e)(4)).

* * * * *

(j) *Applicability date*—(1) *In general.* Paragraph (b)(4)(iv) of this section applies to any original consolidated Federal income tax return due (without extensions) after June 14, 2007. For original consolidated Federal income tax returns due (without extensions) after May 30, 2006, and on or before June 14, 2007, see § 1.1502–32T as contained in 26 CFR part 1 in effect on April 1, 2007. For original consolidated Federal income tax returns due (without extensions) on or before May 30, 2006, see § 1.1502–32 as contained in 26 CFR part 1 in effect on April 1, 2006.

(2) *Adjustment for the offset tested income amount, net offset tested income amount, and used tested loss amount of a controlled foreign corporation.* Paragraphs (b)(3)(ii)(E), (b)(3)(ii)(F), and (b)(3)(iii)(C) of this section apply to any consolidated Federal income tax return for a taxable year in which or with which the taxable year of a controlled foreign corporation beginning after December 31, 2017, ends.

* * * * *

■ **Par. 14.** Section 1.1502–51 is added to read as follows:

### § 1.1502–51 Consolidated section 951A.

(a) *In general.* This section provides rules for applying section 951A and §§ 1.951A–1 through 1.951A–7 (the *section 951A regulations*) to each

member of a consolidated group (each, a *member*) that is a United States shareholder of any controlled foreign corporation. Paragraph (b) describes the inclusion of the GILTI inclusion amount by a member of a consolidated group. Paragraph (c) modifies the rules provided in § 1.951A–6(e) for adjustments to basis related to used tested loss amount. Paragraph (d) provides rules governing basis adjustments to member stock resulting from the application of § 1.951A–6(e) and paragraph (c) of this section. Paragraph (e) provides definitions for purposes of this section. Paragraph (f) provides examples illustrating the rules of this section. Paragraph (g) provides an applicability date.

(b) *Calculation of the GILTI inclusion amount for a member of a consolidated group.* Each member who is a United States shareholder of any controlled foreign corporation includes in gross income in the U.S. shareholder inclusion year the member's GILTI inclusion amount, if any, for the U.S. shareholder inclusion year. See section 951A(a) and § 1.951A–1(b). The GILTI inclusion amount of a member for a U.S. shareholder inclusion year is the excess (if any) of the member's net CFC tested income for the U.S. shareholder inclusion year, over the member's net deemed tangible income return for the U.S. shareholder inclusion year, determined using the definitions provided in paragraph (e) of this section.

(c) *Adjustments to basis related to used tested loss amount*—(1) *In general.* The adjusted basis of the section 958(a) stock of a controlled foreign corporation that is owned (directly or indirectly) by a member (*specified stock*) or an interest in a foreign entity other than a controlled foreign corporation by reason of which a domestic corporation owns (within the meaning of section 958(a)(2)) stock of a controlled foreign corporation is adjusted immediately before its disposition pursuant to § 1.951A–6(e). The amount of the adjustment is determined using the rules provided in paragraphs (c)(2), (3), and (4) of this section.

(2) *Determination of used tested loss amount.* For purposes of the section 951A regulations and this section, the term *used tested loss amount* means, with respect to a member and a tested loss CFC for a U.S. shareholder inclusion year—

(i) In the case of the consolidated group tested income equaling or exceeding the consolidated group tested loss for a U.S. shareholder inclusion year, the member's pro rata share (determined under § 1.951A–1(d)(4)) of

the tested loss of the tested loss CFC for the U.S. shareholder inclusion year.

(ii) In the case of the consolidated group tested income being less than the consolidated group tested loss for a U.S. shareholder inclusion year, the amount that bears the same ratio to the member's pro rata share (determined under § 1.951A–1(d)(4)) of the tested loss of the tested loss CFC for the U.S. shareholder inclusion year as the consolidated group tested income for the U.S. shareholder inclusion year bears to the consolidated group tested loss for the U.S. shareholder inclusion year.

(3) *Determination of offset tested income amount.* For purposes of the section 951A regulations and this section, the term *offset tested income amount* means, with respect to a member and a tested income CFC for a U.S. shareholder inclusion year—

(i) In the case of the consolidated group tested income exceeding the consolidated group tested loss for a U.S. shareholder inclusion year, the amount that bears the same ratio to the member's pro rata share (determined under § 1.951A–1(d)(2)) of the tested income of the tested income CFC for the U.S. shareholder inclusion year as the consolidated group tested loss for the U.S. shareholder inclusion year bears to the consolidated group tested income for the U.S. shareholder inclusion year.

(ii) In the case of the consolidated group tested income equaling or being less than the consolidated group tested loss for a U.S. shareholder inclusion year, the member's pro rata share (determined under § 1.951A–1(d)(2)) of the tested income of the tested income CFC for the U.S. shareholder inclusion year.

(4) *Special rule for disposition by a controlled foreign corporation less than 100 percent owned by a single domestic corporation.* For purposes of determining the application of § 1.951A–6(e)(7), the amount of stock in the controlled foreign corporation a member owns, within the meaning of section 958(a), includes any stock that the member is considered as owning by applying the rules of ownership of section 958(b).

(5) *Special rule for intercompany nonrecognition transactions.* If a member engages in a nonrecognition transaction (within the meaning of section 7701(a)(45)), with another member in which stock of a controlled foreign corporation that has a net used tested loss amount is directly transferred, the adjusted basis of the nonrecognition property (within the meaning of section 358) received in the nonrecognition transaction is

immediately reduced by the amount of the net used tested loss amount. In cases of intercompany transactions that are governed by § 1.368–2(l), the reduction in basis pursuant to this paragraph (c)(5) is made prior to the application of § 1.1502–13(f)(3). See § 1.1502–13(f)(7), Example 4(c).

(d) *Adjustments to the basis of a member.* For adjustments to the basis of a member related to paragraph (c) of this section, see § 1.1502–32(b)(3)(ii)(E), (b)(3)(ii)(F), and (b)(3)(iii)(C).

(e) *Definitions.* The following definitions apply for purposes of the section—

(1) *Aggregate tested income.* With respect to a member, the term *aggregate tested income* means the aggregate of the member's pro rata share (determined under § 1.951A–1(d)(2)) of the tested income of each tested income CFC for a U.S. shareholder inclusion year.

(2) *Aggregate tested loss.* With respect to a member, the term *aggregate tested loss* means the aggregate of the member's pro rata share (determined under § 1.951A–1(d)(4)) of the tested loss of each tested loss CFC for a U.S. shareholder inclusion year.

(3) *Allocable share.* The term *allocable share* means, with respect to a member that is a United States shareholder and a U.S. shareholder inclusion year—

(i) With respect to consolidated group QBAI, the product of the consolidated group QBAI of the member's consolidated group and the member's GILTI allocation ratio.

(ii) With respect to consolidated group specified interest expense, the product of the consolidated group specified interest expense of the member's consolidated group and the member's GILTI allocation ratio.

(iii) With respect to consolidated group tested loss, the product of the consolidated group tested loss of the member's consolidated group and the member's GILTI allocation ratio.

(4) *Consolidated group QBAI.* With respect to a consolidated group, the term *consolidated group QBAI* means the sum of each member's pro rata share (determined under § 1.951A–1(d)(3)) of the qualified business asset investment of each tested income CFC for a U.S. shareholder inclusion year.

(5) *Consolidated group specified interest expense.* With respect to a consolidated group, the term *consolidated group specified interest expense* means the excess (if any) of—

(i) The sum of each member's pro rata share (determined under § 1.951A–1(d)(5)) of the tested interest expense of each controlled foreign corporation for

the U.S. shareholder inclusion year, over

(ii) The sum of each member's pro rata share (determined under § 1.951A–1(d)(6)) of the tested interest income of each controlled foreign corporation for the U.S. shareholder inclusion year.

(6) *Consolidated group tested income.* With respect to a consolidated group, the term *consolidated group tested income* means the sum of each member's aggregate tested income for a U.S. shareholder inclusion year.

(7) *Consolidated group tested loss.* With respect to a consolidated group, the term *consolidated group tested loss* means the sum of each member's aggregate tested loss for a U.S. shareholder inclusion year.

(8) *Controlled foreign corporation.* The term *controlled foreign corporation* means a controlled foreign corporation as defined in section 957.

(9) *Deemed tangible income return.* With respect to a member, the term *deemed tangible income return* means 10 percent of the member's allocable share of the consolidated group QBAI.

(10) *GILTI allocation ratio.* With respect to a member, the term *GILTI allocation ratio* means the ratio of—

(i) The aggregate tested income of the member for a U.S. shareholder inclusion year, to

(ii) The consolidated group tested income of the consolidated group of which the member is a member for the U.S. shareholder inclusion year.

(11) *GILTI inclusion amount.* With respect to a member, the term *GILTI inclusion amount* has the meaning provided in paragraph (b) of this section.

(12) *Net CFC tested income.* With respect to a member, the term *net CFC tested income* means the excess (if any) of—

(i) The member's aggregate tested income, over

(ii) The member's allocable share of the consolidated group tested loss.

(13) *Net deemed tangible income return.* With respect to a member, the term *net deemed tangible income return* means the excess (if any) of the member's deemed tangible income return over the member's allocable share of the consolidated group specified interest expense.

(14) *Net offset tested income amount.* The term *net offset tested income amount* means, with respect to a member and a controlled foreign corporation, the excess (if any) of the amount described in paragraph (e)(15)(ii) of this section over the amount described in paragraph (e)(15)(i) of this section.

(15) *Net used tested loss amount.* The term *net used tested loss amount* means, with respect to a member and a controlled foreign corporation, the excess (if any) of —

(i) The aggregate of the member's pro rata share of each used tested loss amount of the controlled foreign corporation for each U.S. shareholder inclusion year over

(ii) The aggregate of the member's pro rata share of each offset tested income amount of the controlled foreign corporation for each U.S. shareholder inclusion year.

(16) *Offset tested income amount.* The term *offset tested income amount* has the meaning provided in paragraph (c)(3) of this section.

(17) *Qualified business asset investment.* The term *qualified business asset investment* has the meaning provided in § 1.951A–3(b).

(18) *Tested income.* The term *tested income* has the meaning provided in § 1.951A–2(b)(1).

(19) *Tested income CFC.* The term *tested income CFC* has the meaning provided in § 1.951A–2(b)(1).

(20) *Tested interest expense.* The term *tested interest expense* has the meaning provided in § 1.951A–4(b)(1).

(21) *Tested interest income.* The term *tested interest income* has the meaning provided in § 1.951A–4(b)(2).

(22) *Tested loss.* The term *tested loss* has the meaning provided in § 1.951A–2(b)(2).

(23) *Tested loss CFC.* The term *tested loss CFC* has the meaning provided in § 1.951A–2(b)(2).

(24) *United States shareholder.* The term *United States shareholder* has the meaning provided in § 1.951–1(g)(1).

(25) *U.S. shareholder inclusion year.* The term *U.S. shareholder inclusion year* has the meaning provided in § 1.951A–1(e)(4).

(26) *Used tested loss amount.* The term *used tested loss amount* has the meaning provided in paragraph (c)(2) of this section.

(f) *Examples.* The following examples illustrate the rules of this section. For purposes of the examples in this section, unless otherwise stated: P is the common parent of the P consolidated group; P owns all of the single class of stock of subsidiaries USS1, USS2, and USS3, all of whom are members of the P consolidated group; CFC1, CFC2, CFC3, and CFC4 are all controlled foreign corporations (within the meaning of paragraph (e)(8) of this section); and the taxable year of all persons is the calendar year.

*(1) Example 1: Calculation of net CFC tested income within a consolidated group*

*when all CFCs are wholly owned by a member*— (i) *Facts.* USS1 owns all of the single class of stock of CFC1. USS2 owns all of the single class of stock of each of CFC2 and CFC3. USS3 owns all of the single class of stock of CFC4. In Year 1, CFC1 has tested loss of $100, CFC2 has tested income of $200x, CFC3 has tested loss of $200x, and CFC4 has tested income of $600x. Neither CFC2 nor CFC4 has qualified business asset investment in Year 1.

(ii) *Analysis*—(A) *Consolidated group tested income and GILTI allocation ratio.* USS1 has no aggregate tested income; USS2's aggregate tested income is $200x, its pro rata share (within the meaning of § 1.951A–1(d)(2)) of CFC2's tested income; and USS3's aggregate tested income is $600x, its pro rata share (within the meaning of § 1.951A–1(d)(2)) of CFC4's tested income. Therefore, under paragraph (e)(6) of this section, the P consolidated group's consolidated group tested income is $800x ($200x + $600x). As a result, the GILTI allocation ratios of USS1, USS2, and USS3 are 0 ($0/$800x), 0.25 ($200x/$800x), and 0.75 ($600x/$800x), respectively.

(B) *Consolidated group tested loss.* Under paragraph (e)(7) of this section, the P consolidated group's consolidated group tested loss is $300x ($100x + $200x), the aggregate of USS1's aggregate tested loss, which is equal to its pro rata share (within the meaning of § 1.951A–1(d)(4)) of CFC1's tested loss ($100x), and USS3's aggregate tested loss, which is equal to its pro rata share (within the meaning of § 1.951A–1(d)(4)) of CFC3's tested loss ($200x). Under paragraph (e)(3)(iii) of this section, a member's allocable share of the consolidated group tested loss is the product of the consolidated group tested loss of the member's consolidated group and the member's GILTI allocation ratio. Therefore, the allocable shares of the consolidated group tested loss of USS1, USS2, and USS3 are $0 (0 × $300x), $75x (0.25 × $300x), and $225x (0.75 × $300x), respectively.

(C) *Calculation of net CFC tested income.* Under paragraph (e)(12) of this section, a member's net CFC tested income is the excess (if any) of the member's aggregate tested income over the member's allocable share of the consolidated group tested loss. As a result, USS1's, USS2's, and USS3's net CFC tested income amounts are $0 ($0 − $0), $125x ($200x − $75x), and $375x ($600x − $225x), respectively.

(2) *Example 2: Calculation of net CFC tested income within a consolidated group when ownership of a tested loss CFC is split between members*— (i) *Facts.* The facts are the same as in paragraph (i) of *Example 1,* except that USS2 and USS3 each own 50% of the single class of stock of CFC3.

(ii) *Analysis.* As in paragraph (ii) of *Example 1,* USS1 has no aggregate tested income and a GILTI allocation ratio of 0, USS2 has $200x of aggregate tested income and a GILTI allocation ratio of 0.25, and USS3 has $600x of aggregate tested income and a GILTI allocation ratio of 0.75. Additionally, the P consolidated group's consolidated group tested loss is $300x (the aggregate of USS1's aggregate tested loss, which is equal to its pro rata share (within

the meaning of § 1.951A–1(d)(4)) of CFC1's tested loss ($100x); USS2's aggregate tested loss, which is equal to its pro rata share (within the meaning of § 1.951A–1(d)(4)) of CFC3's tested loss ($100x); and USS3's aggregate tested loss, which is equal to its pro rata share (within the meaning of § 1.951A–1(d)(4)) of CFC3's tested loss ($100x)). As a result, under paragraph (e)(12) of this section, as in paragraph (ii)(C) of *Example 1,* USS1's, USS2's, and USS3's net CFC tested income amounts are $0 ($0—$0), $125x ($200x—$75x), and $375x ($600x—$225x), respectively.

(3) *Example 3: Calculation of GILTI inclusion amount*— (i) *Facts.* The facts are the same as in paragraph (i) of *Example 1,* except that CFC2 and CFC4 have qualified business asset investment of $500x and $2000x, respectively, for Year 1. In Year 1, CFC1 and CFC4 each have tested interest expense (within the meaning of § 1.951A–4(b)(1)) of $25x, and CFC1, CFC2, CFC3, and CFC4 have $0 of tested interest income (within the meaning of § 1.951A–4(b)(2)). CFC1's tested loss of $100x and CFC4's tested income of $600x take into account the interest paid.

(ii) *Analysis*—(A) *GILTI allocation ratio.* As in paragraph (ii) of *Example 1,* the GILTI allocation ratios of USS1, USS2, and USS3 are 0 ($0/$800x), 0.25 ($200x/$800x), and 0.75 ($600x/$800x), respectively.

(B) *Consolidated group QBAI.* Under paragraph (e)(4) of this section, the P consolidated group's consolidated group QBAI is $2,500x ($500x + $2,000x), the aggregate of USS2's pro rata share (determined under § 1.951A–1(d)(3)) of the qualified business asset investment of CFC2 and USS3's pro rata share (determined under § 1.951A–1(d)(3)) of the qualified business asset investment of CFC4. Under paragraph (e)(3)(i) of this section, a member's allocable share of the consolidated group QBAI is the product of the consolidated group QBAI of the member's consolidated group and the member's GILTI allocation ratio. Therefore, the allocable shares of the consolidated group QBAI of each of USS1, USS2, and USS3 are $0 (0 × $2,500x), $625x (0.25 × $2,500x), and $1,875x (0.75 × $2,500x), respectively.

(C) *Consolidated group specified interest expense*—(1) *Pro rata share of tested interest expense.* USS1's pro rata share of the tested interest expense of CFC1 is $25x, the amount by which the tested interest expense increases USS1's pro rata share of CFC1's tested loss (from $75x to $100x) for Year 1. USS3's pro rata share of the tested interest expense of CFC4 is also $25x, the amount by which the tested interest expense decreases USS1's pro rata share of CFC4's tested income (from $625x to $600x). See § 1.951A–1(d)(5).

(2) *Consolidated group specified interest expense.* Under paragraph (e)(5) of this section, the P consolidated group's consolidated group specified interest expense is $50x, the excess of the sum of each member's pro rata share of the tested interest expense of each controlled foreign corporation ($50x, $25x from USS1 + $25x from USS3), over the sum of each member's pro rata share of tested interest income ($0). Under paragraph (e)(3)(ii) of this section, a

member's allocable share of consolidated group specified interest expense is the product of the consolidated group specified interest expense of the member's consolidated group and the member's GILTI allocation ratio. Therefore, the allocable shares of consolidated group specified interest expense of USS1, USS2, and USS3 are $0 (0 × $50x), $12.50x (0.25 × $50x), and $37.50x (0.75 × $50x), respectively.

(D) *Calculation of deemed tangible income return.* Under paragraph (e)(9) of this section, a member's deemed tangible income return means 10 percent of the member's allocable share of the consolidated group QBAI. As a result, USS1's, USS2's, and USS3's deemed tangible income returns are $0 (0 − $0), $62.50x (0.1 − $625x), and $187.50x (0.1 − $1,875x), respectively.

(E) *Calculation of net deemed tangible income return.* Under paragraph (e)(13) of this section, a member's net deemed tangible income return means the excess (if any) of a member's deemed tangible income return over the member's allocable share of the consolidated group specified interest. As a result, USS1's, USS2's, and USS3's net deemed tangible income returns are $0 ($0 − $0), $50x ($62.50x − $12.50x), and $150x ($187.50x − $37.50x), respectively.

(F) *Calculation of GILTI inclusion amount.* Under paragraph (b) of this section, a member's GILTI inclusion amount for a U.S. shareholder inclusion year is the excess (if any) of the member's net CFC tested income for the U.S. shareholder inclusion year, over the shareholder's net deemed tangible income return for the U.S. shareholder inclusion year. As described in paragraph (ii)(C) of *Example 1,* the amounts of USS1's, USS2's, and USS3's net CFC tested income are $0, $125x, and $375x, respectively. As described in paragraph (ii)(E) of this *Example 3,* the amounts of USS1's, USS2's, and USS3's net deemed tangible income return are $0, $50x, and $150x, respectively. As a result, under paragraph (b) of this section, USS1's, USS2's, and USS3's GILTI inclusion amounts are $0 ($0 − $0), $75x ($125x − $50x), and $225x ($375x − $150x), respectively.

(G) *Calculation of used tested loss amount and offset tested income amount.* As described in paragraph (ii)(A) of *Example 1,* P consolidated group's consolidated group tested income is $800x. As described in paragraph (ii)(B) of *Example 1,* P consolidated group's consolidated group tested loss is $300x. Therefore, the P consolidated group's consolidated group tested income exceeds its consolidated group tested loss. As a result, USS1 has a $100x used tested loss amount with respect to CFC1 and USS2 has a $200x used tested loss amount with respect to CFC3. Additionally, USS2 has a $75x offset tested income amount with respect to CFC2 ($200x x $300x/$800x) and USS3 has a $225x offset tested income amount with respect to CFC3 ($600x x $300x/$800x). See paragraph (c) of this section. P will adjust its basis in USS1 and USS2 pursuant to the rule in § 1.1502–32(b)(3)(iii)(C).

(g) *Applicability date.* This section applies to taxable years of foreign corporations beginning after December

31, 2017, and to taxable years of United States shareholders in which or with which such taxable years of foreign corporations end.

■ **Par. 15.** Section 1.6038–2 is amended by:

■ 1. Revising the section heading.
■ 2. Revising the first sentence in paragraph (a).
■ 3. Revising paragraph (m).

The revisions read as follows:

### § 1.6038–2   Information returns required of United States persons with respect to annual accounting periods of certain foreign corporations.

(a) *Requirement of return.* Every U.S. person shall make a separate annual information return with respect to each annual accounting period (described in paragraph (e) of this section) of each foreign corporation which that person controls (as defined in paragraph (b) of this section) at any time during such annual accounting period. * * *

\*    \*    \*    \*    \*

(m) *Applicability dates.* This section applies to taxable years of foreign corporations beginning on or after October 3, 2018. See 26 CFR 1.6038–2 (revised as of April 1, 2018) for rules applicable to taxable years of foreign corporations beginning before such date.

■ **Par. 16.** Section 1.6038–5 is added to read as follows:

### § 1.6038–5   Information returns required of certain United States persons to report amounts determined with respect to certain foreign corporations for global intangible low-taxed income (GILTI) purposes.

(a) *Requirement of return.* Except as provided in paragraph (d) of this section, each United States person who is a United States shareholder (as defined in section 951(b)) of any controlled foreign corporation must make an annual return on Form 8992, ''U.S. Shareholder Calculation of Global Intangible Low-Taxed Income (GILTI),'' (or successor form) for each U.S. shareholder inclusion year (as defined

in § 1.951A–1(e)(4)) setting forth the information with respect to each such controlled foreign corporation, in such form and manner, as Form 8992 (or successor form) prescribes.

(b) *Time and manner for filing.* Returns on Form 8992 (or successor form) required under paragraph (a) of this section for a taxable year must be filed with the United States person's income tax return on or before the due date (taking into account extensions) for filing that person's income tax return.

(c) *Failure to furnish information*—(1) *Penalties.* If any person required to file Form 8992 (or successor form) under section 6038 and this section fails to furnish the information prescribed on Form 8992 within the time prescribed by paragraph (b) of this section, the penalties imposed by section 6038(b) and (c) may apply.

(2) *Increase in penalty.* If a failure described in paragraph (c)(1) of this section continues for more than 90 days after the date on which the Director of Field Operations, Area Director, or Director of Compliance Campus Operations mails notice of such failure to the person required to file Form 8992, such person shall pay a penalty of $10,000, in addition to the penalty imposed by section 6038(b)(1), for each 30-day period (or a fraction of) during which such failure continues after such 90-day period has expired. The additional penalty imposed by section 6038(b)(2) and this paragraph (c)(2) shall be limited to a maximum of $50,000 for each failure.

(3) *Reasonable cause*—(i) For purposes of section 6038(b) and (c) and this section, the time prescribed for furnishing information under paragraph (b) of this section, and the beginning of the 90-day period after mailing of notice by the director under paragraph (c)(2) of this section, shall be treated as being not earlier than the last day on which reasonable cause existed for failure to furnish the information.

(ii) To show that reasonable cause existed for failure to furnish information as required by section 6038 and this section, the person required to report such information must make an affirmative showing of all facts alleged as reasonable cause for such failure in a written statement containing a declaration that it is made under the penalties of perjury. The statement must be filed with the director where the return is required to be filed. The director shall determine whether the failure to furnish information was due to reasonable cause, and if so, the period of time for which such reasonable cause existed. In the case of a return that has been filed as required by this section except for an omission of, or error with respect to, some of the information required, if the person who filed the return establishes to the satisfaction of the director that the person has substantially complied with this section, then the omission or error shall not constitute a failure under this section.

(d) *Exception from filing requirement.* Any United States person that does not own, within the meaning of section 958(a), stock of a controlled foreign corporation in which the United States person is a United States shareholder for a taxable year is not required to file Form 8992. For this purpose, a U.S. shareholder partner (as defined in § 1.951A–5(e)(3)) with respect to a partnership CFC (as defined in § 1.951A–5(e)(2)) is treated as owning, within the meaning of section 958(a), stock of the partnership CFC.

(e) *Applicability date.* This section applies to taxable years of controlled foreign corporations beginning on or after October 3, 2018.

**Kirsten Wielobob,**
*Deputy Commissioner for Services and Enforcement.*

[FR Doc. 2018–20304 Filed 10–3–18; 4:15 pm]
**BILLING CODE 4830–01–P**